UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF LOUISIANA


* * * * * * * * * * * * * * * * * * * * * * *

ANTHONY MINNIS                      CIVIL ACTION
                                    NO. 13-5-BAJ-RLB
VS.

BOARD OF SUPERVISORS,
ET AL

* * * * * * * * * * * * * * * * * * * * * * *



DEPOSITION OF JOSEPH ALLEVA, taken on
Wednesday, April 9, 2014, at the Law
Offices of Taylor, Porter, Brooks &
Phillips, 451 Florida Street, 8th Floor,
Baton Rouge, Louisiana



REPORTED BY:  TAMRA K. KENT, CCR, Retired RPR
Court Reporters of Louisiana, LLC
9614 Brookline Avenue, Suite A
Baton Rouge, Louisiana 70835
(225)201-9650 Office * (225)201-9651 Fax

JOSEPH ALLEVA                                    4/9/2014

```
1                    I N D E X
2
3                                           Page
4      Caption                               1
5      Appearances                           3
6      Agreement of Counsel                  4
7      Examination
8          BY MS. CRAFT                      5
9
10     Witness' Signature Page              125
11
12     Reporter's Certificate               126
13
14                 *    *    *    *    *
15     Exhibits:
16     No. 31.....  3/12 E-mail chain........  60
17     No. 32.....  EEOC Charges.............  69
18
19
20
21
22
23
24
25
```

```
 1    APPEARANCES:
 2    Representing the Plaintiff:
 3        JILL L. CRAFT
          Attorneys at Law
 4        509 St. Louis Street
          Baton Rouge, Louisiana 70802
 5
          BY:  MS. JILL L. CRAFT
 6
 7
      Representing the Defendant:
 8
          TAYLOR, PORTER, BROOKS & PHILLIPS
 9        Attorneys at Law
          451 Florida Boulevard, Eighth Floor
10        Baton Rouge, Louisiana 70802
11        BY:  MR. ROBERT W. BARTON
               MS. VICKI CROCHET
12
13
14
      Also present:  Mr. Anthony Minnis
15                    Ms. Miriam Segar
16
17
18    Reported by: Tamra K. Kent,
                    Certified Court Reporter
19                  In and for the State of
                    Louisiana.
20
21
22
23
24
25
```

Page 4

```
 1              S T I P U L A T I O N

 2              IS STIPULATED AND AGREED by and among

 3    Counsel that the testimony of the witness, JOSEPH

 4    ALLEVA, is hereby being taken pursuant to Notice

 5    under the Federal Rules of Civil Procedure for all

 6    purposes permitted under law.

 7

 8              The witness reserves the right to read and

 9    sign the deposition.  The original is to be

10    delivered to and retained by Jill L. Craft,

11    Attorney, for proper filing with the Clerk of

12    Court.

13

14              All objections, except those as to the

15    form of the questions and/or responsiveness of the

16    answers, are reserved until the time of the trial

17    of this cause.

18

19                    *   *   *   *   *

20

21              Tamra K. Kent, Certified Court Reporter in

22    and for the State of Louisiana, officiated in

23    administering the oath to the witness.

24

25
```

```
 1              JOSEPH ALLEVA, having been first duly
 2    sworn, was examined and testified as follows:
 3                      EXAMINATION
 4              (Commencing at 10:15 a.m.)
 5         MS. CRAFT:
 6              We are reserving all objections except
 7         as to form of the question, responsiveness
 8         of the answer.
 9              Off the record we did discuss the names
10         of students and information which is
11         subject to various Protective Orders
12         already entered by the judge in this case,
13         which may be in this deposition record.
14              We all agree, obviously, to stand by
15         the Protective Orders and will avoid any
16         inadvertent publication outside the
17         parameters of the Orders.
18    BY MS. CRAFT:
19      Q.  Mr. Avella, my name is Jill Craft and I
20    represent Tony Minnis seated to my left.  It is very
21    important during the course of this deposition that
22    you understand what I'm asking you.  And if at any
23    time you do not, just tell me to stop and rephrase
24    it, and I will be happy to.
25              It's also important that nods of the head
```

 1    yes or no cannot be taken down by the court

 2    reporter, so you need to make sure that you answer

 3    out loud.

 4           And my final instruction is rather unique to

 5    me insofar as I may ask you to spell names, places

 6    or things.  I'm not here to test your spelling but

 7    it's a lot easier for the reporter to get those down

 8    as we go along than to figure out later what we're

 9    talking about.  Is that fair enough?

10    A.  Okay.

11    Q.  Can you give me your full name and address,

12    please, sir.

13    A.  My name is Joseph Lewis Avella.

14        My home address?

15    Q.  Sure.

16    A.  14719 Memorial Tower Drive, Baton Rouge.

17    Q.  And can you walk me through your educational

18    background, sir, starting with where and when you

19    graduated high school, please.

20    A.  I graduated high school from Suffern High

21    School in Suffern, New York.

22    Q.  Can you spell that, please?

23    A.  S-U-F-F-E-R-N.

24    Q.  Okay.

25    A.  I went to Lehigh University in Pennsylvania

```
 1    and got a Bachelor's Degree in finance.  And then I
 2    stayed there and got an MBA from Lehigh University.
 3         Q.  When did you get your Bachelor's Degree?
 4         A.  In 1975.
 5         Q.  And your MBA?
 6         A.  In 1976.
 7         Q.  Any other education?
 8         A.  Uh-uh.
 9         Q.  I'm sorry.  You have to answer out loud.  Is
10    that a no?
11         A.  No.
12         Q.  Have you given any depositions before?
13         A.  I have.
14         Q.  And how many have you done?
15         A.  One.
16         Q.  And in conjunction with what?
17         A.  The Duke lacrosse case.
18         Q.  I don't want to know a whole lot about what
19    happened in the Duke lacrosse case specifically.
20             But am I correct that you were the Athletic
21    Director at Duke University at the time there were
22    some allegations involving some male lacrosse
23    players?
24         A.  Yes.
25         Q.  And how long had you been at Duke
```

1    University?

2         A.   I worked at Duke for a total of 32 years.

3         Q.   From when to when?

4         A.   From 1976 to 2008.

5         Q.   And the entire time, were you always in the

6    Athletic Department or a different --

7         A.   -- no.

8         Q.   -- entities?

9              Walk me through kind of what your tenure

10   with the school was.

11        A.   I started as an intern working for the

12   controller of the university.  Then I became the

13   Business Manager for the dining halls.  Then I

14   became the Business Manager for the pharmacy in the

15   hospital.  And then I became the Business Manager

16   for the Athletic Department.

17        Q.   And when did you take that role?

18        A.   Let's see, approximately 1980, I would

19   guess.  I guess it was around 1980, '80 or '81.

20        Q.   And then what did you do?

21        A.   I was Business Manager for a long time.  I

22   was head of fundraising for a while.  And then in

23   1998, I believe, I became Athletic Director.

24        Q.   For the ten years you were Athletic Director

25   at Duke University, did you ever hire an African-

1    American head coach?

2        A.   No.

3        Q.   And you have been at LSU since 2008; is that

4    correct?

5        A.   Uh-huh.

6        Q.   I'm sorry?

7        A.   Yes, yes.

8        Q.   And since you arrived at LSU in 2008 -- and

9    my math is terrible this morning -- but in the six

10   years you have been here, or thereabouts, have you

11   hired an African-American head coach?

12       A.   Three.

13       Q.   Okay, who?

14       A.   Trent Johnson.

15       Q.   For basketball?

16       A.   Yeah.

17       Q.   All right.

18       A.   Johnny Jones.

19       Q.   For?

20       A.   Basketball.

21            And Nikki Caldwell for women's basketball.

22       Q.   Trent Johnson is no longer here; is that

23   correct?

24       A.   Correct.

25       Q.   And when did he leave?

```
 1        A.   Two years ago about, I would imagine.
 2        Q.   And Johnny Jones replaced him; is that
 3   correct?
 4        A.   Uh-huh.
 5        Q.   Is that yes?
 6        A.   Yes.
 7        Q.   And Miss Caldwell, she came here when?
 8        A.   About three years ago.
 9        Q.   Okay.  Now, you are familiar, are you not,
10   with Mr. Minnis seated to my left; is that correct?
11        A.   Yes.
12        Q.   And was he already here as a head coach when
13   you arrived?
14        A.   Yes.
15        Q.   Can you describe the first interaction, if
16   you will, that you had with Tony?
17        A.   I don't really recall it, to be honest with
18   you.
19        Q.   Well, he was here.  Did you have a lot of
20   interaction with him?
21        A.   Not -- not a whole lot.
22        Q.   Okay.  Did you have not a whole lot of
23   interaction with all of your head coaches, or just a
24   few of them?
25        A.   I have people that my head coaches report
```

JOSEPH ALLEVA

1    to.

2        Q.  Okay.  So is that an answer of, I don't have

3    interactions, Jill, with a lot of coaches here or --

4        A.  -- I don't have interaction with a lot of

5    the coaches, no.

6        Q.  Are there some coaches that you do have a

7    lot of interaction with?

8        A.  Les Miles.

9        Q.  Okay.  Anybody else?

10       A.  Not any more and not any extraordinary

11   contact, no.  You know, not one out of proportion

12   with the other I would say.  No.

13       Q.  And you said you have people to whom these

14   coaches refer to that report to you; is that

15   correct?

16       A.  Correct.

17       Q.  So who was the person or people to whom

18   Mr. Minnis reported on your watch that would then

19   report to you?

20       A.  Eddie Nunez and Miriam Segar.

21       Q.  And what was Miss Segar's job?  And if it

22   has been the same, tell me that.  And if it hasn't,

23   then tell me that, too.

24       A.  Her job is Senior Women's Administrator and

25   Senior Associate Athletic Director.

```
 1        Q.   And what about Mr. Nunez, sir?
 2        A.   He's a Senior Associate Athletic Director.
 3        Q.   Is there anybody else who is a Senior
 4   Athletic Director other than those two?
 5        A.   Yes.
 6        Q.   Who is that?
 7        A.   Mark Ewing, Verge Ausberry, Bo Bahnsen --
 8        Q.   -- wait, you are going a little too fast for
 9   her and me.
10             Ausberry is A-U-S-B-E-R-R-Y; is that
11   correct?
12        A.   Uh-huh.
13        Q.   Yes?
14        A.   Yes.
15        Q.   And then Bo Bahnsen, B-A-H-N-S-E-N?
16        A.   Yes.
17        Q.   Any others?
18        A.   Mark Ewing, did you get him?
19        Q.   Got him.
20        A.   Okay.
21        Q.   Do those three individuals have different
22   areas of responsibility?
23        A.   Yes.
24        Q.   What does Mark Ewing do?
25        A.   He's our Chief Financial Officer.
```

```
 1        Q.  And Mr. Ausberry?

 2        A.  He has a variety of roles.  I use him as

 3   liaison with football.  He's the liaison with the

 4   training room, with the strength staff.  Handles a

 5   lot of external activities.

 6        Q.  Like what?

 7        A.  External relations with donors, with

 8   legislators, things like that.

 9        Q.  And Mr. Bahnsen, what does he do?

10        A.  He's head of Compliance.

11        Q.  Do you know how long Mr. Bahnsen has been

12   the head of Compliance?  And that's NCAA Compliance;

13   is that correct?

14        A.  Yes.

15        Q.  Do you know how long he has been the head of

16   NCAA Compliance at LSU?

17        A.  No, not exactly how long.  But he was the

18   head of Compliance prior to me getting here.  Then

19   he got out of Compliance for a while.  And then I

20   got here, and I brought him back into Compliance.

21        Q.  Do you know if there was a period of time

22   when LSU did not have a head of NCAA Compliance,

23   like the position?

24        A.  Did not have a head?

25            MR. BARTON:
```

JOSEPH ALLEVA

```
 1              Like, in its history?
 2         MS. CRAFT:
 3              Yes.
 4         THE WITNESS:
 5              I don't know.
 6    BY MS. CRAFT:
 7         Q.  Do you know if there were any significant
 8    NCAA compliance issues LSU experienced in the late
 9    '90s or 2000?
10         A.  I haven't gone back and studied the
11    history, no.
12         Q.  Were you aware of any issues, whether you
13    have heard about them, or anything like that?
14         A.  I'm not aware of them.
15         Q.  Has LSU, since you have been here, in 2008,
16    suffered any NCAA sanctions?
17         A.  Yes.
18         Q.  For?
19         A.  We suffered some in football.
20         Q.  When?
21         A.  I can't recall the exact date.
22         Q.  Do you remember what the underlying
23    violation was?
24         A.  We had a coach that -- we had a coach that
25    handled a recruit in the wrong manner, an assistant
```

```
 1   coach that handled the recruit in an improper

 2   manner.  That coach was dismissed from the

 3   university.

 4        Q.  Any others NCAA violations since you have

 5   been here?

 6        A.  I would -- we have had, I would say,

 7   numerous minor, secondary violations.

 8        Q.  What is a secondary violation?

 9        A.  There's a whole NCAA manual about two

10   inches thick that has the rules.  And if you don't

11   follow one of those rules, it is either a major

12   violation or a secondary violation.

13        Q.  Would it be fair to say in the NCAA

14   violation rules, that secondary violations are ones

15   that are not going to have a significant punishment

16   attached to them?

17        A.  Correct.

18        Q.  Now, you said you have had numerous

19   secondary violations since you have been here.  In

20   what programs?

21        A.  I would say in most of our programs.  I

22   don't know exactly which ones, but I would say that

23   the preponderance of our programs have had at least

24   one secondary violation over the course of time.

25        Q.  Do y'all at LSU keep track of those?
```

1       A.   Absolutely.  We can -- a better person to

2   ask that question would be Bo Bahnsen when you talk

3   to him.

4       Q.   Has women's soccer, for example, had any

5   secondary NCAA violations to your knowledge?

6       A.   I would assume they have.  I can't tell you

7   what they are specifically.

8       Q.   I don't want you to assume.  If you know,

9   fine.  If you don't know, say, "I don't know."

10      A.   I don't know.

11      Q.   Okay.

12      A.   But I don't know.

13      Q.   Do you have a recollection of somebody

14  discussing with you a secondary violation reported

15  to the NCAA in women's soccer?

16      A.   Not to my recollection.  But that doesn't

17  -- not to my recollection.

18      Q.   I understand that doesn't mean, you can't

19  recall, and that's fine with me.

20      A.   Right, right.

21      Q.   Now, are you aware of LSU having a history

22  as it relates to failing to comply with Title 9?

23          MR. BARTON:

24              Objection to the form.

25          MS. CRAFT:

```
 1                  Subject to that, you can answer it.

 2           THE WITNESS:

 3                  I have a little knowledge of that

 4           history, yeah, why we added some sports,

 5           some women's sports, so that we would

 6           comply with Title 9, yes.

 7    BY MS. CRAFT:

 8      Q.   Tell me what you understand that history to

 9    be.  And I'm not going to hold you to what the court

10    said or anything else; just in general terms.

11      A.   Generally, we were not in compliance with

12    Title 9.  I believe we added soccer and softball, I

13    think.  At least those two, anyway.

14      Q.   Do you have an understanding that that

15    non-compliance actually was an issue for the courts?

16      A.   Yes, I do know it went to the courts.

17      Q.   And the courts had to intervene at some

18    point?

19      A.   Yes, I know that.

20      Q.   And is it your understanding that that was

21    in -- sometime in the mid '90sish?

22      A.   Yes.

23      Q.   And I also understood -- and correct me if

24    I'm wrong -- that women's soccer was one of the

25    programs that developed as a result of those, of
```

1    that court issue; am I correct?

2         A.  Yes.

3         Q.  And how many coaches of women's soccer have

4    there been at LSU?

5         A.  Since I have been here, I think only one.

6    I don't -- only one since I have been here.

7         Q.  And that's Mr. Lee; is that correct?

8         A.  Correct.

9         Q.  Now, with respect to Mr. Minnis, were you

10   aware at any time while he was employed of any

11   concerns he had regarding his salary?

12        A.  Yes.

13        Q.  What can you tell me about that?

14        A.  Only that he voiced concerns about his

15   salary.

16        Q.  Did he ever voice those concerns to you?

17        A.  Yes.

18        Q.  And what did he tell you?

19        A.  I don't exactly recall what he told me.

20   But I believe it was that he was not compensated,

21   in his opinion, fairly.

22        Q.  When he expressed -- and "he" being

23   Mr. Minnis -- expressed he was not compensated

24   fairly, what, if anything, did you do?

25        A.  I investigated his salary in relation to

Case 3:13-cv-00005-BAJ-RLB    Document 59-6    05/15/14    Page 19 of 127

```
 1    other coaches in the SEC.
 2         Q.   And did you do that personally?
 3         A.   Mark Ewing did it.
 4         Q.   So did you task Mark Ewing with that chore?
 5         A.   Yes.
 6         Q.   And what did Mr. Ewing report to you, if
 7    anything?
 8         A.   He reported back to me.  Mark Ewing would
 9    contact his counterparts at other schools and get
10    what the salaries of the other tennis coaches were.
11    And he reported that back to me.
12         Q.   Was that some sort of document?
13         A.   I don't recall, but it might have been.
14         Q.   And when he reported back -- by the way,
15    when was this?  Just a timeframe.
16         A.   I don't recall.
17         Q.   What about a year?
18         A.   I honestly don't recall what year.
19    Somewhere in the last five years.
20         Q.   Do you remember, in general terms, what it
21    was Mark Ewing concluded or found out or anything?
22         A.   He would -- he told me the salaries,
23    whether -- I don't remember if it was on a list.
24    It probably was on a list.  And I evaluated those
25    salaries and felt like Mr. Minnis was paid
```

1    according -- fairly.

2         Q.  Based on what?

3         A.  Based on his record as a coach and the way

4    he ran his program.

5         Q.  What about the way he ran his program?

6         A.  My evaluation of the way he ran his

7    program.

8         Q.  Like what?

9         A.  Well, his winning record, his ability to

10   recruit, his ability to develop athletes and make

11   them better, the quality of the experience that the

12   young ladies had in his program.

13        Q.  Okay.  You told me four things.  His winning

14   record, his ability to recruit, his ability to

15   develop players.  And then you said the experience

16   by his players in the program?

17        A.  The quality of the experience of the

18   players in his program.

19        Q.  Okay.  So what do you mean by that, the

20   quality of the experience?

21        A.  Just what I said.

22        Q.  I'm trying to understand.  Is that a good

23   thing, a bad thing?  What are you looking for?

24        A.  It could be a very good thing, or it could

25   be a very bad thing.

JOSEPH ALLEVA                                    4/9/2014

```
 1       Q.  So what was the quality of the experience of
 2   the players in the women's tennis program?
 3       A.  In my opinion and in my evaluation and the
 4   evaluation of my staff, it was below average.
 5       Q.  Based on what?
 6       A.  Based on what?
 7       Q.  Yes.
 8       A.  Based on the experience that the young
 9   ladies had, and in conversation with the young
10   ladies.
11       Q.  Okay.  Did you have any conversations with
12   any of the young ladies?
13       A.  I had a conversation with a parent of a
14   young lady.
15       Q.  Who?
16       A.  To be honest with you, I forget the
17   person's name at this time.  I could research it
18   and come up with that name.
19       Q.  Sure.
20           And it was a parent of a women's tennis
21   player?
22       A.  Yes.
23       Q.  What year was this?
24       A.  I don't remember the year.
25       Q.  Okay.  So what was the gist of this
```

```
 1    conversation?

 2        A.  The unhappiness of that young -- of that

 3    parent with the experience the young lady was

 4    having.

 5        Q.  Did this parent say why?

 6        A.  It was because of the treatment in the --

 7    the treatment of Coach Minnis.

 8        Q.  Like what?

 9        A.  For the most part, how he was harassing

10    her.

11        Q.  Harassing her how?

12        A.  Harassing her with text messages all the

13    time, trying to control all of her behavior,

14    setting curfews when she had to -- when she had to

15    be in her room, et cetera, et cetera.

16        Q.  I need the "et cetera."

17        A.  I mean, that's -- that's it.  Those are the

18    basics of it.

19        Q.  So are you telling me there's something

20    wrong with an NCAA Division 1 coach setting curfews

21    for their players?

22        A.  When it's 8 o'clock at night.

23        Q.  So the answer is yes, there's something

24    wrong with it?

25        A.  Yes, 8 o'clock at night.  She couldn't even
```

```
 1    go to the library.
 2        Q.  And it was your understanding from this
 3    parent that the 8 o'clock at night curfew related to
 4    game prep or match prep?
 5        A.  No, this was every day.
 6        Q.  Every day.  And did you ever verify that
 7    with the student?
 8        A.  No.
 9        Q.  Did you ever verify that with Mr. Minnis?
10        A.  No.
11        Q.  Did you ever contact Mr. Minnis and say,
12    Hey, a parent of one of your players has spoken to
13    me and these are the concerns they expressed.
14    What's your side?
15        A.  No.
16        Q.  Why not?
17        A.  I had other people with me in the room at
18    that time, while we were talking to the parent,
19    people that Mr. Minnis reports to.
20        Q.  Who?
21        A.  Miriam Segar.
22        Q.  And who else?
23        A.  And I believe that Eddie Nunez was in the
24    room, too.
25        Q.  So this was a prearranged meeting with this
```

```
 1   parent?

 2        A.  He asked for the meeting.

 3        Q.  I'm sorry?

 4        A.  The parent called the meeting.

 5        Q.  Okay.  And when parents call you for a

 6   meeting, sir, to have an issue or talk about one of

 7   their kids playing on a program at LSU, do you

 8   always take the meetings?

 9        A.  Yes.

10        Q.  Are you sure about that, sir, that you

11   always take the meetings when a parent of a student

12   athlete at LSU calls about concerns with the coach?

13        A.  If they -- it's my recollection if they

14   call my office directly and I feel like that

15   there's -- yes.  I mean, I can't -- I cannot recall

16   right now a parent that I have denied a meeting.

17        Q.  How about some of the parents of the women's

18   soccer players?

19        A.  I have met with some of the parents of the

20   women's soccer players.  And I know Miss Segar has

21   met with some, too.

22        Q.  So do you have a recollection of turning

23   down the meeting or meetings with some of the

24   parents of the former women's soccer players at LSU

25   with concerns about Brian Lee?
```

JOSEPH ALLEVA

4/9/2014

```
 1        A.   I met with some of the parents.
 2        Q.   I know you did.
 3        A.   Oh, and --
 4        Q.   -- but did you also turn down some of the
 5   other ones?
 6        A.   I do not recollect turning them down, no.
 7        Q.   Okay.  So you had this conversation with one
 8   parent which you recall it being they had some
 9   unhappiness, their kid had some unhappiness with
10   Mr. Minnis; they felt Mr. Minnis was harassing with
11   text messages.
12             Do you have a gist of what kind of text
13   messages?
14        A.   The text messages were basically asking,
15   What are you doing?  Where are you going?  Just
16   constant asking questions like that.
17        Q.   So kind of micromanaging, maybe?
18        A.   Good term.
19        Q.   Not anything inappropriate; just
20   micromanaging?
21        A.   Agreed.
22        Q.   And then you said trying to control.  And
23   that would be text messages, curfew, that kind of
24   stuff?
25        A.   Uh-huh.
```

```
 1      Q.  Yes?  I'm sorry.

 2      A.  Yes, yes.

 3      Q.  Okay.  And then after you had this

 4  conversation with this parent, with Miss Segar and

 5  perhaps Mr. Nunez present in the room, what, if

 6  anything, did you do?

 7      A.  We just took note of it.  We took note of

 8  it.

 9      Q.  Did you make notes, or did anybody in the

10  room make notes?

11      A.  I believe so.  I did not take notes, but I

12  believe maybe someone else did.

13      Q.  Okay.  And we were talking about that in

14  terms of your evaluation that Mr. Minnis' salary

15  that he was receiving was not unfair, you said that

16  you had met with one parent in terms of this quality

17  of experience of players.

18          Had some other folks on your staff met with

19  players or parents or anything?

20      A.  Yes.

21      Q.  Who?

22      A.  I believe Miriam Segar has -- had met with

23  other players.

24      Q.  Under what circumstances?

25      A.  What do you mean?
```

1        Q.  Well, was it your understanding that Miss

2    Segar actually sought out these players, or that

3    these players came to her?

4        A.  I think they came to her.

5        Q.  Is that a guess on your part?

6        A.  That's a guess.

7        Q.  All right.

8        A.  But her job is to -- the welfare of our

9    student athletes, and it's not uncommon for her to

10   interview students from all of our sports.

11       Q.  You said the other factor was the ability to

12   develop players.  What was Mr. Minnis doing with

13   respect to developing players?  Or not doing?

14       A.  Well, it was obvious they weren't getting

15   better because the record of the team never got

16   better.

17       Q.  Obvious to whom?

18       A.  To me.

19       Q.  Well, didn't he make the NCAA tournament in

20   2012?

21       A.  Yes, he did.

22       Q.  But he hadn't made it in '11 and '10?

23       A.  His record was not indicative of what an

24   LSU coach should be.

25       Q.  Talk about his replacement.

```
 1        A.  Uh-huh.

 2        Q.  As I understand it, and I could be wrong, in

 3   the last two tennis seasons, she's only won three

 4   SEC matches.

 5             Is that indicative of what an LSU coach

 6   should be?

 7        A.  Absolutely not.  But she inherited a very

 8   talent-poor team.  There was not much talent on

 9   that team that she inherited.  And it would take

10   her some time to build up the recruiting that was

11   lacking in the past.

12        Q.  You said she inherited a talent-poor team.

13   But it was a team that made the NCAA final; do I

14   have that right?

15        A.  No.

16             MR. BARTON:

17                  No.

18   BY MS. CRAFT:

19        Q.  Sorry.  Made the NCAA tournament?

20        A.  Right.

21        Q.  And how many of those people on that team

22   chose not to return because of Miss Sells?

23        A.  I have no idea.

24        Q.  Okay.  How many quit the team after Miss

25   Sells came in?
```

```
 1        A.   I have no idea.

 2        Q.   Did you ever ask anybody?

 3        A.   I have talked to Miss Segar about that,

 4   yes.

 5        Q.   And has she, to your knowledge, interviewed

 6   any of those kids from the last two seasons to find

 7   out if they are happy, unhappy, have a quality

 8   experience, anything like that, to your knowledge?

 9        A.   You will have to ask her that.

10        Q.   And you said the ability to recruit.  What

11   does that mean?  Like, he wasn't doing a recruiting

12   job, or what?

13        A.   The ability to recruit top-quality athletes

14   to compete at the highest level, he was not doing

15   that.

16        Q.   How do you know that?

17        A.   Our record.

18        Q.   Well, it's true, is it not, that LSU at one

19   point in time had the number-one recruit in the

20   country, right, on Mr. Minnis' watch?

21        A.   And she never got any better.  In fact, she

22   got worse as she stayed here.

23        Q.   Says who?

24        A.   Her record.

25        Q.   Did you go back and look at her record?
```

1        A.  Yeah, it's -- well, first, who are you

2    referring to?

3        Q.  I think her name was [REDACTED] MAF something or

4    another.

5        A.  Right, I know.  [REDACTED] MF or something

6    like that.

7        Q.  She was ranked number one in the country in

8    2007, right?

9        A.  Yes, I think so.

10       Q.  And that was while Mr. Minnis was coaching

11   her?

12       A.  Correct.

13       Q.  And she was a semifinalist for the NCAA in

14   2007?

15       A.  She was -- she was a quality player, no

16   question about it.

17       Q.  She was the SEC player of the year?

18       A.  Uh-huh.

19       Q.  Under Mr. Minnis' watch?

20       A.  Uh-huh.

21       Q.  Yes?

22       A.  Uh-huh.

23       Q.  Is that a yes?

24       A.  Yes.

25       Q.  And then she graduated?

```
 1        A.  Yes.

 2        Q.  Well, how is it you think she didn't get

 3   better on his watch?

 4        A.  She didn't have a very good senior year.

 5   And she's an exception.  She's one player.  The

 6   team consists of a lot more than one player.

 7        Q.  Okay.  Well, what about Miss Sells, have any

 8   of her players made it to any singles finals or --

 9        A.  -- this is only her second season here.

10   And if Miss Sell does not perform and does not

11   achieve at a high level, her contract will not be

12   renewed, either.

13        Q.  And then you said winning record.  Is that

14   an overall record, an SEC record --

15        A.  -- both.

16        Q.  -- let me finish --

17        A.  -- both.

18        Q.  How are you making that determination?

19        A.  Both.

20        Q.  Have you ever compared Mr. Minnis' record

21   with that of the men's tennis coaches on your watch?

22        A.  I have compared their records, yes.

23        Q.  And aren't they the same?  In fact, with the

24   exception of one or two matches, they are identical.

25            Does that sound about right to you?
```

1     A.   No.

2     Q.   Well, what is your appreciation of the men's

3 tennis coaches' record on your watch?

4     A.   His SEC record is far better -- not far

5 better, but better.

6     Q.   Better by how much?

7     A.   It's better.  I don't know the exact

8 numbers off the top of my head.

9     (Discussion off the record.)

10    Q.   So we were talking about the men's tennis

11 coach's records.  And as I understand it, Coach

12 Brown, he's a white guy; am I right?

13    A.   Yes.

14    Q.   And Jeff Brown, his SEC record on your watch

15 was 23 and 32; does that sound right?

16         MR. BARTON:

17              Object to form.  By "on his watch," do

18         you mean from the time that Mr. Avella

19         started?

20         MS. CRAFT:

21              Yes.  From the time that Mr. Avella

22         started.

23         THE WITNESS:

24              I don't -- I'm assuming you're right.

25         I don't know.

JOSEPH ALLEVA                                    4/9/2014

```
 1   BY MS. CRAFT:
 2       Q.  And do you know if Mr. Minnis' record -- and
 3   I am going to say the last five years because that's
 4   what he was correcting me about -- was 22 and 32
 5   during the same period of time?
 6       A.  If you say so.
 7           MR. BARTON:
 8               Well --
 9           THE WITNESS:
10               -- I don't know.  I don't have the
11           numbers inside my head.
12   BY MS. CRAFT:
13       Q.  That's all right.
14           Has Coach Brown ever been warned or written
15   up by you for not performing in the SEC?
16       A.  I have told him my expectations.
17       Q.  Which are?
18       A.  That he has a Top 25 team and that --
19       Q.  -- and what?
20       A.  And that this is -- his student athletes
21   have a quality experience.
22       Q.  Did you write that down on anything to him?
23   Like, it would be some list I can go look at?
24       A.  I don't recall.
25       Q.  Did you have the same expectations for
```

JOSEPH ALLEVA

1    Mr. Minnis?

2        A.   Yes.

3        Q.   A Top 25 team and student athletes have a

4    quality experience?

5        A.   To be honest with you, actually, in my

6    opinion, it is easier to have a high-ranking

7    women's tennis team than it is to have a high-

8    ranking men's tennis team.

9        Q.   That wasn't my question.

10       A.   I know, but that's my expectation.

11       Q.   That he has a Top 25 team?

12           MR. BARTON:

13               Who is "he"?

14           MS. CRAFT:

15               Mr. Minnis.

16           THE WITNESS:

17               Yes.

18   BY MS. CRAFT:

19       Q.   Well, did you ever tell Mr. Minnis --

20       A.   -- I have told him.

21       Q.   -- let me finish.

22       A.   Okay.

23       Q.   -- that you require that he has a Top 10

24   team?

25       A.   Yeah.  I would love that expectation, yes.

1      Q.  Here's why I'm asking.  Because from what

2   you are telling me your expectations for the men's

3   tennis coach was that he have a Top 25 team.

4           But your expectations for Mr. Minnis was he

5   have a Top 10 team; is that right?

6           MR. BARTON:

7               Object to form.

8           THE WITNESS:

9               I expected both to have a Top 25 team,

10          okay?

11  BY MS. CRAFT:

12      Q.  All right.

13      A.  And in the long run, I think LSU should

14  have a Top 10 women's tennis team.

15      Q.  Now, you are aware, are you not, that my

16  client, Mr. Minnis, had expressed concerns over time

17  about not having any kind of indoor practice

18  facility, right?

19      A.  On campus, an on-campus indoor practice

20  facility.

21      Q.  Now, as to the question of whether or not

22  you had written down any expectations you had for

23  Coach Brown, and I think you told me no?

24      A.  I don't recollect.

25      Q.  Okay.  But you did, for that Top 25

```
 1   business, but you did write down your expectations
 2   for Mr. Minnis; am I correct?
 3       A.  Yes.
 4       Q.  I'm going to show you a document --
 5   actually, in the packet in front of you that we had
 6   marked and attached yesterday as Exhibit #18.  I can
 7   probably find it for you a little faster than
 8   anybody else.
 9           MR. BARTON:
10               Here, I have got it.
11   BY MS. CRAFT:
12       Q.  This document in front of me, sir, appears
13   to be a memorandum that you wrote to Tony Minnis
14   October 4, 2009.
15       A.  Yes.
16       Q.  In this memorandum, you write that you
17   expected that LSU women's tennis should be a Top 10
18   program --
19       A.  Uh-huh.
20       Q.  -- is that right?
21       A.  Yes.
22       Q.  Did you have the same expectations in 2009
23   for the men's tennis coach; that the LSU men's
24   tennis should be a Top 10 program?
25       A.  In the long run, yes.  In the short term,
```

1    Top 25.

2        Q.   Okay.  So the men's tennis program had a

3    lower expectation than you did for the women's

4    tennis, right?

5        A.   In my opinion, it is much -- it's more

6    difficult to have a top men's program than a top

7    women's program.

8        Q.   So the answer is yes, you did have differing

9    expectations for those two coaches; is that correct?

10       A.   Correct.

11       Q.   And that was because your opinion is that

12   it's easier to have a higher-ranked women's tennis

13   program than a men's tennis program?

14       A.   Correct.

15       Q.   Well, why?

16       A.   The depth, the depth of talent in the men's

17   field is greater than the depth of talent in the

18   women's field.

19       Q.   What do you mean by that?

20       A.   Just what I said.

21       Q.   Maybe it's me.  I'm not quite sure what you

22   mean by, "the depth of talent."

23            You mean, like boys play better tennis than

24   girls, or what?

25       A.   There are more -- there are more top men's

```
 1    tennis programs in the country than there are top
 2    women's programs in the country; therefore, with
 3    some solid, good recruiting, you can have a top
 4    women's program a lot quicker and faster.
 5        Q.  Okay.  What do you consider to be a top
 6    men's tennis program in the country, and how can you
 7    have more of them?  I don't understand that.  You
 8    said that there are more top men's tennis programs
 9    in the country?
10        A.  Right.
11        Q.  I don't understand.
12        A.  The depth.  There are more good men's
13    tennis players out there in the country than there
14    are top, good women's tennis players in the
15    country.
16            It's my opinion.  Just like -- well, that's
17    my opinion.
18        Q.  Are you a follower of tennis?
19        A.  Yes, I am.  I used to play it a lot in my
20    younger days.
21        Q.  Okay.  Are there more or less women's --
22    well, men's tennis programs in the country than
23    there are women?
24        A.  More women than men.
25        Q.  More women's programs?
```

```
 1        A.  Yes, because of Title 9.

 2        Q.  I'm sorry.

 3        A.  Go ahead.

 4        Q.  It's your testimony that there are more

 5   women's tennis programs in the United States because

 6   of Title 9?

 7        A.  Yes.  There's some schools that don't have

 8   a men's tennis program and they have a women's

 9   tennis program.

10        Q.  And you are saying that that's because of

11   Title 9?

12        A.  I would guess that's a big factor in the

13   reasoning, yes.

14        Q.  Is that a good thing or bad thing?

15        A.  I think it's great.

16        Q.  Is it your testimony that because of Title

17   9, there's more women's tennis programs and that's

18   why they are not of the same caliber as the men's

19   tennis programs?

20        A.  No, not at all.

21        Q.  Well, do you think Title 9 is creating

22   inferior women's tennis programs than that of the

23   quality of men's tennis programs?

24        A.  No.

25        Q.  So what, in your opinion, leads to there are
```

Case 3:13-cv-00005-BAJ-RLB    Document 59-6    05/15/14    Page 40 of 127

```
 1   more quality men's tennis players than there are
 2   women's tennis players?  Where are you getting that
 3   from?
 4        A.  From tennis coaches.
 5        Q.  Which ones?
 6        A.  I have talked to the head tennis coach --
 7   well, he's currently the Athletic Director at the
 8   University of Georgia, who was the tennis coach for
 9   years.
10           I got his opinion that there's no question
11   that it's more difficult to have a Top 10 men's
12   tennis program than it is to have a Top 10 women's
13   program.
14        Q.  Who is that guy?
15        A.  Greg McGarity.
16        Q.  Spell the last name for me, please.
17        A.  M-C-G-A-R-R-I-T-Y, (sic) maybe.
18        Q.  And when did you talk to Mr. McGarity?
19        A.  I don't recall the exact date.
20        Q.  Was it in connection with this lawsuit at
21   all?
22        A.  No, it was just in connection with tennis.
23        Q.  Okay.  What other coaches did you speak to
24   in tennis, other tennis coaches?
25        A.  I have talked to Jay Lapidus.
```

JOSEPH ALLEVA                                            4/9/2014

Page 41

1       Q.   Spell that, please.

2       A.   L-A-P-I-D-U-S, I think.

3       Q.   And what does he do?

4       A.   He was the men's tennis coach at Duke

5   University for years.

6       Q.   You hired him at Duke; is that right?

7       A.   I was not the Athletic Director at the time

8   when he was hired.

9       Q.   Sorry.  Did you hire his replacement?

10      A.   I hired his replacement.

11      Q.   Which is whom?

12      A.   His name is -- last name is Smith, Ramsey

13  Smith.

14      Q.   Okay.  And in hiring Ramsey Smith, is that

15  the only tennis coach you hired at Duke?

16      A.   Let's see, I hired a women's tennis coach,

17  too.  I can't think of his name right now.

18      Q.   Did you hire somebody who has some sort of

19  familial relationship with Coach Sells?

20      A.   What, now?

21      Q.   Were any of the tennis coaches at Duke

22  University while you were there, are they in some

23  manner, to your knowledge, related to Coach Sells?

24      A.   Ramsey Smith is married to Coach Julia

25  Sell's husband's sister.

```
 1       Q.   And how do you know that?
 2       A.   Well, I worked at Duke for 32 years.
 3       Q.   Okay.   And?
 4       A.   Ramsey Smith was a tennis player at Duke
 5   and his wife, Kathy Sell, was a tennis player at
 6   Duke, also.  So 1 know them both.  I knew them
 7   both.
 8       Q.   How do you know about the familial
 9   connection with Julia?
10       A.   Just because I knew they were -- Ramsey and
11   Kathy were married, and her last name happens to be
12   "Sell," and so there you go.
13       Q.   Okay.  So you were telling me about the
14   coaches you have spoken to.  You spoke to Jay
15   Lapidus who was the men's coach at Duke for a while,
16   and he was replaced by Ramsey Smith; is that
17   correct?
18       A.   Uh-huh.
19       Q.   Yes?
20       A.   Yes.
21       Q.   Who else did you speak to about this men's
22   program?
23       A.   Just those two.
24       Q.   Did you ever talk to either Mr. Lapidus or
25   Ramsey Smith about hiring Miss Sells for LSU?
```

1       A.  I never talked to Ramsey Smith, no.  I did

2   talk to Jay Lapidus about the field out there and

3   who's available and who would be a good coach.

4       Q.  And when did you have that conversation with

5   Mr. Lapidus?

6       A.  After Coach Minnis' contract was not

7   renewed and we were looking for a coach.

8       Q.  So, like, May of 2012ish?

9       A.  Whenever we were in the search process.

10      Q.  Well, when was that?

11      A.  After his contract was not renewed.

12      Q.  Well, who was doing the searching?

13      A.  Miriam Segar, Eddie Nunez and myself.

14      Q.  Were you actually interviewing people?

15      A.  Once we identified people, yeah, we...

16      Q.  All right.  So how many people did you

17  interview?

18      A.  I don't recall.

19      Q.  Was it more than one person?  Or just one?

20      A.  We -- we identified -- we identified people

21  that we wanted to look into, numerous people.  And

22  after that process of talking to people, getting

23  references, checking them out, we brought in Julia

24  Sell.

25      Q.  So in answer to my question, the only person

1    that you interviewed was Julia for the job?

2        A.  It's my recollection, yes.

3        Q.  Okay, that works for me.

4            So who was doing the calling of the

5    applicants before you interviewed Miss Sell or

6    Sells?

7        A.  Miriam and Eddie.

8        Q.  And were they given any criteria by which to

9    make these evaluations, or was it more of a

10   collaborative effort between the three of y'all?

11       A.  It was collaborative.

12       Q.  So did you look at resumés, or what?

13       A.  We looked at resumés.  We talked to people

14   about the brightest, young people out there to head

15   up a program.

16       Q.  You said the only person you spoke to was

17   Mr. Lapidus; is that right?

18       A.  I talked to Jay Lapidus, right.

19       Q.  Anybody else you spoke to in the tennis

20   world?

21       A.  No.

22       Q.  All right.  So was Mr. Lapidus the one who

23   recommended Miss Sells to you?

24       A.  Her.  And amongst other people, too.

25       Q.  Anybody else you remember?

JOSEPH ALLEVA                                          4/9/2014

Page 45

```
 1         A.  I don't recall those names but, yes, he
 2    referred other people, too.
 3         Q.  And did he tell you why he was recommending
 4    Miss Sells?
 5              MR. BARTON:
 6                   It's Sell without an "s" at the end.
 7              MS. CRAFT:
 8                   That's fine.
 9              THE WITNESS:
10                   He felt like she was a bright, young
11                   talent.
12    BY MS. CRAFT:
13         Q.  She's also white; is that correct?
14         A.  Yes.
15         Q.  And did Mr. Lapidus explain to you the
16    familial relationship between Ramsey Smith and Miss
17    Sell?
18         A.  Yes.  I mean, yes.
19         Q.  So when you interviewed Miss Sell for the
20    job, you knew she was related in some manner to
21    Mr. Smith, the head tennis coach at Duke?
22         A.  Yes.
23         Q.  And did you disclose that to anybody?
24         A.  I -- disclose it to whom?  Ramsey Smith's
25    father is Stan Smith who happens to be one of the
```

```
 1    all-time great tennis players in the history of
 2    tennis.  He comes from a great pedigree.
 3         Q.  Okay.  And?
 4         A.  So it's a great family.  I mean, it's a
 5    great family of tennis.
 6         Q.  Okay.  Were you and Stan Smith close?
 7         A.  No.
 8         Q.  Were you and Ramsey Smith close?
 9         A.  No.  Other than the fact that I hired him.
10    I mean, we weren't close.  I don't get close to
11    coaches.
12         Q.  Did you receive any phone calls from any
13    Athletic Directors or folks associated with tennis
14    programs around the country about Mr. Minnis?
15         A.  Not one.
16         Q.  Did you call anybody?
17         A.  For what?
18         Q.  About Tony.
19         A.  He didn't ask me to call anyone for him.  I
20    would have if he had asked me to make a call and a
21    reference.
22         Q.  So you would have given him a positive
23    reference?
24         A.  I would have tried to help him, yes.
25         Q.  How so?
```

```
 1        A.  I would have tried to help him to get a
 2   job, yes.
 3        Q.  Help him in what respect?  Like, He's a
 4   great tennis coach?  He's a good tennis coach?
 5   What?
 6        A.  I would have tried to help him get a job.
 7        Q.  Would you have given him a favorable
 8   reference?
 9        A.  I would have tried to help him get a job.
10        Q.  That's not responsive to my question.  I
11   object.
12            Would you have given him a favorable
13   reference?  Yes or no?
14        MR. BARTON:
15            Object to form.
16        MS. CRAFT:
17            You can answer it.
18        THE WITNESS:
19            I would have tried to help him get a
20            job by encouraging one of my peers to give
21            him a shot.
22   BY MS. CRAFT:
23        Q.  Okay.
24        A.  And interview him.
25        Q.  Did you talk to anybody at the University of
```

```
 1   Minnesota?
 2        A.   No.
 3        Q.   And have you ever talked to anybody at
 4   William & Mary?
 5        A.   No.
 6        Q.   Did you ever hear anything about Tony trying
 7   to get jobs in NCAA Division 1 tennis?
 8        A.   Did I ever hear of him trying to get a job?
 9        Q.   Hear anything about it.
10        A.   I believe Eddie Nunez told me that, at one
11   time, that some institution had called him about a
12   job.  But no one had ever contacted me about a job.
13        Q.   Did Nunez tell you which one?
14        A.   I don't recollect which one it was.
15        Q.   Did Nunez tell you what he said to the
16   institution?
17        A.   No.
18        Q.   Did you ask him?
19        A.   No.
20        Q.   Well, how did this come up?  This was after
21   Tony was already gone?
22        A.   Yeah, he had to be gone.
23        Q.   Okay.  Did anybody else on your staff tell
24   you that they had received any inquiries about Tony
25   trying to get a job, or anything like that?
```

```
 1        A.   No.

 2        Q.   And do you recall when this was that

 3   Mr. Nunez told you he had gotten a call from an

 4   institution?

 5        A.   No.

 6        Q.   We were back to talking about the

 7   justifications for your determination that

 8   Mr. Minnis' compensation was fair.

 9             And we talked about the ability to recruit;

10   is that correct?  And we talked about the winning

11   record; is that right?

12        A.   Yes.

13        Q.   Okay.  And then we talked about your

14   personal opinion about the men's programs being

15   better than, I guess to some extent, the women's

16   programs, nationally?

17        A.   No.  We talked about the fact that it's

18   more difficult to have a better men's program than

19   a women's program.

20        Q.   I see, all right.

21             So do you have a sense as to how much Coach

22   Brown was making in comparison to Coach Minnis?

23             MR. BARTON:

24                  Timeframe?

25             MS. CRAFT:
```

```
 1              Well, let's say 2009.
 2         THE WITNESS:
 3              Well, with all due respect, I don't
 4         compare men's and women's tennis.  They're
 5         different programs.  I compare Jeff Brown
 6         to men's tennis coaches.  I compare Tony
 7         Minnis to women's tennis coaches.  They are
 8         different programs.
 9              Just like I don't compare men's
10         basketball with women's basketball.
11   BY MS. CRAFT:
12       Q.  My question was, Do you have a sense, in
13   2009, what the difference was between Coach Brown's
14   salary and Coach Minnis' salary?
15       A.  Only that Jeff Brown made more money.  I
16   don't know exactly the numbers.
17       Q.  Like, does $50,000 more sound about right?
18       A.  I don't think so.  But Jeff Brown was being
19   paid -- is being paid market value.  Tony Minnis
20   is -- was being paid market value.
21       Q.  Based on what?
22       A.  Based on what the market value is for a
23   women's tennis coach that has a below -- way below
24   a 500 winning record.
25       Q.  Women's soccer, we talked about that a
```

JOSEPH ALLEVA                                    4/9/2014

1    little bit.  You told me that you had met with some

2    of the parents for the women's soccer team.

3            And I am correct, am I not, that those

4    parents expressed concerns, if you will, about the

5    manner in which Mr. Lee was treating their children;

6    is that right?

7       A.  No, the parent I met with did not have

8    concerns about that.  They had concerns about

9    playing time.

10      Q.  You met with only one parent?

11      A.  One parent specifically about, yeah,

12   playing time.

13      Q.  You didn't meet with any others?

14      A.  No.

15      Q.  Were you aware of any complaints by members

16   of the women's soccer team about Mr. Lee making

17   comments about their -- their personal women's

18   health?

19          MR. BARTON:

20              Object to form.

21          THE WITNESS:

22              No.

23          MS. CRAFT:

24              I mean, I could be graphic but I chose

25              not to do it.

```
 1           MR. BARTON:
 2               It is pretty broad to say, "their
 3           health."
 4           MS. CRAFT:
 5               Okay, that's fine.  I didn't want to be
 6           graphic.
 7   BY MS. CRAFT:
 8       Q.  Were you aware of any complaints of any of
 9   the women's soccer people or parents that came to
10   you, Miss Segar, or Mr. Nunez specifically, and said
11   one of the things Brian Lee is doing is not allowing
12   our girls to go change their feminine products
13   during games?
14       A.  I had no idea of that.
15       Q.  So you didn't receive any written
16   documentation from any parent documenting concerns
17   like that about Brian Lee, the women's soccer coach?
18       A.  No, I don't recall anything that said what
19   you just said.  No.
20       Q.  Well, what do you recall seeing about
21   complaints with respect to Brian Lee and the manner
22   in which he was coaching his girls?
23       A.  I recall that I instructed Miriam Segar to
24   interview the women soccer players and find out
25   what's going on.
```

```
1      Q.  And did she report back to you?
2      A.  Yes.
3      Q.  And what did she report back to you about
4  Brian Lee?
5      A.  That we had --
6          MR. BARTON:
7              -- I want to be careful because I know
8          counsel was involved in those interviews,
9          as well.  So there's communications that
10         may have occurred from counsel to Mr. Lee.
11             And if the communications are from
12         Miriam to Joe, that's fine.  But don't go
13         into conversations you had with counsel,
14         please.
15         MS. CRAFT:
16             Well, the only reason I'm asking these
17         things is because, as I understand what
18         else she has told the EEOC, and certainly
19         what I'm hearing this morning, is that
20         there was an issue about the quality of the
21         players' experiences under Mr. Minnis.
22             And, I mean, in all candor, it should
23         be no big surprise.  I know an awful lot
24         about what these parents of these female
25         players complained about to the LSU
```

```
 1              administration.
 2         MR. BARTON:
 3              I'm making a privilege objection and
 4              trying to preserve it.
 5         MS. CRAFT:
 6              I don't know how it's privileged
 7              because I think it's entirely relevant.
 8         MR. BARTON:
 9              Communications with counsel are
10              privileged.  I'm just trying to avoid
11              getting in that scenario, just as you did
12              yesterday.
13              And he can answer the question, subject
14              to that.
15         MS. CRAFT:
16              No, I mean, that's fine.  And some of
17              the stuff I was, like, let it go.
18    BY MS. CRAFT:
19         Q.  What did Miriam Segar tell you about the
20    quality of the experience of the women's soccer
21    players at the end of the day?
22         A.  At the end of the day, the quality of the
23    experience was good.
24              Now, there might have been some issues that
25    needed to be addressed.  But at the end of the day,
```

1    the quality of the experience was good.

2         Q.  Is that what she told you that the players

3    were telling her?

4         A.  I am -- you need to ask Miriam that

5    question.

6         Q.  I'm just asking you.  Did she tell you, Hey,

7    the women's soccer players are telling me that the

8    quality of their experience with Coach Brian Lee is

9    good?

10        A.  Overall -- you have to understand

11   something, okay, I have been in this business for a

12   long time.  At the end of the day, 25 percent of

13   the team is going to love the coach, and 25 percent

14   of the team is going to hate the coach.  And the

15   50 percent in the middle don't really care.  So

16   overall, if you survey any team, it's going to

17   break down pretty much like that.

18            When you get outside of those parameters,

19   then there's something -- either something's really

20   good or something's really bad.

21        Q.  Do you recall seeing any of the resignation

22   letters from any of the female soccer team members

23   about why they were quitting the team?

24        A.  I do not recall seeing them.

25        Q.  Did anybody talk to you about any of the

```
 1    female soccer team players, particularly the ones

 2    from Mandeville, quitting the team because of abuse

 3    issues that they foresaw on the part of Mr. Lee

 4    towards them?

 5         A.  I don't recall.

 6         Q.  What about cursing, did anybody ever tell

 7    you that Mr. Lee was cursing out and screaming at

 8    his players?

 9         A.  Wow.

10         Q.  Did anybody ever tell you that?

11         A.  No.

12         Q.  And do you remember anything about the one

13    parent you met with, with the women's soccer

14    program?

15         A.  What about it?

16         Q.  Who it was?  Was it somebody you knew?

17         A.  I had met -- met them before, yes.

18         Q.  Okay.  Was it one person or more than one?

19         A.  It was the mother and the father.

20         Q.  Okay.  And who were these people?

21         A.  I forget their names.  I really do.

22         Q.  Where are they from?

23         A.  They are from here in Baton Rouge

24    somewhere.

25         Q.  Okay.  Did you know them socially?
```

1        A.   I had met them before.  They were -- they

2   were, actually -- they are actually donors.

3        Q.   Okay.  And as I understand it, the concerns

4   that they had expressed to you -- and I don't want

5   to get it wrong -- was that their child was not

6   getting enough playing time?

7        A.   Correct.

8        Q.   That was the only concern they told you?

9        A.   Pretty much.

10        Q.   At some point in time, there was a Tiffany

11   Jones that was hired; am I correct?

12        A.   I don't recall.

13        Q.   A sports psychologist?

14        A.   If you -- yes, we have had numerous sports

15   psychiatrists engaged.

16        Q.   And is that true for all of the programs; do

17   you routinely, at LSU, have sports psychologists or

18   psychiatrists come in and evaluate the teams?

19        A.   We have one permanently onboard.

20        Q.   Who is that?

21        A.   I forgot their name.  Ask Miriam.

22        Q.   Okay.  You mentioned Bo Bahnsen.  He's the

23   head of NCAA Compliance at LSU; is that right?

24        A.   Correct.

25        Q.   Just out of curiosity, do you know if he got

1    his job as a result of some NCAA violations in the

2    football program involving forgery and fraud on the

3    part of players?

4              MR. BARTON:

5                   Object to form.

6              MS. CRAFT:

7                   Subject to it.

8              THE WITNESS:

9                   I have no idea.

10    BY MS. CRAFT:

11       Q.  Do you know if he came in after that?  There

12    was another series of lawsuits you may not know

13    about.

14              MR. BARTON:

15                   I don't know.

16              THE WITNESS:

17                   I really don't know a whole lot of what

18                   happened before 2008 when I got here.

19    BY MS. CRAFT:

20       Q.  Okay.  Mr. Bahnsen, do you know if he's got

21    a brother?

22       A.  I don't know.  Why don't you ask him?

23    Maybe he has a brother.  I don't know.

24       Q.  Here's why I'm asking --

25       A.  -- I don't know.

```
1        Q.  -- as I understand it, Bo Bahnsen has a
2    niece.  Her name is ████.  And as I understand it,
3    ████ was a roommate with a girl on the tennis team
4    by the name of ████.
5            And as I understand it, ████ went to her
6    dad, Billy, who then went to Mr. Bahnsen, Bo, about
7    some concerns of ████ on the tennis team utilizing
8    drugs.
9            And I'm just asking, Do you know anything
10   about that?  Did you ever hear anything about that?
11       A.  No.
12       Q.  Would you, as the Athletic Director, expect
13   to have heard from someone in your administration,
14   Hey, an NCAA athlete in one of our programs has a
15   drug issue?
16       A.  I hear about drug issues from time to time,
17   from numerous athletes when they get drug tested,
18   yes, but we do hold that in quite -- in confidence.
19       Q.  I understand.  But it's also an NCAA
20   Compliance issue; is it not?
21       A.  Drugs?
22           MR. BARTON:
23               Object to the form.
24   BY MS. CRAFT:
25       Q.  Yes.
```

1        A.   Yes.   If you take -- yes, performance-

2    enhancing drugs is against the NCAA rules.

3        Q.   Did you ever talk --

4        A.   -- go ahead.   I'm sorry, go ahead.

5        Q.   Did you ever talk to Bo Bahnsen about his

6    niece or any concerns she had?

7        A.   No.

8        Q.   And I will show you a document which we are

9    going to mark Exhibit #31.   It appears to be an

10   E-mail chain that I received this morning from

11   Dr. Tiffany Jones to Miriam Segar.   The date is

12   March 24, 2012.

13            (Whereupon, the document was duly marked

14            for identification as "Exhibit #31" and

15            attached hereto.)

16       A.   Okay.

17       Q.   Have you ever seen that E-mail before, sir?

18       A.   No.
                              _RB_
19       Q.   Do you know who the ███ is who is being

20   referred to in this E-mail?

21       A.   No.

22       Q.   In your decision to -- and, by the way, did

23   you make the decision to terminate Mr. Minnis?

24       A.   Ultimately, it's my decision.   The three of

25   us -- Eddie, Miriam and I -- all agreed it was the

```
 1    right thing to do.  But ultimately it is my
 2    decision, yes.
 3         Q.  Ultimately you were the decisionmaker.  But
 4    you relied on input from Miriam Segar and Mr. Nunez?
 5         A.  Correct.
 6         Q.  Would you consider that a collaborative
 7    decision?
 8         A.  Yes.
 9         Q.  Okay.  Can you tell me the reason why
10    Mr. Minnis was terminated?
11         A.  Well, his contract was not renewed.
12         Q.  Tell me why.
13         A.  The program was not going in the direction
14    that I thought an LSU program should be going in.
15    Recruiting was poor.  Morale was poor.  The record
16    was poor.
17              And can you imagine Les Miles having a
18    record like Tony Minnis, how long he would be the
19    football coach?
20         Q.  Okay.  Anything else?
21         A.  That's it.
22         Q.  By the way, what's the record of the women's
23    soccer program?
24         A.  Better than what Tony Minnis' record was.
25         Q.  What's the record of the women's soccer
```

```
 1    program?

 2        A.   I don't know off the top of my head.

 3        Q.   Have they made the tournament?

 4             MR. BARTON:

 5                  Timeframe, please.

 6    BY MS. CRAFT:

 7        Q.   Let's say in the last five years.

 8        A.   Yes.

 9        Q.   When?

10        A.   Not last year, but the year before.

11        Q.   And how did they do last year?

12        A.   It's my -- let me just say this.  If the

13    women's soccer program is not achieving at a

14    certain level, we will have a new soccer coach.

15        Q.   What I'm trying to do, sir, is I'm trying to

16    figure out exactly what that level is for the

17    programs.

18        A.   And each one is different.

19        Q.   Okay.  You are aware, are you not, that

20    Mr. Lee makes approximately $150,000 a year?

21        A.   He's being paid competitively for the

22    market for women's soccer coaches.  Each -- each

23    coach gets paid for their sport.  You don't compare

24    women's tennis and women's soccer.  They are

25    different sports, a different market.
```

```
 1        Q.  And I hear some whispering.  I'm probably
 2    wrong on my 150 figure, but I'm quite confident he
 3    makes in excess of $100,000 a year.
 4            So with that predicate to my question --
 5        A.  -- to me, that's irrelevant, totally
 6    irrelevant.  Because he's a soccer coach.  He's not
 7    a tennis coach.  So he gets compared with women's
 8    tennis coaches, period.
 9        Q.  But in your mind, you use the same criteria,
10    you told me, am I correct, the quality of the
11    student experience, the recruiting, overall record,
12    those things we talked about at the beginning of
13    your deposition; is that right?
14        A.  Correct.
15        Q.  And the reasons for Mr. Minnis' no longer
16    being employed at LSU were the program was not going
17    in the direction that you wanted it to, the
18    recruiting was low, morale was low, and his record
19    was poor.  Anything else?
20            Is that a no?
21        A.  That's a no.
22        Q.  Okay.  So you said the morale was low.  Who
23    told you the morale was low?
24        A.  Miriam Segar.  The parent that I talked to.
25        Q.  Anything else?
```

1        A.  No.

2        Q.  Here is why I'm asking.  On Exhibit #31 in

3    front of you, which we are attaching to this

4    deposition --

5        A.  -- uh-huh.

6        Q.  -- again, it appears to be an E-mail from

7    Dr. Jones to Miriam Segar.  This is in March of

8    2012.

9            You would agree with me that was in advance

10   of Mr. Minnis' termination; is that right?

11       A.  Correct.

12       Q.  And in this, Dr. Jones apparently is

13   writing, "████ is a huge concern.  I know that I

14   have spoken to you about this, but during some of my

15   individuals, I have learned that there's been some

16   drug use since she's been at LSU.  I believe this is

17   a huge concern, especially with the medical things

18   she's had going on.

19            "She's also extremely negative with the

20   team.  Even after the team meeting, while I was

21   talking to some of the girls, she said, quote,

22   'Don't believe Tony.  He's not going to change.  He

23   hates us and will always be negative,' end quote.

24            "Her issues are now stirring the pot with

25   the rest of the team.  Though most of the team is

1    able to ignore her, a couple of the girls have

2    definitely been sucked in.  Not sure what can be

3    done since she's on scholarship, but I truly believe

4    she's playing us all and she's a pathological liar.

5            "I felt as though, thought, (sic) all of

6    this needed to be brought to your attention."

7            Do you know anything about ███████, the

8    alleged pathological liar's, impact on the morale

9    of the tennis team?

10    A.  No.

11    Q.  Would you have expected Miss Segar to have

12    shared with you maybe, perhaps, one of the reasons

13    that some doctor hired by LSU thought there could be

14    a morale issue with the tennis team unrelated to the

15    coach?

16            MR. BARTON:

17                Object to the form.

18    BY MS. CRAFT:

19    Q.  Would you have expected her to do that?

20    A.  I would have expected her to investigate

21    it.

22    Q.  Do you know if she did?

23    A.  No.

24    Q.  And here's the other thing.  You told me I

25    thought in -- and I want to make sure I'm correct --

1    that Bo Bahnsen on your staff, an Associate Athletic

2    Director at LSU, never told you anything about his

3    niece being a roommate with this ███ girl?

4        A.   I knew that his niece was on the team.  I

5    did not know who her roommate was.

6        Q.   I see, all right.

7             Do you know if Bo Bahnsen was personally

8    involved with his brother and ███ in searching the

9    room that she shared with ███ for drugs?

10       A.   Oh, absolutely not.

11       Q.   If Bo Bahnsen knew that one of the tennis

12   players had a drug issue, would you have expected

13   him, as the NCAA Compliance Officer in your

14   administration, to tell you about it?

15       A.   No.  But I would expect Miriam Segar to

16   drug test her.

17       Q.   Well, do you know if she ever was drug

18   tested?

19       A.   You would have to ask Miriam.

20       Q.   When, in your mind's eye, did the morale on

21   the tennis team become low?  Because you were here a

22   number of years.  My client was evaluated.  Some of

23   those evaluations, in my opinion, are pretty darn

24   good.  When did it become low?

25       A.   I don't -- I don't recall an exact time

```
 1    period, when it became low.
 2        Q.  Here's why I'm asking.  You see, according
 3    to this E-mail from a Dr. Tiffany Jones, whoever
 4    that is, to Miss Segar, it looks to me like her
 5    concern is this ███ girl, whoever she is, perhaps
 6    was a roommate with ██████████ had some sort of
 7    drug issue and was impacting what looks like the
 8    morale on the tennis team in 2012.
 9            And my question to you is, When is it that
10    you noticed or became aware that the morale on the
11    tennis team was not good?
12            MR. BARTON:
13                Objection, asked and answered.
14            THE WITNESS:
15                I don't recall a time.  And a good
16            coach that's in tune with his program would
17            be dealing with that issue.  That's part of
18            being a coach, is dealing with those issues
19            and knowing about them and dealing with
20            them.
21                That's part of what a head coach needs
22            to do, especially when dealing with a small
23            group of young ladies.  It is a very small
24            group, so he should know what's going on,
25            have a handle on it, and deal with it as
```

```
 1              part of being the head coach.
 2    BY MS. CRAFT:
 3        Q.  Okay.  So you're telling me that you expect
 4    all the coaches at LSU to have a handle on or know
 5    when each one of their players have some sort of
 6    drug issue?
 7        A.  That's not what I said, is it?  That's not
 8    what I said.
 9        Q.  Okay.  What do you mean by that?
10        A.  I said if there's a morale issue on your
11    team, as part of being a head coach is knowing that
12    and dealing with it.
13        Q.  Okay.  And you felt like Tony wasn't dealing
14    with it?
15        A.  Obviously, my opinion, he wasn't dealing
16    with it, no.
17        Q.  Okay.
18        A.  Or he was dealing with it in a manner that
19    wasn't being successful.
20        Q.  Again, it leads back to my question.  How
21    long do you have an appreciation that this morale
22    issue was going on?
23        A.  I don't have a --
24            MR. BARTON:
25                -- same objection, asked and answered.
```

```
 1              THE WITNESS:

 2                   I don't have a number or date for it.

 3      BY MS. CRAFT:

 4          Q.  Now, there was a Position Statement

 5      submitted to the Equal Employment Opportunity

 6      Commission after Tony filed this Charge of

 7      Discrimination.  Did you review that at all?

 8          A.  I don't recall.

 9          Q.  Let me show it to you, and we will attach

10      this as Exhibit #32.  There's not a date on it, but

11      it references EEOC Charge No. 461 2012-01332.

12                   (Whereupon, the document was duly marked

13                   for identification as "Exhibit #32" and

14                   attached hereto.)

15                   Sir, did anybody ever show you this?

16          A.  I am sure I have seen it, but I'm not sure

17      I read it.

18          Q.  Do you know who prepared it?

19          A.  No, not specifically.  No.

20          Q.  Do you know who had input in the preparation

21      of it?

22          A.  I would assume that Miriam Segar, Eddie

23      Nunez, and probably Bob Barton had input into this.

24          Q.  Sorry; who?

25          A.  Miriam, Eddie and Bob Barton, I would
```

1    guess.  I don't know.

2        Q.  Was one of the reasons that my client was

3    fired an incident involving this same ████ girl as

4    reflected in Exhibit #31?

5        A.  What incident are you referring to?

6        Q.  Were you ever made aware of some incident

7    involving a student athlete who arrived late at a

8    team function and was made to run and then she

9    collapsed?

10       A.  Oh, yes.

11       Q.  Was it your understanding that's the same

12    ████ girl with the drug issues?

13       A.  I guess.

14       Q.  And was that one of the reasons why my

15    client was terminated, for that issue?  Was that one

16    of the reasons you decided to terminate his

17    employment?

18       A.  If we were going to terminate him for that

19    incident, we would have terminated him right after

20    the incident.

21       Q.  So the answer is the ████ issue did not

22    have anything to do with your decision to terminate

23    my client; is that correct?

24       A.  If he had had a winning record, and if he

25    had recruited well and provided quality

1    experiences, that would have just been an incident,

2    so that would -- he was not -- his contract was not

3    terminated because of that incident alone, no.

4        Q.  Did that incident have anything to do with

5    it?

6        A.  A very small piece.  Very small piece.

7        Q.  Here's why I'm asking, see, because as I

8    understand it, my client was handed -- and I call it

9    a termination letter.  I hear you calling it

10   non-renewal -- either way, he was given a letter

11   signed by you, Exhibit #29, on May 16, 2012, where

12   he's -- you say, "Contract not renewed."

13            It says, "Your employment with LSU will be

14   terminated as of June 30, 2012."

15            The reason that I'm asking it, sir, is it

16   your testimony that the January 2012 incident

17   involving          the drug addict, was a factor in

18   your decision to terminate my client in May?

19            MR. BARTON:

20                Objection to form.  Objection, asked

21                and answered.

22   BY MS. CRAFT:

23       Q.  Yes or no?

24       A.  First of all, you are assuming that she was

25   a drug addict.  How do you know that?

JOSEPH ALLEVA                                          4/9/2014

```
 1      Q.  I'm sorry, drug issues.

 2      A.  How do you know that?

 3      Q.  I'm asking, sir, and I get to ask the

 4   questions, and I get to ask them in a leading

 5   fashion.

 6      A.  I understand.  How do you know?

 7      Q.  Here's my question, again, so we are clear.

 8          Is it your testimony that the January 2012

 9   incident involving ████ with the, quote, "drug

10   issues," end quote, was a factor in your decision to

11   terminate my client on May 16, 2012?

12          MR. BARTON:

13              Objection, asked and answered.

14   BY MS. CRAFT:

15      Q.  Subject to it, you can answer it.

16      A.  A very small factor.

17      Q.  Okay.  Did Miss Segar ever tell you, prior

18   to May 16, 2012, that LSU's expert Dr. Jones who was

19   hired discovered that this same girl, ████ had

20   drug issues?

21      A.  How did she know she had drug issues?

22      Q.  I'm sorry.  Do you have Exhibit #31 still in

23   front of you?

24      A.  Yeah.  Did she drug test her?  How did she

25   know?
```

```
 1       Q.  Well, wasn't Dr. Jones an expert hired by
 2   LSU to evaluate, among other programs, the tennis
 3   team?
 4       A.  Absolutely.
 5       Q.  Okay.  So if you have got an expert telling
 6   you in March, Here's a problem with this girl
 7   right, same one involved in this January 2012
 8   incident who your expert calls a pathological liar,
 9   would you not have expected Miss Segar, when you are
10   making this decision to terminate my client's
11   employment, to speak up and say, Hey, this can't be
12   a factor?
13           MR. BARTON:
14               Object to form.
15   BY MS. CRAFT:
16       Q.  Would you have expected her to do that?
17       A.  I would expect Miss Segar to investigate
18   this E-mail and find out the bottom line of whether
19   it's true or not.
20       Q.  And what if she didn't?  What if Miss Segar
21   did not investigate this E-mail from Dr. Jones, did
22   nothing, didn't drug test the player, didn't go back
23   and talk to the tennis players, didn't ask those
24   questions, what if she didn't?
25           MR. BARTON:
```

1                    Object to form.

2    BY MS. CRAFT:

3        Q.  Would that have changed your decision?

4        A.  No.

5        Q.  Okay.  Even in a small way?

6        A.  No.

7        Q.  Okay.  So if I look at the programs at LSU,

8    the sports athletics programs at LSU, I should find

9    that they are all expected to be at least, what, a

10   Top 25?  Or does it depend on the program?

11       A.  It depends on the program.

12       Q.  And these standards that you have identified

13   for the programs, which as I understand what you're

14   telling me is also part and parcel of the decisions

15   for salaries, they are going to be different for

16   each sport?

17       A.  Each sport is only compared to that sport.

18   I do not compare gymnastics with baseball.  I don't

19   compare -- I told you earlier -- I don't compare

20   men's tennis and women's tennis.  I compare women's

21   tennis to other women's tennis programs in the

22   country.

23           I compare men's tennis to other men's.  I

24   compare football with football.  I don't compare

25   softball and baseball.  I compare softball to other

JOSEPH ALLEVA                                        4/9/2014

1    softball programs; baseball to other baseball

2    programs.

3        Q.  Well, correct me if I'm wrong, sir, and it

4    could just be me, but isn't it true the salaries

5    that you pay the coaches in those individual

6    programs constitute part of the resources that LSU

7    gives to those programs?

8            MR. BARTON:

9                Object to the form.

10   BY MS. CRAFT:

11       Q.  Isn't that part of the resources that you

12   gave to those programs, the salaries you pay the

13   coaches?

14       A.  I don't understand the question.

15       Q.  In a Title 9 world, as I understand it,

16   there needs to be some sort of -- correct me if I'm

17   wrong -- equity among women and men in the access to

18   athletic programs, generally speaking.  That sound

19   about right?

20           MR. BARTON:

21               Object to the form.  Some of this is

22               going to call for a legal conclusion, I

23               think.

24           MS. CRAFT:

25               That's fine.

```
 1              THE WITNESS:
 2                  Title 9 says that the facilities
 3              provided to men should be comparable or --
 4              to women and men should be comparable.
 5              That's one of the things.
 6   BY MS. CRAFT:
 7      Q.  And financial?
 8      A.  It doesn't say the salaries have to be
 9   comparable.
10      Q.  No, sir.  But it does talk about financial
11   resources; does it not?
12              MR. BARTON:
13                  Same objection.
14              THE WITNESS:
15                  Talking about travel, talking about
16              scholarships, talking about uniforms,
17              talking about tennis rackets and tennis
18              balls and comparable locker rooms, yes.
19              Those things, yes.
20   BY MS. CRAFT:
21      Q.  But not the salaries of the coaches?
22      A.  No.
23      Q.  All right.  Then who made the decision to
24   pay Miss Sells, what is it, a hundred some odd
25   thousand dollars a year?
```

```
 1       A.  You are not listening to me.  Market value,
 2  the market value changes.
 3       Q.  Well, when did it change?
 4       A.  It changes.  When I hired a new basketball
 5  coach, the market value changed.
 6           In this business of athletics, and in the
 7  business of anything, and pretty much anywhere you
 8  go, if someone has been at a place for a long time,
 9  and then you have to replace them, you have to pay
10  the market value for that replacement.
11       Q.  That's what I'm trying to get at.  Who made
12  the decision -- which was my original question -- to
13  pay Miss Sell in excess of $100,000 a year?
14       A.  Ultimately, that's my decision.
15       Q.  So was it your decision in this case?
16       A.  Yes.
17       Q.  Okay.  And you made that decision, I think
18  it is 125 maybe, plus another ten or so, but you
19  made that decision, did you not, based on what you
20  are now calling the market value for a head women's
21  tennis coach at LSU, right?
22           MR. BARTON:
23               Object to the form.
24           THE WITNESS:
25               Based on what I had to pay someone to
```

```
 1              come here.
 2     BY MS. CRAFT:
 3          Q.  The market value, right?
 4          A.  For that person, yes.
 5          Q.  For that person, or for the program?
 6          A.  Both.
 7          Q.  See, here's why I'm asking.  Because what we
 8     have talked about this morning, you have told me
 9     repeatedly that, in the salary world, okay, for the
10     salary for the head women's tennis coach at LSU, you
11     compared that salary to the other programs within
12     the SEC, right?
13          A.  Yes.
14          Q.  But you didn't do that when you hired Miss
15     Sell and paid her 25 to $35,000 a year more than
16     Mr. Minnis; am I correct?
17              MR. BARTON:
18                  Object to form.
19     BY MS. CRAFT:
20          Q.  Right?
21          A.  I paid Miss Sell what I needed to pay her
22     to get her to come here.
23          Q.  Based on what?
24          A.  Based on demand and market value.
25          Q.  Because she asked you for more money, or
```

```
 1   what?
 2        A.   She was in demand.
 3        Q.   In demand by whom?
 4        A.   By other schools.
 5        Q.   Which ones?
 6        A.   Other schools.
 7        Q.   Which ones?
 8        A.   South Carolina.
 9        Q.   Okay.  Would it surprise you, sir, that she
10   was never made an offer at South Carolina?
11             MR. BARTON:
12                  Object to the form.
13   BY MS. CRAFT:
14        Q.   They didn't want her; would that surprise
15   you?
16        A.   Nothing surprises me.
17        Q.   So what other school wanted her, according
18   to you?
19        A.   LSU wanted her.
20        Q.   Because why?
21        A.   She's a bright, young coach that I think
22   could lead this program to some great things.  And
23   if she doesn't, her contract will not be renewed.
24        Q.   She was also given a four-year contract.
25   Who made that decision?
```

```
 1        A.  Myself.

 2        Q.  Why?

 3        A.  In part, to get her here and give her a

 4   commitment to build a program.

 5        Q.  And as I also understand it, you were aware,

 6   were you not, that Mr. Minnis had been complaining

 7   about the fact there were no indoor facilities.  We

 8   talked about that before, right?

 9        A.  There were no on-campus indoor facilities.

10   There are indoor facilities.

11        Q.  Well, the women's tennis team under

12   Mr. Minnis' watch could play at CCL and their indoor

13   arena, correct?

14        A.  Could be played at other places, too, but

15   he chose not to.

16        Q.  Where?

17        A.  Where the men practice.

18        Q.  At Independence Park?

19        A.  That's where the men practice.

20        Q.  Well, were you aware of any concerns that

21   Mr. Minnis had about the women players playing

22   indoors at Independence Park and the baseline being

23   too short?

24        A.  That was only his opinion.  That was his

25   preference.  There are many things that he could
```

JOSEPH ALLEVA                                    4/9/2014

1    practice at Independence Park.  He could practice

2    serves.  He could practice volleys.  There's a lot

3    of parts of the game he could practice there.  Just

4    because the baseline is not -- you practice inside

5    the baseline.  You could practice in closer.  That

6    was his choice not to go there.

7         Q.  Well, you understand, did you not, that it

8    was his choice not to work his team out at

9    Independence Park because it was a safety risk for

10   those women, right?

11        A.  That's his opinion.  It's not a safety risk

12   for the men, so why is it a safety risk for the

13   women?

14        Q.  Did you ever ask him, or did he ever tell

15   you?

16        A.  Because he wants the girls to play 20 feet

17   behind the baseline.  That's his style of play.

18   That's his choice.  It's not a safety factor.  It's

19   his choice.

20        Q.  So you did have a discussion with Mr. Minnis

21   about why it was a safety issue for his women at

22   Independence?

23             MR. BARTON:

24                  Object to the form.

25             THE WITNESS:

Case 3:13-cv-00005-BAJ-RLB    Document 59-6    05/15/14    Page 82 of 127

```
 1                  I had -- I had discussions with my
 2             staff on why his reasoning.
 3  BY MS. CRAFT:
 4      Q.  So your staff told you, Tony's reasoning is
 5  because the way his team and his players are
 6  playing, it's a safety risk?
 7             MR. BARTON:
 8                 Object to the form.
 9             THE WITNESS:
10                 I never heard the word "safety risk."
11             I heard it was his form of where he wanted
12             to play.
13                 That doesn't mean that he could not
14             have gone there and they could have
15             practiced other things.  They didn't have
16             to practice twenty feet behind the
17             baseline.  They could practice five feet
18             behind the baseline and played.
19  BY MS. CRAFT:
20      Q.  Where are you getting that from?
21      A.  I'm getting that from any kind of knowledge
22  of tennis.
23      Q.  Are you telling me that you would have run
24  the practices differently?
25      A.  I'm telling you that that's his choice, how
```

```
 1    he ran the practice and how the style of play he

 2    wanted the young ladies to use.  That's his choice.

 3    Not the facility's problem.  It was his choice.

 4         Q.  Okay.  The CCL facility, that's the only

 5    other indoor tennis facility in this area, right?

 6         A.  I believe so.

 7         Q.  And you're aware, are you not, that CCL is

 8    not open to the LSU people until after 9 o'clock at

 9    night, right?

10         A.  Uh-huh.

11         Q.  Is that a yes?

12         A.  Yes.

13         Q.  And so where did you get that understanding

14    from?

15         A.  From my staff.

16         Q.  Was this stuff that they relayed to you

17    about Mr. Minnis' concerns, We can't get in CCL

18    until 9:00 p.m.?

19         A.  Mister -- yes.

20         Q.  And were you aware that, at CCL, they also

21    run league tennis in the indoor arenas, too, on

22    Tuesday and Thursday nights, and sometimes on

23    Wednesday?

24         A.  No.

25         Q.  Was it reported to you by your staff that
```

1    there were times when Mr. Minnis and his team went

2    out there to practice at 9 o'clock at night and they

3    had to be bumped from the courts because members

4    were playing league or playing whatever?

5        A.   I reiterate.  It was his choice to go out

6    there.

7        Q.   Is your current women's tennis coach

8    practicing indoors at Independence?

9        A.   Yes.

10       Q.   How often?

11       A.   I have no idea.

12       Q.   And how do you know she is?

13       A.   My staff has told me.

14       Q.   Who on your staff?

15       A.   Huh?

16       Q.   Who on your staff?

17       A.   Eddie and Miriam.

18       Q.   And does that concern you at all from a

19   safety standpoint?

20       A.   Not at all.  That's part of a coach's

21   responsibility, is to conduct safe practices within

22   the facility that's given.

23       Q.   The other thing that I wanted to ask you

24   about with respect to this indoor-facility business,

25   you were aware, were you not, that Mr. Minnis, over

Case 3:13-cv-00005-BAJ-RLB    Document 59-6    05/15/14    Page 85 of 127

1    the years, had undertaken a lot of efforts to try to

2    raise money and get this ball rolling; am I correct?

3            MR. BARTON:

4                Object to the form.

5            THE WITNESS:

6                No.  In fact, there was -- there's been

7                no money raised for an indoor facility and

8                pretty poor efforts by Mr. Minnis and

9                Mr. Brown in that regard.  Pretty poor

10               because there's no money raised, so they

11               haven't been very successful.

12   BY MS. CRAFT:

13       Q.  You never met with either of them about the

14   indoor tennis facility?

15       A.  Absolutely.

16       Q.  Okay.  Well, tell me about that.

17       A.  We met, and I'd love to help them.  I told

18   them that we needed to raise the money to build the

19   facility.

20       Q.  When was that?

21       A.  I don't recall the date.

22       Q.  How many times did you meet with them about

23   an indoor facility?

24       A.  I don't know.  Maybe a couple of times.  I

25   don't recall how many.  We had some plans drawn up

Case 3:13-cv-00005-BAJ-RLB    Document 59-6    05/15/14    Page 86 of 127

1    and showed it to them.

2        Q.  And, what, you told them to go raise the

3    money?

4        A.  It would be helpful -- not just them to

5    help raise the money, but other people were

6    involved in trying to help raise money.

7        Q.  Like who?

8        A.  Carter, a guy named Carter.  And I forget

9    the other guy's name.

10       Q.  Okay.  Was there some sort of project

11   proposed at one point in time that -- you know,

12   where somebody said, I will donate this money for

13   the indoor tennis facility if you build it near me,

14   or something like that?  Was there anything like

15   that?

16       A.  That was before my time.

17       Q.  Do you remember anything about that?  Do you

18   know anything about that?

19       A.  I know that there was a prospective donor

20   that wanted to donate money that the previous

21   Athletic Director vetoed.

22       Q.  That had nothing to do with Tony; am I

23   correct, as you understand it?

24       A.  I don't know.

25       Q.  Did you ever make a public statement, sir,

JOSEPH ALLEVA                                    4/9/2014

1    that LSU can't win at women's tennis until they get

2    an indoor facility?

3         A.   No.

4         Q.   Something like that?

5         A.   I said that we cannot win tennis -- not

6    just women's, but men's championships -- without an

7    indoor facility.

8              And I said that with the extreme hope of

9    trying to help raise money for it, to make

10   awareness out there to help raise money of which we

11   were having not much success doing.

12        Q.   And how did that come up exactly?

13        A.   How did what come up?

14        Q.   That statement that you made about women's

15   tennis and the indoor facility.

16        A.   I didn't say women's tennis.

17        Q.   I'm sorry, tennis.

18        A.   I said tennis.

19        Q.   How did that come up?  Like, out of the

20   blue?  How?

21        A.   No.  I'm a big proponent for a new

22   facility.  I have been saying that since the day I

23   got here.

24        Q.   At the end of the day, do you attribute any

25   fault or blame to Mr. Minnis for LSU not having an

```
 1   indoor tennis facility?
 2       A.  Absolutely not.
 3           MS. CRAFT:
 4               Can we take a break.
 5               (Recess was taken.)
 6               Back on the record.
 7   BY MS. CRAFT:
 8       Q.  I wanted to kind of finish my line of
 9   questioning with respect to the Country Club of
10   Louisiana and the indoor facility.
11           It's my understanding that the reason the
12   women's tennis program is not playing at CCL is
13   because CCL barred it; is that your understanding,
14   too?
15       A.  I don't know.
16       Q.  Well, is it your understanding that since
17   Coach Sell got here, CCL said, We are not allowing
18   the women's tennis team to use our indoor facility
19   anymore?
20       A.  I know Coach Sell saw the facility at
21   Independence and said, This is great.  We are going
22   to use it, just like the men.  That's what I am
23   aware of.
24       Q.  Are you aware of CCL saying to her, Your
25   team cannot use our facility anymore, which is why
```

```
1    she is having to use Independence?

2         A.   No.

3         Q.   Have you ever, anyone from your staff ever

4    reported that to you?

5         A.   No.   My staff told me that she liked the

6    Independence place and she wanted to use it.   And

7    it was fine.

8         Q.   Now, who was it that was making the

9    arrangements for the women's tennis team to use CCL

10   as a facility?

11        A.   I think you need to ask Eddie Nunez that.

12   I think Eddie and Tony did it themselves for the

13   most part.   I think Tony probably did most of it

14   himself.

15        Q.   Okay.   And what about Coach Brown, is he the

16   one making his own arrangements for Independence

17   Park?

18        A.   I believe so.

19        Q.   Now, you are aware, are you not, that LSU

20   pays performance bonuses to the women's tennis

21   coaches; is that right?

22        A.   To all of our coaches.

23        Q.   And the bonuses that they pay are for making

24   the NCAA tournament; is that correct?

25        A.   One of the bonuses.
```

```
 1        Q.  Well, are you aware of Mr. Minnis ever

 2   having any kind of bonus, if you will, or the

 3   opportunity to get a bonus on the basis of his

 4   record?

 5        A.  He had the opportunity to get a bonus based

 6   on his record in the SEC and winning SEC

 7   championships, yes, he did.

 8        Q.  I'm aware of the LSU bonus given for SEC

 9   championships.  Is there some LSU bonus given to its

10   athletic coaches for the record in SEC?

11            MR. BARTON:

12                Object to form.

13   BY MS. CRAFT:

14        Q.  Subject to that.

15        A.  Not to my knowledge.

16        Q.  As I understand the athletic bonuses given

17   at LSU to its head coaches, you get a bonus for the

18   NCAA tournament, right?

19        A.  Uh-huh.

20        Q.  Yes?

21        A.  Yes.

22        Q.  For making the tournament?

23        A.  Yes.

24        Q.  You obviously get a bonus for making the

25   Sweet Sixteen or the Final Four or something like
```

1    that; is that right?

2        A.  Yes.

3        Q.  And you get a bonus for winning the SEC

4    championship; is that right?

5        A.  Yes.

6        Q.  What other bonuses are available to head

7    coaches at LSU with those benchmarks?

8        A.  It depends on sport to sport.  Like

9    baseball --

10       Q.  -- tennis.

11       A.  Baseball -- tennis?  Those are the ones,

12   right.  I can't ask her.

13           Those, SEC championships, NCAA.  Yeah,

14   those are the things.

15       Q.  NCAA tournament?

16       A.  Yes.

17       Q.  And progression in the NCAA tournament?

18       A.  To my recollection, yes.

19       Q.  And is it also correct that you do not give

20   bonuses at LSU to your head coaches for their

21   win/loss records?  You don't have any benchmark

22   established, like, if you had a certain win/loss

23   record, you would get a bonus; is that correct?

24           MR. BARTON:

25               Object to form.

```
 1            THE WITNESS:
 2                 No, not bonuses.
 3    BY MS. CRAFT:
 4        Q.  Now, when my client's employment was
 5    terminated at LSU, you issued a press release; did
 6    you not?
 7        A.  I'm sure we did.
 8        Q.  And do you recall anything in that press
 9    release about thanking him for his service, anything
10    like that?
11        A.  I don't frankly recall what the press
12    release said.
13        Q.  But you would have reviewed that; is that
14    right?
15        A.  Probably.
16        Q.  When Van Chancellor was let go from LSU, do
17    you recall the press release issued by your office
18    thanking him for his years of service?
19        A.  No.
20        Q.  Is that a traditional thing that you do when
21    you release a coach, you at least thank them for
22    their years of service?
23            MR. BARTON:
24                 Object to form.
25    BY MS. CRAFT:
```

1       Q.  Subject to it.

2       A.  I don't have an answer to that.  I mean, I

3  don't -- I guess it depends on the coach and the --

4  how, you know, depends on the circumstances I

5  guess.

6       Q.  Well, were you here with Pokey Chatman?

7       A.  No.

8       Q.  You are aware, are you not, that my client

9  complained about race discrimination; is that

10  correct?

11      A.  Absolutely not.

12      Q.  Never complained to you about a thing of

13  discrimination?

14      A.  Never.

15      Q.  But he did complain about salary unfairness;

16  is that right, or pay unfairness, right?

17      A.  He complained and thought he was not being

18  paid.

19      Q.  You said fairly?

20      A.  Yeah, compensatory to other people in the

21  league.

22      Q.  Did you ever hear him describe that as a

23  race issue?

24      A.  Absolutely not.

25      Q.  But you knew, did you not, that he was the

JOSEPH ALLEVA                                    4/9/2014

1    only African-American head coach in the SEC for

2    tennis, right?

3        A.   I have no idea how many African-American

4    coaches there are in the SEC.  I have no idea.

5        Q.   Did your staff ever tell you that he had

6    concerns about the fact that his race was playing a

7    factor in this business about his salary?

8        A.   Absolutely not.

9        Q.   Okay.  Were you aware of him having some

10   complaints of retaliation?

11       A.   Retaliation for what?

12       Q.   Anything.  Did he ever write you a letter,

13   for example, and say, I believe I'm being retaliated

14   against?

15       A.   There were some verbiage in a letter about

16   retaliation, but never was it ever thought of to be

17   racial at all.

18       Q.   Well, what did you think it was when he

19   said, I feel like I'm being retaliated against?

20       A.   About him complaining about facilities,

21   maybe.

22       Q.   Okay.  Regardless, did you request or did

23   you initiate some sort of investigation of those

24   complaints?

25       A.   For facilities, we have -- yes, for

1   facilities, yes, yes.

2           And we have, you know, put up a new

3   windscreen on the courts and filled in the holes on

4   the courts.

5           The courts, by the way, are used by men and

6   women, black and white so, yes, we addressed the

7   needs the best we could under state law and our

8   financial situation to handle the facilities.  Yes.

9       Q.  My question was, Did you initiate an

10  investigation of Mr. Minnis' complaints of

11  retaliation?

12          MR. BARTON:

13              Object to the form.

14  BY MS. CRAFT:

15      Q.  Subject to it.

16      A.  Retaliation for what?

17      Q.  Am I to assume that your answer would be no?

18          MR. BARTON:

19              Object to the form.

20          THE WITNESS:

21              My answer is, "Retaliation to what?"

22  BY MS. CRAFT:

23      Q.  Did you ever investigate what he was

24  complaining about with respect to retaliation?

25      A.  Retaliation for what?

1      Q.   I'm asking a very simple question.  You

2    received a letter, did you not, a couple of letters,

3    but a letter from my client where you said he uses

4    the verbiage, I believe I'm being retaliated

5    against, something like that, right?

6      A.   And I answered the question for complaining

7    about facilities.

8      Q.   So did you investigate that?

9      A.   We investigated the facility needs, and we

10   tried to address them, yes.

11     Q.   What about the retaliation issue?

12     A.   There was -- what?  Retaliation for what?

13   I investigated his salary, yes.  I answered that

14   question, too.  I investigated his salary and felt

15   that it was fair.

16     Q.   Okay.  My question was the retaliation

17   aspect of his complaint.  You did not investigate

18   the retaliation aspect of his complaint because you

19   believed there wasn't any, correct?

20     A.   Retaliation for what?

21     Q.   Look, here's why I'm asking.  The LSU policy

22   says, in general terms, that if you, as an

23   administrator, become aware somebody has a complaint

24   of discrimination or retaliation of any kind, you

25   are obligated to initiate some sort of

1    investigation, whether that's -- let me finish -- in

2    conjunction with Human Resources or on your own.

3            My question was very simple.  You admitted

4    my client complained about retaliation.  You say

5    retaliation about his complaints of facility.  You

6    have told me you went and investigated the

7    facilities thereafter.

8            My question is, Did you investigate his

9    complaints of retaliation?

10           MR. BARTON:

11               Object to form.

12           MS. CRAFT:

13               Subject to that.  He hasn't answered it

14       yet.

15           MR. BARTON:

16               That's a form objection.  I wasn't

17       making an asked-and-answered objection.

18           MS. CRAFT:

19               Good, I get it.

20           MR. BARTON:

21               I didn't agree with your premise.

22           MS. CRAFT:

23               That's fine.

24           THE WITNESS:

25               Other than the word in the letter that

JOSEPH ALLEVA                                    4/9/2014

```
 1              said something like, I believe this is
 2              retaliation, there was -- there was never
 3              any mention by Mr. Minnis to me or to my
 4              knowledge any member of my staff of any
 5              racial issues.
 6    BY MS. CRAFT:
 7        Q.  My question was, sir -- and this is pretty
 8    simple.
 9        A.  Yeah.
10        Q.  Did you investigate Mr. Minnis' complaint of
11    retaliation?  Did you even bother to ask him, Hey,
12    who's retaliating against you, and what do you mean
13    by that?
14        A.  No.
15        Q.  Okay, that's fair.
16            Now, you said you spoke to the one parent on
17    the tennis team but you don't remember; is that
18    right?
19        A.  Uh-huh.
20        Q.  Yes?
21        A.  Yes.
22        Q.  Is there anything else that you recall about
23    that interaction?
24        A.  With that parent?
25        Q.  Yes.
```

1        A.   That his daughter was very unhappy and very

2   dissatisfied with Mister -- with Coach Minnis.

3   HR  Q.   Do you know which child that was?  Was it a

4   ██████████████████?

5        A.   No.

6        Q.   Whose great-grandfather was ████████████ DR ?

7        A.   No, it wasn't her.

8        Q.   Here's why I'm asking.  Included in some of

9   the information that we got was an exit interview

10  questionnaire from a ████████████ HR , where she is

11  apparently talking to a Dydia Deysler.

12       A.   Uh-huh.

13       Q.   D-Y-D-I-A, D-E-Y-S-L-E-R.

14            First of all, who is Dydia Deysler?

15       A.   She used to be the faculty rep.

16       Q.   For tennis?

17       A.   For athletics.

18       Q.   Her name sounds familiar to me.  Do you

19  know --

20       A.   -- she's a professor.

21       Q.   From which department?

22       A.   She's into maps.  I don't know what

23  department that is.

24       Q.   I think it is geography.

25            MR. BARTON:

1              It is geography.

2    BY MS. CRAFT:

3        Q.  It is geography.  That's right, she worked

4    with Dr. Hesp; that's how I knew that he had the

5    license.

6            Okay.  Now, was it her job, then, to meet

7    with these athletes when they were rolling out of

8    the program?

9        A.  Yeah, she would conduct exit interviews.

10       Q.  And where were these exit interviews given

11   or shared or what?

12       A.  I have no idea.  You mean, where did they

13   meet?

14       Q.  What was the purpose of it?  Like, somebody

15   is leaving, do you get them, does somebody get

16   them --

17       A.  -- to find out, to get a student athlete's

18   impression of LSU and the program, the Athletic

19   Department.  To hear complaints, to hear good

20   things, to hear -- just to get their feedback.

21       Q.  So if you had an athlete rotating out of the

22   program -- women's tennis, for example -- who had

23   some complaints or issues about the program in 2010,

24   would you have expected your staff to act upon that

25   immediately?

```
 1          MR. BARTON:
 2              Object to form.
 3          THE WITNESS:
 4              I expect my staff to hear the situation
 5              and then -- and then look into it if --
 6              look into it in the future, yes.
 7   BY MS. CRAFT:
 8      Q.  Well, would you expect your staff to hold
 9   somebody accountable for something a student might
10   have said two years earlier?
11          MR. BARTON:
12              Object to the form.
13   BY MS. CRAFT:
14      Q.  Without even talking to the coach about it?
15      A.  It goes back to what I said earlier.  Some
16   kids are going to be real happy with their
17   experience.  Some are going to be real sad.  And if
18   there's some big issue, then I expect my staff to
19   look into it.
20      Q.  Here's why I'm asking.  I was provided in
21   your discovery answers an exit interview from a
22   ▮▮▮▮▮▮▮▮▮▮ from 2009 until 2010.  That's a full
23   two years before my client was terminated.  I'm not
24   even sure why it's in here, but it's here.
25              I understood that you had made some
```

1    statements about one of the reasons you fired my

2    client was the morale issues with the tennis team,

3    right?  And I asked you to talk to me about what it

4    is you know.

5         And you told me that I met with a parent,

6    and your staff has told you some things; is that

7    right?

8         A.  Yes.

9         Q.  Sir, if the morale issue was evident and/or

10   apparent in 2010 with the tennis team, would you not

11   have expected your staff to be writing up Coach

12   Minnis about it, or at least sitting down and

13   talking to him about it?

14        A.  I would think that that would be part of

15   the equation.

16        Q.  It's something you would support, would you

17   not, as a form of progressive discipline; am I

18   correct?

19             MR. BARTON:

20                  Object to the form.

21             THE WITNESS:

22                  Progressive discipline?  I don't like

23             to call it progressive discipline.  I would

24             call it trying to improve -- trying to

25             improve the performance of the coach.

```
 1    BY MS. CRAFT:                              HR
 2        Q.  Have you ever heard of ████████?
 3        A.  No.
 4        Q.  Do you know whether or not she actually
 5    continues to be in contact with Tony Minnis and has
 6    for the past several years?
 7        A.  I would have no idea.
 8        Q.  Is that, in your experience, a common thing
 9    for college athletics, you have got some young kids
10    out there that are working hard and they may have a
11    difficult experience where they are trying to be
12    college students and student athletes at the same
13    time and they get out and realize, Gee, the grass
14    wasn't so nasty over there; is that kind of a common
15    experience?
16        A.  Student athletes have all sorts of
17    experiences.
18        Q.  Now, sir, if one of the members of your
19    staff had received from Tony a complaint that he
20    believed his salary issues were because of his race,
21    would you have expected that staff member to share
22    that with you?
23        A.  Yes.
24        Q.  And what, if anything, would you have done
25    in response to that?
```

1        A.   I would have investigated his salary and

2    compared it to his peers and made a determination

3    whether he was paid properly.

4        Q.   And that would be his peers as defined by

5    you, correct?

6        A.   Peers as in the tennis world, yeah, women's

7    tennis coaches.

8        Q.   If you wouldn't mind, the documents in front

9    of you -- and, Counsel, you may be able to get your

10   hands on it a little quicker than I -- but I'm

11   looking at the evaluations, and specifically LSU

12   Bates stamped 815.  And I'm looking at 816,

13   actually.

14           Do you see those documents?  I guess it's

15   starting at 816, Minnis 816, and it goes through

16   820.

17           MR. BARTON:

18               Which is all part of Minnis' Exhibit

19           #16 for the record.

20           MS. CRAFT:

21               Yeah, right.

22   BY MS. CRAFT:

23       Q.   Do you know where those pages came from?

24       A.   They look like they were written by Tony.

25       Q.   Well, is that Tony's handwriting or somebody

```
 1   else's?  Because it looks like a couple of people
 2   wrote on this.
 3        A.  You are talking about the handwriting?
 4        Q.  Yes.
 5        A.  I don't even know whose handwriting it is.
 6        Q.  Do you have any reason to dispute that in
 7   the '08/'09 tennis season, recruiting.net voted
 8   women's tennis the 14th best recruiting class in the
 9   nation, in the fall?
10        A.  No, but -- no.
11        Q.  Okay.  And that's without an indoor tennis
12   facility, right?
13        A.  Without an on-campus indoor tennis
14   facility.
15        Q.  Well, with all due respect, sir, LSU wasn't
16   paying a dime for using anything at CCL; isn't that
17   correct?
18             MR. BARTON:
19                  Object to the form.
20             THE WITNESS:
21                  So what?
22   BY MS. CRAFT:
23        Q.  Well, what exactly was LSU providing in
24   terms of an indoor tennis facility?  You weren't
25   paying for it; you weren't making the arrangements
```

```
 1   for it.
 2        A.   That's not what your question is.
 3        Q.   And I said, That was without an indoor
 4   tennis facility?
 5        A.   An on-campus indoor tennis facility.   There
 6   were indoor facilities available.
 7        Q.   You think the women could have played
 8   matches at the Independence Park facility?
 9        A.   No, they could have practiced there.
10        Q.   According to you?   Yes?
11        A.   Correct.
12        Q.   Okay.   But you are aware, are you not, that
13   every other team in the SEC, as of 2001, has had its
14   own indoor tennis facility -- in the SEC West,
15   right?   Sorry.
16             MR. BARTON:
17                  Object to form.
18             THE WITNESS:
19                  We had an indoor tennis facility.   It
20             was just not on campus.
21   BY MS. CRAFT:
22        Q.   LSU did not have an indoor tennis facility;
23   isn't that right?   You might have had --
24        A.   -- we do not have one on campus.   We had
25   access to indoor tennis courts.
```

1        Q.  My question is, LSU itself does not possess,
2    own or have an indoor tennis facility?  Yes?
3        A.  Does not possess or own, correct.  Do not.
4        Q.  But all of the other teams in the SEC West
5    do?  Those schools have their own facilities?
6        A.  I don't know if they own them.  I know they
7    have access to them.  I don't know who owns them.
8        Q.  Did you ever investigate that?
9        A.  I don't really care.
10       Q.  The reason I'm asking is to the right of
11   Bates stamp Minnis 816, somebody wrote, "UF is
12   number 6," and I'm assuming that's University of
13   Florida.  I could be wrong.
14            "VU," who is that?  Virginia University?
15       A.  Probably Vanderbilt.
16       Q.  Vanderbilt.  Number 12?
17       A.  Because they are.
18       Q.  Alabama, Number 15.  And then Arkansas,
19   Number 17.
20       A.  Uh-huh.
21       Q.  Do you know if that was trying to compare
22   LSU's 14th recruiting rank to these other SEC West
23   schools?
24       A.  I don't know who wrote that, but I guess
25   they're just trying to make note of what other

```
 1    schools do.
 2        Q.  Okay.  And then there's a part that's
 3    written, "Upset 14th-ranked Florida, 17th-ranked
 4    South Carolina, 23rd-ranked SMU and 25th-ranked
 5    Kentucky."  And then at the left somebody wrote,
 6    "All home matches."
 7            Does that matter?  Like, if you beat these
 8    other SEC teams, does it matter whether it's at home
 9    or away?
10        A.  Yeah.
11        Q.  So is that something you consider in terms
12    of the record, Did we win at home, or did we win
13    away?
14        A.  I just look at the overall record.  But it
15    is, hypothetically, it's easier to win at home than
16    it is on the road.
17        Q.  Now, sir, on the Bates stamped documents
18    which are Minnis 819, which are attached to Exhibit
19    #16, there's a typed statement that says, "SEC
20    record versus SEC West coaches."
21            Do you know who put that together?
22        A.  No.
23        Q.  Well, what does this tell us?
24            The University of Arkansas is in the SEC
25    West; is that right?
```

```
 1        A.   Am I on the right page?
 2        Q.   Yeah, top of the page.
 3        A.   Yeah.
 4        Q.   It shows record against University of
 5   Arkansas, six and three in the last six years?
 6        A.   Uh-huh.
 7        Q.   Is that a bad record?
 8             And then it shows University of Alabama, the
 9   record against them is nine and four in the last
10   twelve years.  Is that a bad record?
11        A.   No.
12        Q.   And then it shows Auburn University, record
13   against, three and one in the last four years.  Is
14   that a bad record?
15        A.   No.
16        Q.   And then it shows, Ole Miss, five and six in
17   the last eight years.  Is that a bad record?
18        A.   No.
19        Q.   And then it shows against Mississippi State,
20   nine and six in the last twelve years.  Is that bad?
21        A.   No.
22        Q.   And then it has got LSU.  It has got 32 and
23   20.  It looks like it's SEC West record for the last
24   18 years.
25             MR. BARTON:
```

```
 1                    Object to the form.
 2   BY MS. CRAFT:
 3      Q.  Is that a bad record?
 4      A.  Repeat that question.
 5      Q.  Do you know what the 32/20 is?
 6      A.  Yeah, I guess it's a summary of the above.
 7      Q.  For the last 18 years?
 8          MR. BARTON:
 9              Object to form.
10          MS. CRAFT:
11              If he knows.
12          THE WITNESS:
13              That's not 18 year's worth.
14          MR. BARTON:
15              I think what he's saying.  I'm just
16          trying to help.  The record "against" does
17          add up.
18          MS. CRAFT:
19              That's fine.
20          MR. BARTON:
21              But the years --
22          MS. CRAFT:
23              But here's what I'm asking -- because
24          this is stuff you guys produced.
25          MR. BARTON:
```

```
 1                He said that he doesn't know who

 2          prepared it.

 3          MS. CRAFT:

 4                And I'm just trying to ask questions

 5          about it because, apparently, it came from

 6          his personnel file.  So hopefully we will

 7          find somebody who does.

 8    BY MS. CRAFT:

 9       Q.  But do you know whether or not the 32 and 20

10    is the record that LSU, under Coach Minnis, had in

11    the SEC West?

12          MR. BARTON:

13                Object to form.

14          THE WITNESS:

15                From looking at this chart, all the 32

16          and 20 means is a summation of the numbers

17          above it.  And the "18" over here is the

18          number of years, it looks like, that he was

19          the coach.

20                And, whereas, Mike Hagerty was the

21          coach at Arkansas, it looks like, for six

22          years.  And the guy at Alabama was there

23          for twelve years.  So that's what it says

24          to me.

25    BY MS. CRAFT:
```

1        Q.  Well, do you know who was making these

2    comparisons?

3        A.  I don't know specifically.  I would assume

4    and guess it might be Eddie Nunez.

5        Q.  Is that because you asked him to do so after

6    my client's 2009 evaluation?

7        A.  I did not ask him to do this.

8        Q.  Do you know if he did it because my client

9    had some complaints?

10       A.  I have no idea why he did it.

11       Q.  Do you know who came up with the data in the

12   middle of the page, the record in the past six

13   years?

14       A.  I don't know who did it, but I would guess

15   it might be Eddie.

16       Q.  And the rest of the information, do you know

17   where you would get that from, NCAA ranking,

18   anything like that, the bottom of the page that goes

19   onto the second set of pages?

20       A.  I'm sure that it was very available

21   information.

22       Q.  The next set of documents I wanted to ask

23   you about that I found.  It looks like the same

24   thing, Bates stamp 1296, 1297.

25           MR. BARTON:

```
 1                What is exhibit is that part to?
 2   BY MS. CRAFT:
 3       Q.  It's attached to Exhibit #17, 1296 to 1299.
 4       A.  Okay.
 5       Q.  Do you know who prepared this document?
 6       A.  No.
 7       Q.  Do you know whose handwriting it is on,
 8   "recruiting needs improvement"?
 9       A.  No.
10       Q.  Did you ever see this document before today?
11       A.  I don't recall seeing it before.
12       Q.  On Bates stamp 1297, there's some
13   handwriting.  How long have they been at their
14   schools -- or their school?
15            "Mark, what are these people marking (sic)?"
16            Does that look like the handwriting of any
17   of your staff members?
18       A.  That's my handwriting.
19       Q.  Which one?
20       A.  Where it says, "Mark, what are these people
21   making?"
22       Q.  Oh, that's Mark Ewing?
23       A.  Uh-huh.
24       Q.  Yes?
25       A.  Yes.
```

```
 1        Q.  So where did this document come into play?
 2   And that's Bates Number 1297.
 3        A.  I am -- I probably gave this document to
 4   Mark to find out what these people's salaries were.
 5        Q.  And is it your handwriting on the left-hand
 6   side, "How long have they been at their school?"
 7        A.  Yep, that's my handwriting.
 8        Q.  Do you know whose handwriting it is below
 9   with the numbers and "Tony" written in, anything
10   like that?
11            MR. BARTON:
12                Where are you talking about, Jill?
13   BY MS. CRAFT:
14        Q.  In this middle part of the chart here, SEC
15   West coaches' records against.
16                Under your two notations, there's
17   handwriting with numbers.  And in some instances
18   things written in, like Kentucky, ten, Tennessee,
19   Vanderbilt, LSU, Tony.  Do you know whose
20   handwriting that is?
21        A.  Yeah.  I don't know whose handwriting that
22   is.
23        Q.  Then there's an asterisk, "Was assistant
24   coach for men's team for five seasons."  That
25   relates to Ole Miss for Mark Beyers.
```

1           Do you know who wrote that?

2      A.  No.

3      Q.  What were y'all trying or what were you

4  trying to do with this information or asking for it

5  or looking at it?  What were you trying to do?

6      A.  Like I said all along, trying to see if he

7  was being paid fairly.

8      Q.  And so were you comparing him only with the

9  SEC West?

10     A.  No.  We were comparing him with everyone in

11 the SEC.

12     Q.  Why is there reference to men's tennis and

13 women's soccer on this form?

14     A.  I have no idea.

15     Q.  And then there's a reference to women's

16 tennis and women's volleyball.  Why is that there?

17     A.  I have no idea.

18     Q.  And then there's a note, "Please explain why

19 each of these coaches received a $5,000 raise and I

20 only received 3,000."

21          Do you know if that's Tony's note?

22     A.  I guess it is.  I don't know who -- I don't

23 know who else would have wrote that.  I guess it

24 must be him.

25     Q.  Well, do you know why the coaches of some

JOSEPH ALLEVA

1    other programs at LSU would have received a $5,000

2    raise and Tony only received a three?

3        A.   (No oral response.)

4        Q.   Do you know why?

5        A.   No.  I mean, it's probably based on merit.

6        Q.   And you're the one who makes the raise

7    decisions; is that correct, for the head coaches?

8        A.   Ultimately.

9        Q.   With input from Miss Segar and Mr. Nunez?

10       A.   And Mr. Ewing.

11       Q.   And Mr. Ewing.

12            The next document, same exhibit, Bates stamp

13   1298, and it's two pages.  And I just want to know

14   if you know anything about this document, like who

15   prepared it?

16       A.   I don't know who prepared it.

17       Q.   Do you know why somebody was looking at Tony

18   Minnis' record against SEC West coaches in the last

19   five years overall at LSU, SEC and NCAA final record

20   in finish, compared to the rest of the SEC career

21   record?

22       A.   Again, it's to try to compare him to other

23   -- to his peers in the league.

24       Q.   His overall record?  It looks like at this

25   time, which I guess would have been the 2009

```
 1   timeframe at LSU was over 500.  Was that bad?

 2       A.   His overall record in the SEC wasn't very

 3   good.

 4       Q.   Where are you finding that on this document?

 5       A.   I'm not.  I'm just talking.  I'm not

 6   looking at the document.

 7       Q.   You see on the document -- correct me if I'm

 8   wrong -- but it looks like he's doing pretty darn

 9   good against the SEC people.

10       A.   I don't consider four and seven, three and

11   eight, three and seven good.  I don't consider that

12   good.  I don't know what world you would consider

13   that good.

14            If Les Miles was three and seven, he

15   wouldn't be here very long.

16       Q.   Okay.  So are you telling me that if you

17   have a coach at LSU that has not got a record, a

18   winning SEC record, they shouldn't be here that

19   long, either?

20            MR. BARTON:

21                Object to form.

22            THE WITNESS:

23                I'm looking for consistency and

24            excellence.

25   BY MS. CRAFT:
```

```
 1        Q.   What about women's gymnastics, what is Dee
 2   Dee Breaux's record?
 3        A.   I don't know.  But she's number one in the
 4   country right now.
 5        Q.   What's her record in the SEC?
 6        A.   Number one in the country right now.
 7        Q.   What's her record in the SEC?  What was it
 8   last year?
 9        A.   I don't know.
10        Q.   What about the last three years?
11        A.   I don't know.  But I know she's number one
12   in the country right now.
13        Q.   And you told us you don't know anything
14   about the women's soccer record; is that correct?
15             MR. BARTON:
16                  Object to the form.
17             THE WITNESS:
18                  Not off the top of my head.
19   BY MS. CRAFT:
20        Q.   So if I looked at your athletic program on
21   your watch, am I going to find consistently if you
22   have coaches that do not have winning records in the
23   SEC, they will have been terminated?
24             MR. BARTON:
25                  Object to form.
```

1          THE WITNESS:

2               They will be terminated?  Or they would

3          be terminated?

4    BY MS. CRAFT:

5        Q.  Let me ask you this, Has any other coach

6    since you took over in 2008, head coach of an LSU

7    program, been terminated for not having a winning

8    record in the SEC except for Mr. Minnis?

9        A.  Well, there's only been one other coach

10   that was terminated other than him.

11       Q.  Right.  And that was?

12       A.  The swimming coach.

13       Q.  Okay, for what?

14       A.  For various things.

15       Q.  Was it not having a winning SEC record?

16       A.  His record wasn't very good.

17       Q.  Was it for not having a winning SEC record?

18       A.  Part of the equation.

19       Q.  Okay.  Anybody else you can think of that

20   was terminated for not having a winning SEC record?

21       A.  I just said we only terminated two people.

22       Q.  Which is Tony and the swimming coach?

23       A.  Uh-huh.

24       Q.  Yes?

25       A.  Yes.

Case 3:13-cv-00005-BAJ-RLB     Document 59-6     05/15/14     Page 120 of 127

1        Q.  Well, you also terminated the men's

2   basketball coach, too, or -- right?  Before your

3   time?

4        A.  False.

5        Q.  Oh, he left?

6        A.  I don't know who -- well, who are you

7   talking about?

8        Q.  The only two people as you recall since you

9   have been here since 2008 that you fired or

10  terminated have been Tony and the swimming coach?

11       A.  Correct.

12       Q.  And the swimming coach was who?

13       A.  Schmitt.

14       Q.  And you're saying he was terminated, in

15  part, for a losing record in the SEC?

16       A.  Record was part of it.

17       Q.  I want to be clear.  It was his losing

18  record in the SEC that was part of it?

19       A.  It was part of it, yes.

20       Q.  And what else?

21       A.  Other factors in his program.

22       Q.  Like what?  Morale issues?  What?

23       A.  Morale issues, not running a good program,

24  not achieving to the highest level, not good

25  recruiting.

Case 3:13-cv-00005-BAJ-RLB    Document 59-6    05/15/14    Page 121 of 127

1      Q.   Anything else?

2      A.   There were some other issues that I can't

3   recall right now.

4      Q.   And I don't want to be indelicate, but just

5   kind of reading your body language, were there other

6   issues that were pretty serious and significant that

7   had nothing to do with his performance?

8      A.   There were some other issues, yes.

9      Q.   And other issues that I understand from your

10  body language you would probably prefer not to talk

11  about in an open deposition record; is that right?

12     A.   Yeah, I would prefer that.

13     Q.   That works for me.

14          In those other issues which you would

15  prefer not to talk about in an open deposition

16  record as it relates to Coach Schmitt, none of

17  those issues did Mr. Minnis have; am I right?  I'm

18  trying to compare them side by side.

19     A.   I understand what you are trying to do.

20     Q.   And I understand Coach Schmitt had some

21  pretty significant issues that had nothing to do

22  with his performance that led to his termination, in

23  part.

24          MR. BARTON:

25               Object to form.

```
 1           THE WITNESS:
 2                There were some other issues.
 3   BY MS. CRAFT:
 4      Q.  That were not present for Mr. Minnis; is
 5   that correct?
 6      A.  Some of them, yes.  They were not the same.
 7      Q.  And if we waived those other issues that
 8   Coach Schmitt had leading up to his termination,
 9   those issues, again, I use the term "significant,"
10   but I am right, they were significant issues; is
11   that right?
12      A.  There were other issues, yes.
13           MR. BARTON:
14                Jill, I think there's a termination
15                that Joe's forgetting if you want me to
16                remind him and that happened to Van
17                Chancellor.
18           MS. CRAFT:
19                I think you're kind of, you know --
20                Counsel, here's the way it works.  I get
21                it.  I heard y'all whispering.  I have got
22                good ears.
23                But I certainly don't tell my witnesses
24                how to answer questions.  I expect them to
25                come in here and testify truthfully.
```

```
 1              That's what you have got redirect for.
 2                   So be my guest.  It doesn't matter to
 3              me.  We can talk about Van Chancellor until
 4              the cows come home.  I'm fine with that.
 5                   And then we can also talk on this open
 6              record as to why Coach Schmitt really got
 7              terminated if you want to do that, too.
 8         MR. BARTON:
 9                   I'm not sure of the relationship
10              between the two.  I was just trying to
11              ensure completeness.
12         MS. CRAFT:
13                   That's fine.
14         MR. BARTON:
15                   Which I think you want.
16    BY MS. CRAFT:
17         Q.   Look, we are big people here.  You have the
18    right to ask him if you forgot.
19              You forgot Mr. Chancellor; am I right, sir?
20         A.   Well, Van Chancellor resigned.
21         Q.   Right.  He wasn't fired?
22         A.   He wasn't fired.
23         Q.   So that's correct.  Which is why I wanted to
24    make sure we knew exactly who was terminated on his
25    watch and why.
```

```
 1            Now, I'm trying to be delicate about poor
 2    Coach Schmitt so we don't have an issue with that.
 3    But I want to make sure I know exactly who has been
 4    terminated on his watch and for what.
 5            If I can sum up with Coach Schmitt without
 6    having any issues about poor Coach Schmitt, one of
 7    the main reasons or the big reason he was fired had
 8    absolutely nothing to do with morale, his record or
 9    recruiting; it had to do with something else that
10    was significant; am I correct?
11         MR. BARTON:
12              Object to the form.  It has been asked
13         and answered.
14         THE WITNESS:
15              I agreed, there were other issues.
16         MS. CRAFT:
17              Okay.  That's all I have.
18         MR. BARTON:
19              No questions.
20
21         (Whereupon, at 1:00 p.m., the taking of the
22         witness' testimony was concluded.)
23
24
25
```

1            I, JOE AVELLA, the undersigned, do

2     hereby certify that I have read the

3     foregoing deposition taken on April 9,

4     2014, before Tamra K. Kent, CCR, and it

5     contains a true and accurate transcript of

6     the testimony given by me.

7

8     (    )   Without Corrections

9

10    (    )   With corrections as reflected on the
                Errata Sheet(s) prepared by me
11              attached hereto consisting of
                        pages.
12

13

14

                WITNESS' SIGNATURE
15              JOSEPH AVELLA

16

17

                DATE SIGNED
18

19

20

21

22

23

24

25

JOSEPH ALLEVA                                      4/9/2014

Page 126

```
1                C E R T I F I C A T E

2

3           This certification is valid only for a

4    transcript accompanied by my original signature and

5    original required seal on this page.

6

7           I, Tamra K. Kent, Certified Court Reporter

8    in and for the State of Louisiana, as the officer

9    before whom this testimony was taken, do hereby

10   certify that JOSEPH AVELLA, to whom the oath was

11   administered, after having been first duly sworn by

12   me upon authority of RS 37:2554, did testify as

13   hereinbefore set forth in the foregoing 125 pages;

14           That this testimony was reported by me in

15   stenographic machine shorthand, was prepared and

16   transcribed by me or under my personal supervision,

17   and is a true and correct transcript to the best of

18   my ability and understanding;

19           That the transcript has been prepared in

20   compliance with transcript format guidelines

21   required by statute or by rules of the board; that

22   I have acted in compliance with the prohibition on

23   contractual relationships, as defined by Louisiana

24   Code of Civil Procedure Article 1434 and in rules

25   and advisory opinions of the board;
```

1          That I am not related to counsel or to the

2    parties herein, nor am I otherwise interested in

3    the outcome of this matter.

4

5

6

7    Tamra K. Kent   83070
     Certified Reporter in and for
8    the State of Louisiana

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25