UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF LOUISIANA


* * * * * * * * * * * * * * * * * * * * * * * *

ANTHONY MINNIS                    CIVIL ACTION
                                  NO. 13-5-BAJ-RLB
VS.

BOARD OF SUPERVISORS,
ET AL

* * * * * * * * * * * * * * * * * * * * * * * *



DEPOSITION OF MIRIAM SEGAR, taken on

Wednesday, April 9, 2014, at the Law

Offices of Taylor, Porter, Brooks &

Phillips, 451 Florida Street, 8th Floor,

Baton Rouge, Louisiana



REPORTED BY:  TAMRA K. KENT, CCR, Retired RPR

Court Reporters of Louisiana, LLC

9614 Brookline Avenue, Suite A

Baton Rouge, Louisiana 70835

(225)201-9650 Office * (225)201-9651 Fax

```
 1                     I N D E X

 2

 3                                        Page

 4   Caption                               1

 5   Appearances                           3

 6   Agreement of Counsel                  4

 7   Examination

 8      BY MS. CRAFT                        5

 9

10   Witness' Signature Page             151

11

12   Reporter's Certificate              152

13

14               *   *   *   *   *

15   Exhibits:

16   #33.....   Handwritten Notes...........    41

17   #34.....   Notes from Interviews.......    88

18   #35.....   E-Mail(s) with Dr. Jones....   119

19   #36.....   Exit Interviews.............   136

20

21

22

23

24

25
```

```
 1    APPEARANCES:
 2    Representing the Plaintiff:
 3         JILL L. CRAFT
           Attorneys at Law
 4         509 St. Louis Street
           Baton Rouge, Louisiana 70802
 5
           BY:  MS. JILL L. CRAFT
 6
 7
      Representing the Defendant:
 8
           TAYLOR, PORTER, BROOKS & PHILLIPS
 9         Attorneys at Law
           451 Florida Boulevard, Eighth Floor
10         Baton Rouge, Louisiana 70802
11         BY:  MR. ROBERT W. BARTON
                MS. VICKI CROCHET
12
13
14
      Also present:  Mr. Anthony Minnis
15
16
17
      Reported by: Tamra K. Kent,
18                 Certified Court Reporter
                   In and for the State of
19                 Louisiana.
20
21
22
23
24
25
```

```
 1               S T I P U L A T I O N

 2          IT IS STIPULATED AND AGREED by and among

 3     Counsel that the testimony of the witness, MIRIAM

 4     SEGAR, is hereby being taken pursuant to Notice

 5     under the Federal Rules of Civil Procedure for all

 6     purposes permitted under law.

 7

 8          The witness reserves the right to read and

 9     sign the deposition.  The original is to be

10     delivered to and retained by Jill L. Craft,

11     Attorney, for proper filing with the Clerk of

12     Court.

13

14          All objections, except those as to the

15     form of the questions and/or responsiveness of the

16     answers, are reserved until the time of the trial

17     of this cause.

18

19                    *   *   *   *   *

20

21          Tamra K. Kent, Certified Court Reporter in

22     and for the State of Louisiana, officiated in

23     administering the oath to the witness.

24

25
```

```
 1            MIRIAM SEGAR, having been first duly sworn,

 2   was examined and testified as follows:

 3                      EXAMINATION

 4            (Commencing at 2:00 p.m.)

 5   BY MS. CRAFT:

 6      Q.  Miss Segar, as you know, my name is Jill

 7   Craft.  I know you have sat through now two

 8   depositions in this case -- three, sorry.

 9            And just as a reminder, you know I am going

10   to stop you and have you spell things if they are

11   different or if the court reporter hasn't seen them

12   yet.

13            And also make sure that you answer out loud

14   to the questions.  Is that fair enough?

15      A.  Yes.

16      Q.  Would you please give me your full name and

17   address?

18      A.  Miriam Segar.  6160 Morgan Bend, Baton

19   Rouge, Louisiana.

20      Q.  Can you walk me through your educational

21   background starting with where and when you

22   graduated high school?

23      A.  I graduated high school in 1990 from Sulfur

24   High School in Louisiana.  I attended LSU in 1994

25   and graduated with a Bachelor's Degree in business
```

Case 3:13-cv-00005-BAJ-RLB   Document 59-7   05/15/14   Page 6 of 153

    1    in 1994.  And then I earned a Master's Degree in

    2    sports administration in 1995 from the Sports

    3    Academy.

    4        Q.  Which sports academy, I'm sorry?

    5        A.  United States Sports Academy.  There's a

    6    branch in Daphne, Alabama.

    7        Q.  Is that where you did it?

    8        A.  Yes.

    9        Q.  And when did you begin your affiliation

   10    with LSU?

   11        A.  As a student athlete at LSU when I attended

   12    from 1990 until 1994.  And I was hired in 19 -- I

   13    think in June of 1995 in a Compliance position.

   14        Q.  Is that an NCAA Compliance position?

   15        A.  Yes, ma'am.

   16        Q.  And were you reporting to Mr. Bahnsen at

   17    the time?

   18        A.  Yes, ma'am.

   19        Q.  You said you were a student athlete.  In

   20    which program?

   21        A.  Women's basketball.

   22        Q.  And in '95, can you describe for me what

   23    position you had in Compliance?  What did you do?

   24        A.  I was Compliance Coordinator.  At the time,

   25    there were two people working Compliance, Bo

1    Bahnsen and myself.

2           Compliance is -- it's a lot of different

3    things to it, so I did a little bit of everything.

4    There were only two of us.

5           The squad list, met with coaches on

6    rosters, helped with housing issues, just different

7    things that came up that they needed help with.

8       Q.  When you arrived at LSU, Mr. Minnis was

9    already here; is that correct?

10      A.  Yes.

11      Q.  He was already the head tennis coach?

12      A.  To my knowledge, yes.

13      Q.  Did you have any interactions with him

14   while you were a student at LSU or a student

15   athlete?

16      A.  Not that I recall.

17      Q.  Did you have any friends that played tennis

18   on the team?

19      A.  I did have some friends that played tennis

20   but not close friends.  I knew people and I knew

21   that they played that sport, but I didn't -- I

22   can't say that I was good friends with anybody on

23   the tennis team.

24      Q.  When you began as the Compliance

25   Coordinator in June of 1995, you remained in that

 1    position until when?

 2        A.  I'm really horrible with dates.  I honestly

 3    don't know.  I can tell you the position I went to

 4    next.

 5        Q.  Do you know what year that was?  That would

 6    be fine.

 7        A.  I know there's a document that we provided

 8    that had all of that in there.  I really don't -- I

 9    don't know.  Maybe 2001, something like that.  I

10    went to -- that can't be right.

11            I'm trying to get the year my kids were

12    born.  About 2000 I think I went to run the

13    CHAMP/Life Skills Program.

14        Q.  CHAMP/Life Skills?

15        A.  Yes.  I was asked by the Athletic Director.

16    We were starting a program, and I was asked to go

17    start it.  I did so.  And then I think I did that

18    for about two to three years.  And I was hired or

19    just shifted back over into administration.

20            I was appointed as a Student Services

21    person who was, again, under Mr. Bahnsen in

22    Compliance.  At that time, we decided we needed

23    more people working in Compliance.  So there was

24    still Mr. Bahnsen, a coordinator, and then myself

25    at that time.

1        Q.   And then you stayed over Student Services

2   or in Student Services until when?

3        A.   I'm still in Student Services.

4        Q.   You are still in the same position?

5        A.   I'm not.  I have been promoted a couple of

6   times.  The most recent promotion was after Miss

7   Judy Southard retired -- I'm bad on dates -- 2010

8   maybe.  After her retirement, I was promoted to the

9   Senior Women's Administrator.

10        And so I don't really work within the

11   Compliance staff any longer.

12        Q.   Okay.  What was the position you had before

13   the Southard position?  And Southard is

14   S-O-U-T-H-A-R-D.

15        A.   I was what I described before, the Student

16   Services person, working within Compliance.  I

17   assisted with kind of the second person under

18   Compliance at that time and assisted with issues

19   that came up and things that occurred.

20        Q.   So would it be fair to say after the

21   CHAMPS/Life Skill Program position, then you went

22   back into administration but you stayed in

23   Compliance until you took over Judy Southard's

24   position?

25        A.   Yeah.  I was in Compliance, but I had the

```
 1    role of Student Services, which basically meant I
 2    oversaw things.  Issues dealing with housing, food,
 3    parents, like things that, just kind of under that
 4    student umbrella.
 5            A liaison with the CHAMPS/Life Skill
 6    Program for the Athletic Department.  All those
 7    things I still currently do.
 8        Q.  Your position is the Senior Women's --
 9        A.  -- I'm Senior Associate Athletic Director
10    on the staff.  And the NCAA has the title of
11    Women's Administrator that every school has to
12    have, and so I have that designation, as well.
13        Q.  And what do you do?  What are your duties?
14        A.  I still work with Student Services, so
15    things I previously described I still do with the
16    staff.
17            I oversee different sport programs, working
18    with the coaches to advocate for their needs, and
19    working with student athletes.
20            As I mentioned, I work, you know, help out
21    with the Life Skills Program administratively if
22    things come up.  I oversee the NCAA Opportunity
23    Fund and how money is allocated for that within
24    coaches' requests.
25            I have been there a very long time so, you
```

```
 1    know, the different things that -- things come up
 2    that need help.  I help out with different things
 3    just like, you know, in an Athletic Department.
 4        Q.  You said you oversee different sports
 5    programs.  Which ones?
 6        A.  Currently I oversee men's baseball.  I
 7    oversee women's basketball.  Oversee men's and
 8    women's swimming, gymnastics, soccer, softball,
 9    volleyball.  We just added sand volleyball.  And I
10    work with the cheerleaders, as well.
11        Q.  And as the Women's Administrator, what do
12    you do?
13        A.  Well, I was kind of explaining.  I don't do
14    anything specific as the Women's Administrator.  I
15    -- it's really a title designation that the NCAA
16    has.
17            But our titles, I'm Senior Associate
18    Athletic Director, so my responsibilities are what
19    I have just indicated.
20        Q.  But isn't it true that the reason the NCAA
21    requires there be a woman administrator at a campus
22    is so that person is primarily responsible for
23    female athletic programs?
24        A.  My personal opinion about the position is
25    that it's a designation that was put in by the NCAA
```

```
 1   a long time ago to make sure that women in
 2   athletics were included within important decision-
 3   making processes.
 4          So it was, I think a long time ago, really
 5   necessary to have more women included in major
 6   athletic decisions.  And I think that decision
 7   change came from that.
 8          Faculty Athletic Rep is the same kind of
 9   thing.  It's a designated position the NCAA
10   requires.
11          I do -- we do work collaboratively with
12   different programs.  So Eddie Nunez oversees some
13   other programs.  And Mark Ewing has a couple of
14   programs, as well, with sport oversight.  And Verge
15   Ausberry has a program, as well.
16      Q.  Which one does he oversee?
17      A.  He oversees men and women's track.  Mark
18   Ewing has men's and women's golf.  And Eddie has --
19   did I mention swimming; that I had swimming?
20      Q.  Yes, ma'am.
21      A.  Eddie has men's and women's tennis, men's
22   basketball.  I think I have gotten them all now.
23   But we work to make sure our policies are -- the
24   decisions we make are the same across all sports.
25      Q.  You heard Mr. Alleva testify that the
```

```
 1   decision, as it was related to Tony Minnis, was one

 2   of a collaborative effort between you, Mr. Nunez

 3   and himself; is that true?

 4       A.   That's true.  We had discussions about the

 5   program issues that had come up.

 6       Q.   And in some sense -- and correct me if I'm

 7   wrong -- I mean, as Senior Associate Women's

 8   Administrator, you are in Tony Minnis' chain of

 9   command; am I correct?

10       A.   Well, I work with every coach from every

11   sport in regard to housing, meal plans, issues that

12   come up in the dorm, issues including football,

13   including men's basketball.  All sports in regards

14   to student issues.

15            And so under those type of things, yes,

16   Tony would work with me directly and receive

17   E-mails from me accordingly.

18            On paper, you know, his direct supervisor,

19   I believe, was -- is Nunez who reports to Joe

20   Alleva.

21       Q.   But in reality what you're telling me is

22   you have some role or function with respect to all

23   of the head coaches at LSU, correct?

24       A.   I do in regards to student-service issues,

25   appeal hearings, like for scholarship non-renewals.
```

```
 1    Scholarships is another example.
 2           I work with every sport on scholarship
 3    limitations, on who they want to award a
 4    scholarship to.
 5       Q.  If there's an issue with a student athlete,
 6    you work with the coach in that regard?
 7       A.  I do.  I do.
 8       Q.  And in some sense, you have some
 9    responsibility for student morale among all the
10    teams; am I correct?
11       A.  I wouldn't say I have influence over
12    student morale, because I don't work with them
13    daily.
14       Q.  I'm sorry; I said "responsibility."  Like,
15    if you are aware of a morale issue with a
16    particular team, you have the responsibility or the
17    right to talk to that head coach of that program
18    about it, right?
19           MR. BARTON:
20               Object to the form.
21           THE WITNESS:
22               The only way I would be aware of a
23               morale issue would be if a student brought
24               something to me on an individual basis.
25               And depending on what the conversation
```

REDACTED

MIRIAM SEGAR                                              4/9/2014

```
1              was, it would depend on what I do with the
2              information.
3    BY MS. CRAFT:
4       Q.  You sat through Mr. Bahnsen's deposition;
5    is that right?
6       A.  I did.
7       Q.  And is that true, that his brother Billy
8    came to you in the fall of 2011 with some concerns
9    about  AB   having some drug and drinking issues?
10      A.  What I recall about my conversation with
11   Billy was primarily that he wanted  AB   to have
12   the ability to move off campus, and that he --
13      Q.  I'm sorry; you're talking about  PB   or
14   RB
15      A.  Sorry --  PB   to move off campus; that he
16   wasn't happy with the living arrangements.
17              I don't recall Billy specifically talking
18   about drugs.  I do recall him talking about having
19   guests late at night, a lot of noise.
20              Prior to his visit, I think there had been
21   some thermostat issues with the girls, and I think
22   they live with a women's golf student athlete, as
23   well.  And so I knew there were some issues in the
24   area.
25      Q.  Do you deny that Billy Bahnsen made any
```

REDACTED

MIRIAM SEGAR                                4/9/2014

```
 1   reference to  RB  having a potential drug issue?

 2       A.   I don't recall Billy Bahnsen talking to me

 3   about drug issues.

 4       Q.   Do you deny that Billy Bahnsen said

 5   something to you about  RB  having a drinking

 6   issue?

 7       A.   I remember Billy talking about drinking, in

 8   regard to having people over and different guests

 9   at different hours of the night and his

10   unhappiness.

11            I remember him showing me a picture on his

12   cell phone of a dorm -- like the common area of the

13   bathroom was really messy, like a lot of clothes

14   everywhere.

15            And he's, like, you know, this just is not

16   an environment for my daughter, and it's messy,

17   that's -- I don't recall talking with him about any

18   drug issues.

19       Q.   Did you talk to anybody about any drug

20   issues with  RB

21       A.      PB          came to see me maybe -- I

22   don't know the timeframe with regard to her dad --

23   I think maybe prior to her dad coming by.

24            And at one point told me, you know, I think

25   that  RB  may -- I may have seen a drug.  I think
```

REDACTED                    **MIRIAM SEGAR**                    **4/9/2014**

1    maybe  *RB*   -- there's a drug that I maybe saw in

2    the bathroom.

3              And I said, Well, can you describe it for

4    me?

5              And she said, Well, I don't know what it

6    is.

7              I said, Well, was it medication?

8              She's, like, I don't know.

9              I said, Could it have been vitamins?

10             She said, I don't know.

11             I said, Well, why do you think it's a drug?

12             And she said, Just because of her general

13   behavior, I just think maybe it's drugs.

14             And I said, Okay, and that was the end of

15   that conversation.

16        Q.  Did you make notes of your conversation

17   with either Billy or   *PB*

18        A.  I did not.

19        Q.  Did you drug test  *RB*   at that time?

20        A.  I did.

21        Q.  When?

22        A.  I drug tested  *RB*   six times over three

23   semesters.

24        Q.  From when to when?

25        A.  I would have to look.  I don't have it with

REDACTED

```
 1    me.  I don't keep those records.

 2           But I think the first test was, like,

 3    September of 2012, whatever -- the fall when she

 4    was here, 2011.  And her last one was in the fall

 5    when she left.  She was here for three semesters.

 6           Our general drug-testing policy calls for a

 7    minimum of two a year.  And we try to get every

 8    athlete twice a year is our goal.  And in three

 9    semesters, she was tested six times.

10    Q.  Why so much?

11    A.  Because I had heard maybe she had a drug

12    problem from  PB   and so I tested her.  I

13    continued to test her because -- just trying to

14    make sure.

15           If we have something reported to us or to

16    me, then I add them to a list and ask them to

17    randomly mix the student in with different tests

18    that we do.  And so I did -- we did test her

19    several times.

20    Q.  Did anybody else from the team ever talk to

21    you about  PB    having -- I'm sorry -- about  RB

22    having some either alcohol or drug issues?

23    A.  No.  At one point, some of the team was

24    reprimanded for going out.  And one of the student

25    athletes said something about, you know,  RB
```

REDACTED

```
 1    drinks, goes out more than we do.  We think she
 2    drinks a little bit more than we do.
 3         Q.  The team was reprimanded by whom?
 4         A.  Coach Minnis.
 5         Q.  When was that?
 6         A.  I don't really know the date.  It would
 7    have been the fall of 2011.
 8         Q.  Before the  RB  incident in January of
 9    2012?
10         A.  It may have been in conjunction with the
11    RB  issue in 2012.  It may have been right after
12    that.  I don't -- I don't remember the timeframe.
13         Q.  Are the student athletes allowed to drink?
14         A.  They are not supposed to drink if they are
15    underage.  We can't condone drinking, obviously.
16         Q.  Was  RB  underage?
17         A.  She was.
18         Q.  When you say that you tested her six times,
19    what was she tested for?
20         A.  Our standard drug panel includes synthetic
21    marijuana, marijuana, cocaine, performance-
22    enhancing drugs, amphetamines.  It's pretty much
23    anything.  I mean, all the tests we test, basic
24    panel.
25         Q.  And if an athlete has a prescription for,
```

REDACTED

MIRIAM SEGAR                                    4/9/2014

```
 1    let's say, for example, an ADHD medicine, you know
 2    that that would be a positive test for
 3    amphetamines, right?
 4         A.  It would.
 5         Q.  And do you know whether or not she had any
 6    of those issues?
 7         A.  She did not.
 8         Q.  And was a hair follicle ever performed on
 9    her?
10         A.  We don't do hair-follicle testing.
11         Q.  But you never went to Tony Minnis and told
12    him that there was some issue about  RB  possibly
13    having a drug and/or alcohol issue; am I right?
14              MR. BARTON:
15                   Object to the form.
16              THE WITNESS:
17                   My understanding is that Tony was aware
18              of the drinking.  I think he had his own
19              concerns with  RB  and the drinking.
20              Like, he had some issues with some workouts
21              in the fall, that she was having a hard
22              time finishing workouts.  And her diet was
23              discussed and different things.  So I think
24              he was definitely aware of that.
25                   I know he was aware that  PB  moved
```

```
 1              out.  I assumed he would have asked PB
 2              about it or talked to  PB   about it and
 3              her reasons.  I don't know what he did or
 4              didn't know.
 5    BY MS. CRAFT:
 6        Q.  Okay.  So in answer to my question, you did
 7    not tell Tony Minnis or talk to Tony Minnis about
 8    RD   having alcohol and/or drug issues?
 9        A.  I did not do that --
10              MR. BARTON:
11                  -- object to the form.
12              THE WITNESS:
13                  I don't think, according to the -- any
14              documentation that I would have or
15              knowledge that I would have, RB  did not
16              have a drug problem.
17    BY MS. CRAFT:
18        Q.  But, yet, you tested her six times in three
19    semesters?
20        A.  Absolutely, because I was -- like I told
21    you, if we suspect or somebody says, then we might
22    test somebody more frequently.
23        Q.  But don't you think that would have been
24    important information for you to pass on to a
25    coach, that, Look, there's been this concern
```

```
 1    registered; maybe you should keep an eye out on
 2    her?  Wouldn't that have been important for you to
 3    tell him?
 4         A.  I think Tony knew.  Tony had his own issues
 5    with  RB   that whole fall and the whole spring.
 6            By the end of the spring semester, he
 7    didn't even want her participating in practice or
 8    competition, so he was aware that  RB   had issues.
 9         Q.  My question was, Wouldn't you have had
10    wanted to at least tell him, Look, I have received
11    this information; I'm an administrator and you need
12    to be on the lookout for her --
13         A.  -- well, if a drug --
14         Q.  -- excuse me, let me finish.
15            -- isn't that part of your job in Student
16    Services?
17            MR. BARTON:
18                Object to the form.
19            THE WITNESS:
20                That's one I tried to answer, but I
21                don't think that if a student comes to me
22                with a thought that maybe something is
23                happening and there's no proof of it, that
24                I would go to a coach with that, no.  I
25                would not.
```

REDACTED

```
 1   BY MS. CRAFT:
 2        Q.  Didn't Billy tell you that he had searched
 3    PB      room and that they had found some
 4   paraphernalia?
 5        A.  Absolutely not.
 6        Q.  Did he tell you that they had searched the
 7   room?
 8        A.  Absolutely not.
 9        Q.  So in answer to my original question, no,
10   you did not discuss with Tony Minnis that there
11   might be an issue with drug and/or alcohol use by
12   Becky; is that correct?
13        A.  I did not discuss when  PB  told me that
14   she thought maybe there was a drug in the bathroom,
15   I did not call Tony.  Because the drug test did not
16   reveal that.
17        And  PB  herself was uncertain what she
18   saw.  She couldn't be sure it wasn't a vitamin.
19   She couldn't be sure it wasn't a form of a
20   prescription medication.  So no, I did not call the
21   coach at that time.
22        When I was aware that  RB  had a, if we
23   want to call it a drinking problem, I would
24   categorize that after the incident at CCL.  And
25   that would be the time that I was aware of any
```

REDACTED

MIRIAM SEGAR                                    4/9/2014

```
 1    issue with  AB  in regards to alcohol.  And Tony

 2    was also, at that same time, aware of that issue.

 3        Q.  And when was that?  When you were aware of

 4    this drinking problem with  AB

 5        A.  Well, her issue at CCL was in January of --

 6    I don't even know the date -- 2012?  That was a

 7    pretty significant issue.

 8        Q.  It's my understanding that she was actually

 9    tested for alcohol when she was taken to the

10    hospital; is that right?

11        A.  I didn't -- I don't know about that.  I

12    didn't see the report.  But my understanding is

13    that that's accurate.

14        Q.  And that it also, when she was tested for

15    alcohol, and it would have been sometime in the

16    morning because she was, you know, past the legal

17    limit and then some, right?

18        A.  I don't think at the time the test was

19    done, to my recollection, she was past the legal

20    limit.  I think the blood -- or the blood alcohol

21    was .04 I think.  But I didn't see the report.  I

22    don't know.

23            Under the LSU policy with an incident

24    involving alcohol, she was given a probationary

25    violation of the Substance Abuse Policy.  And
```

1    obviously Coach Minnis was aware of that.

2         Q.   Was that a factor that you considered in

3    your evaluation of whether or not Coach Minnis

4    handled the January 2012 incident appropriately?

5         A.   Is what a factor?

6         Q.   That this girl was -- had alcohol in her

7    system a whole day later, I mean?

8         A.   No.

9         Q.   I will show you a document.  I think your

10   counsel just grabbed it, but it was Exhibit #31.

11        A.   Okay.

12        Q.   That's an E-mail trail that I got this

13   morning.

14             First of all, are there any other E-mails

15   between you and Tiffany Jones about the tennis

16   program?

17        A.   Not that I'm aware of, that haven't been

18   produced.

19        Q.   In this document, she's writing to you on

20   March 24, 2012.  And, first of all, Dr. Jones is

21   whom?

22        A.   Tiffany Jones was a consultant that was

23   hired by LSU after a recommendation from Brian Lee,

24   who's our head soccer coach.  He saw her at an

25   Olympic Development Soccer Clinic and thought she

```
 1   had a really good message and was interested in

 2   having him work -- her work with his team, maybe in

 3   the preseason as I recall, and we were open to that

 4   idea.  And she ended up working with gymnastics.

 5          And at some point, Coach Minnis requested

 6   that she also be allowed to work with his program.

 7       Q.  So Dr. Lee wasn't hired by LSU specifically

 8   because of any problems in the tennis --

 9       A.  -- Dr. Jones?

10       Q.  I'm sorry, Dr. Jones.  You said Tony

11   requested her?

12       A.  No, I didn't even -- no, Tony requested her

13   to work with his team.

14       Q.  Okay.  And so did LSU ever hire anybody

15   specifically to work with the tennis team or

16   evaluate the tennis team's morale to your

17   knowledge?

18          MR. BARTON:

19              Object to the form.

20          THE WITNESS:

21              No.

22   BY MS. CRAFT:

23       Q.  In this E-mail from Dr. Jones to you, she's

24   referencing a detailed report.  I think we saw that

25   yesterday; am I right?
```

```
1        A.   Yes.

2        Q.   Some reports she had put together?

3        A.   Yes.

4        Q.   And she put together -- correct me if I'm

5   wrong -- similar reports about some of the other

6   teams at LSU that she looked at, right?

7        A.   She did not.

8        Q.   Why did she put a report together for

9   tennis?

10       A.   Because when she met with me about tennis,

11  she was really concerned with the program.  She was

12  concerned with the information she was receiving

13  from the girls in the program.

14       Q.   Like what?

15       A.   They're mentioned in the report.  I think

16  they are detailed pretty carefully in there.

17            But there was, I guess, a little bit of a

18  faction on the team.  Some of the girls were -- I

19  guess had different objectives within the team.

20            And she met with the girls individually,

21  and she would meet with the coaches.  And there was

22  a disconnect with the coaches and the team.  She

23  was concerned about it.

24            She, you know, talked to Tony about it.  I

25  think the girls felt like they could not talk to
```

MIRIAM SEGAR                                    4/9/2014

```
1    Tony about the issues.  She encouraged them to talk
2    to Tony.  I had encouraged kids that came to me to
3    talk to Tony, and they felt like it wouldn't matter
4    what they said.
5              So at some point, she recommended a
6    meeting.  I asked to attend the meeting, and she
7    told me that she didn't think it would be good to
8    do that because Tony didn't trust me.  And that if
9    I attended, she didn't feel like Tony would be able
10   to really focus on what the girls were saying.
11             And that she thought that if we let it stay
12   within the team, it would be, you know, a better
13   thing for the team, but that she would write up a
14   report.
15             Because my biggest concern with having
16   somebody that doesn't work for LSU to do that was
17   you leave, and I don't -- you know, I want to make
18   sure we are all on the same page, everybody is on
19   the same page.  Because you leave and you are not
20   going to be here, and so I want you to write me a
21   report, so that's where this -- why this was
22   written.
23       Q.  And I was going to ask you that.  That
24   report from Dr. Jones is something that you
25   requested she do; isn't that right?
```

```
 1        A.   I did ask her that.
 2        Q.   And you did not ask that she write a report
 3   on either gymnastics or women's soccer; is that
 4   right?
 5        A.   I didn't.  But she didn't recommend a team
 6   meeting like that with soccer or gymnastics.  She
 7   didn't have the same findings.
 8             She had some issues that she was dealing
 9   with, trying to help these girls deal with their
10   coach.  And there were a lot of problems that year
11   on the team.
12             And at one point, she told me that she had
13   not ever had a team that had this many people that
14   just were not working well together, and the coach
15   wasn't working well with them.  And she thought
16   everybody was doing their best, but that it was
17   really difficult.
18        Q.   Well, let's compare that to women's soccer.
19   How many of the parents of the female soccer
20   players came to you to complain about Brian Lee?
21        A.   I think I met -- and, you know, in all
22   fairness, that was several years ago, and I would
23   need to look back at my record to be accurate --
24   but I think I met with probably -- for sure I can
25   remember three, different parents.
```

```
 1        Q.   Three, different sets of parents; isn't
 2    that right?
 3        A.   I didn't meet with -- well, yes, different
 4    -- different children, yes.
 5        Q.   And I am correct -- and I know you're going
 6    to look at your notes, and I am assuming all of us
 7    will, too -- but my recollection is that the timing
 8    that all of that occurred was around 2011/2012;
 9    does that sound about right?
10        A.   I don't recall it being the same year.
11        Q.   I'm sorry.  During that timeframe?
12        A.   I don't really know.
13        Q.   All right, that's fine.
14             Was it your understanding that the parents
15    that you met with from the women's soccer team were
16    complaining that Mr. Lee was abusive to their
17    children?
18        A.   I don't know that they ever used the word
19    "abusive."
20             What I recall about that situation was that
21    a letter was received, which I believe came from
22    your office, and we took it very seriously.  We
23    hired outside counsel to sit with me, and every
24    student athlete was interviewed from that entire
25    team.
```

```
 1              And if I recall, we -- Bob Barton who was
 2     our legal counsel sent a letter back, I believe to
 3     you, indicating, you know, that we took things
 4     seriously and we were going to make some decisions,
 5     but that we were closing our investigation.
 6          Q.   Okay.   What were the parents and the female
 7     athletes complaining about with respect to Brian
 8     Lee?   What were the big issues?
 9          A.   Well, the one thing is there were three out
10     of twenty-six or seven kids that I believe had
11     issues.   We met with every kid.   I don't recall
12     every situation to -- I would be inaccurate right
13     now to answer it without looking at all the
14     documentation.   We interviewed over 20 kids.
15          Q.   What about him yelling and cursing at the
16     players?
17          A.   My recollection is that one person said
18     that he cursed at them.
19              When we asked that individual, the student,
20     what I recall is that student did not feel like it
21     was an attack on them as a person but, rather, a
22     coach yelling a profanity.
23          Q.   Was it that the student said that, or was
24     that you suggested that to the student during that
25     meeting?
```

```
 1          MR. BARTON:
 2              Object to the form.
 3          THE WITNESS:
 4              The student would have said it.
 5     BY MS. CRAFT:
 6      Q.  Is that a guess on your part, ma'am?
 7      A.  That would be accurate to my recollection.
 8      Q.  I understand.
 9          And at the same time -- and correct me if
10     I'm wrong.  At least I may be wrong -- three
11     members of the women's soccer team quit as a result
12     of Coach Lee; does sound about right?
13      A.  We did have some women's soccer student
14     athletes that quit the team at different times.
15      Q.  How many?
16      A.  I don't know.
17      Q.  And was it your understanding they quit
18     because of Coach Lee?
19      A.  The girls that quit, I know they weren't
20     playing very much, either.  And I think it was a
21     combination of no return on investment.  I'm out
22     there a whole lot, I'm not enjoying myself, and I
23     don't want to play soccer anymore.
24      Q.  So is it your testimony that those girls
25     quitting the soccer program had nothing to do with
```

```
 1   Coach Lee?
 2           MR. BARTON:
 3                Object to the form.
 4           THE WITNESS:
 5                That's not my testimony.  I'm saying
 6                that I recall other things, as well.
 7   BY MS. CRAFT:
 8       Q.  Okay.  Well, aside from the, "other things,
 9   as well," I need you to tell me.  It's true, is it
10   not, that some of these women soccer players quit
11   because of Coach Lee?
12       A.  I think it was a combination of reasons why
13   they quit.  And I think that they -- a couple of
14   them did not enjoy the experience that they had.
15   It doesn't mean that was the only reason.
16       Q.  I'm not saying it was the only reason.  But
17   it was a reason, correct --
18       A.  -- I don't remember --
19       Q.  -- as far as you know?
20       A.  I don't remember the interview we had with
21   those specific individuals.  And I would like to
22   look at that before I answer that question any
23   further.
24       Q.  The parents that you met with, did they
25   express to you that they were having frustration or
```

1    problems even trying to get to meet with you and/or

2    Mr. Alleva about what was going on in soccer?

3         A.   I don't recall them having any issues

4    meeting with me, and I don't recall them asking to

5    meet with Mr. Alleva.

6              Our normal process if a parent calls is,

7    depending on the sport, they are referred to the

8    sport administrator.

9              The sport administrator looks into the

10   situation, meets with individuals, and then if it

11   rises to a level where we believe the AD needs to

12   be involved, we do that.

13             Shortly after, we got a letter from your

14   office and involved legal counsel.

15        Q.   Okay.  Was there occasion where these

16   parents were denied meetings with any

17   administration at LSU?

18        A.   I have no recollection of that.

19        Q.   When you talked to the parents, the three

20   different parents for three different kids, what in

21   general terms were their complaints about Coach

22   Lee?

23        A.   I would have to look at my notes.

24        Q.   Okay.  And you said there were 26 soccer

25   players?

MIRIAM SEGAR                                    4/9/2014

```
 1        A.   Approximately.

 2        Q.   And how many women's tennis players are

 3   there?

 4        A.   Usually about eight on a roster.

 5        Q.   Is that the full roster, or is it eight

 6   plus some subs?

 7        A.   It's probably the average roster size is

 8   about eight.  I wish it was bigger.

 9        Q.   Okay.  And as I understand it, what you're

10   telling me is -- by the way, was Dr. Jones brought

11   in after these parents and student athletes

12   complained about the women's soccer, or as a

13   result?

14        A.   It wasn't as a result, because it was at

15   the request of Coach Lee, but I don't know.  I

16   would have to look at the contract and the timing

17   of that.  I really don't know if they corresponded

18   or if it was before or after.  Because I don't know

19   my dates.

20        Q.   Do you know if one was proposed as a fix

21   for a morale problem or a problem on the women's

22   soccer team?

23        A.   Not to my knowledge.

24             As I mentioned, he saw her speaking and

25   thought she would be good for the department, his
```

```
 1    program.  Specifically, she worked with soccer
 2    players for the U.S. Olympic Team, and he thought
 3    it would probably be a good idea.
 4            I didn't know about her until he asked to
 5    have her come in.  It may have been after this, I
 6    just -- I don't know.
 7        Q.  But correct me if I'm wrong, the women's
 8    soccer team had a morale issue that you became
 9    aware of, and that resulted in you personally, with
10    legal counsel, interviewing every female soccer
11    player on the team; is that right?
12            MR. BARTON:
13                Object to the form.
14            THE WITNESS:
15                Again, it wasn't a morale issue as to
16            why we interviewed the people that we
17            interviewed.
18                It was a document we received
19            indicating some complaints that came from
20            your office which predicated and resulted
21            in us meeting.  Not as a result of a morale
22            issue.
23    BY MS. CRAFT:
24        Q.  And was there some sort of report?  Or were
25    there notes taken during your interviews with these
```

1    people?

2        A.   Legal counsel took notes.

3        Q.   You didn't take notes?

4        A.   I honestly don't know.  I probably took

5    some notes during those meetings.  I'm sure I did.

6    I don't -- I don't know.  Bob conducted most of the

7    meetings, so I'm sure I have notes.

8        Q.   You didn't ask the questions; the lawyer

9    did?

10       A.   I asked some.  But he asked a lot, too.  We

11   had information from the -- that you drew up, and

12   so I'm sure you are aware of what was in it.

13       Q.   Do you know if any of the interviews were

14   recorded?

15       A.   They were not recorded to my knowledge,

16   that I recall.

17       Q.   By you or legal counsel?

18       A.   We were together, and I don't recall

19   recording any of the meetings.

20       Q.   Okay.  And so at the end of the interview

21   with the soccer team, you indicated that there were

22   some actions taken; am I right?  Or some things

23   were done?

24       A.   I think you received a letter that said,

25   that summarized it -- and I haven't looked at that

```
 1    letter in three years, four years, whatever it has
 2    been.  And I don't recall the contents exactly of
 3    the letter.
 4        Q.  Did Mr. Lee receive any letters of
 5    reprimand?
 6        A.  I don't know the answer to that, either.  I
 7    really don't.
 8        Q.  Has he ever received any reprimand letters?
 9        A.  I would have to look in his personnel file.
10    I do evaluate --
11        Q.  -- and with all due respect, I really would
12    like to look in his personnel file, too.  But I'm
13    apparently not able to get a copy of that.
14        A.  Yeah, I can understand.
15        Q.  So you're the only person that I'm allowed
16    to ask.
17        A.  Well, if you want me to look and get back
18    with you, I'm happy to do that.
19             I'm sure there's some reprimand letters in
20    there.  All coaches receive reprimand letters for
21    NCAA violations, any departmental policy that's not
22    followed.  Reprimand letters are issued to document
23    whatever occurred.
24             So yes, there's reprimand letters I'm
25    certain in his folder.  What they contain exactly,
```

REDACTED

MIRIAM SEGAR                                    4/9/2014

```
 1    I could not answer to that.
 2        Q.  In the document that's in front of you,
 3    which I think we have attached as Exhibit #31, it's
 4    the E-mail from Dr. Jones to you dated March 24th.
 5            And am I correct that this is where she's
 6    basically transmitting the report to you?
 7        A.  Correct.
 8        Q.  In this, she writes at the bottom of the
 9    first page, "On another note, I did not want to
10    include this in the report because I wasn't sure
11    who you may show the report to."
12            What's that about?
13        A.  I think what she's talking about is what's
14    below it.
15        Q.  Okay.
16        A.  I assume.  I don't know.
17        Q.  She writes, " RB  is a huge concern."
18            She had spoken to you about her concerns
19    with respect to  RB  before; am I correct?
20        A.  She talked about  RB  with me, yes.
21        Q.  What did she talk to you about?
22        A.  What I recall is that she told me that Tony
                              RB
23    was concerned about        her commitment to the
24    team, her desire to really be at LSU, whether or
25    not she could continue to participate and practice
```

REDACTED

MIRIAM SEGAR

1    was an issue.

2              She had been withheld.  And I know she had

3    told me about that issue going on with RB  .  I

4    think she -- I can't remember the exact words she

5    would use -- but I think she summarized some of it·

6    in this statement.

7         Q.  Well, she says, "I know I have spoken to

8    you about this.  But during some of my individuals,

9    I have learned that there has been some drug abuse

10   since she's been at LSU."

11             How many times did Dr. Jones talk to you

12   about  RB   having drug abuse since she's been at

13   LSU?

14        A.  This is the first thing I recall our --

15   this is the first thing I'm aware of, that I

16   recall, that she said anything about a drug issue.

17        Q.  Did she ever talk to you about an alcohol

18   issue with RB  ?

19        A.  Well, this is -- this summary was after the

20   issue at CCL with the alcohol.  So I think all of

21   us knew that, at that point, there was at least one

22   incident where there was an alcohol concern, that

23   she was abusing alcohol.

24             But I don't recall speaking to her

25   specifically outside of this framework about

1    *RB*    alcohol or drug.  The first time that I

2    remember talking to her about it was in this.

3         I never replied to this E-mail.  I talked

4    to her in person on the phone about it.

5         Q.  By this point in time, had you interviewed

6    the tennis-team people or some of the people from

7    the tennis team?

8         A.  Yes.  Before that, Eddie and I talked to

9    the entire team about the incident at CCL.

10        Q.  Separately or together?

11        A.  Together.

12        Q.  I will show you some documents I'm going to

13   attach to the deposition as Exhibit #33.  It seems

14   to be a series of handwritten notes.

15             (Whereupon, the document was duly marked

16             for identification as "Exhibit #33" and

17             attached hereto.)

18        A.  Yes, ma'am.

19        Q.  Are these your notes?

20        A.  They are.

21        Q.  I didn't know exactly whose they were.

22   These are your notes from talking to the entire

23   team; is that right?

24        A.  Yes, ma'am.

25        Q.  And I just wanted to kind of make sure that

1    I'm clear.  The first page of Exhibit #33 which is

2    Bates 1377 -- and that's the tiny number on the

3    bottom.

4         A.  Oh, okay.

5         Q.  That's from your notes of interviewing

6    RB

7         A.  Yes.

8         Q.  And you interviewed her on January 30,

9    2012?

10        A.  That's what it says, yes, ma'am.

11        Q.  Is that your recollection?

12        A.  Only because it's on here, yes.

13        Q.  Okay.  And is this whole note your

14   discussion with    RB

15        A.  Yes.

16        Q.  PB    came to you about   RB    or    RB

17   Did you ever talk to   RB  about, Hey, there's some

18   concern that you might be partying too much or you

19   might be using drugs?  Did you ever do that?

20        A.  I had a lot of different talks with   RB

21   And I don't remember one directly after talking

22   with   PD    But during her enrollment at LSU, I

23   had several different conversations with   RB

24   about making good decisions.

25             You know, at one point, she -- it was after

```
 1   Coach Minnis left -- she wanted to transfer, and we
 2   started talking about grades and we were talking
 3   about --
 4       Q.  -- I'm sorry, after Coach Minnis left,
 5   that's when she transferred?
 6       A.  She did transfer in January, I believe, of
 7   '13.
 8       Q.  She transferred under Coach Sell?
 9       A.  She transferred after Coach Sell got here.
10       Q.  Why?
11       A.  Continued to have -- I don't know exactly
12   why, other than I think it was  RB   idea.  RB
13   wanted to transfer.  I think she wanted a fresh
14   start.
15       Q.  How many other students, just out of
16   curiosity, transferred after Coach Minnis was
17   terminated?
18       A.  I think  RB  was the only transfer.
19       Q.  Okay.  How many quit the team?
20       A.  PB  did not come back to the team.  She
21   was a walk-on.  And after year one, I'm trying to
22   think of her name,            CH            I
23   believe is still enrolled at LSU but did not return
24   for her sophomore year.
25       Q.  Anybody else?
```

1        A.   That's all I can recall right now.

2        Q.   Have there been any complaints, to your

3   knowledge, by any of the tennis-team members about

4   Coach Sell?

5        A.   I do exit interviews with student athletes

6   from every sport, and I did exit interview some of

7   the seniors from the '12/'13 team.  That was

8   Julia's first year and, you know, I had different

9   conversations with them.

10           I mean, yes, there were some complaints.

11       Q.   Like what?

12       A.   I'm trying to think.  I think overall that

13   the practices were set up differently.  I think

14   they were harder; there was more physical activity.

15           There was a complaint by one of the -- or a

16   conversation that we had by one of the students

17   felt like she closed practice to people to come in,

18   and they liked having sometimes people come in.

19   They didn't enjoy that.

20       Q.   The exit interviews would probably be the

21   best evidence of what they told you; is that right?

22           MR. BARTON:

23               Object to the form.

24           THE WITNESS:

25               Probably.  Because I would have notes

```
 1              about what was said.
 2    BY MS. CRAFT:
 3       Q.  And isn't it true that at least one of
 4    those athletes told you that they did not like the
 5    way Coach Sell talked to them, dealt with them,
 6    something like that?
 7              It wasn't just closed practice or that we
 8    have to work harder; there were complaints about
 9    Coach Sell and how she was running that team; isn't
10    that right?
11       A.  I want to look at my notes so I don't
12    misspeak.  I know one in particular did not -- did
13    not like the experience that she had.  I don't
14    recall it being because of anything that was said
15    to her, per se.
16       Q.  But?
17       A.  Well, you asked me about saying something.
18    I don't recall that.  But I know one of them did
19    not enjoy the senior year that she had.
20       Q.  Why?
21       A.  Again, I would want to look at my notes.  I
22    don't recall the overall reason why.  I don't -- I
23    don't really remember everything she said.  Just
24    generally.
25       Q.  Sure.  She expressed to you that her senior
```

```
 1   year was not a quality experience; isn't that

 2   correct?

 3            MR. BARTON:

 4               Object to the form.

 5            THE WITNESS:

 6               I don't know that she used those words.

 7            She did describe some things she didn't

 8            enjoy.  I think she felt like -- I don't

 9            want to make up words she used.  Clearly,

10            she did not have an experience that she

11            enjoyed her senior year.

12   BY MS. CRAFT:

13       Q.  And did she also compare it to Coach Minnis

14   and that her experience under Coach Minnis was far

15   more enjoyable?

16       A.  No, I wouldn't say that.  I try not to get

17   into compare.  I think one of them said -- I just

18   feel like if I say something, it would be wrong, so

19   I choose not to say anything until I look at the

20   documents.  I don't recall.

21            MS. CRAFT:

22               To the extent I think they are

23            responsive in terms of this quality-of-life

24            business, I am going to ask that we produce

25            those documents.
```

```
 1              And obviously I am going to need to see
 2         the personnel files from some of the other
 3         individuals.  And as we talked about this
 4         morning, I'm probably going to need to come
 5         back and re-depose them when I do get some
 6         information.
 7    BY MS. CRAFT:
 8       Q.  Aside from the exit interviews that you
 9    have talked about -- and you conducted those
10    personally?
11       A.  I did.
12       Q.  Why?
13       A.  Because that's my job.
14       Q.  Has it always been your job?
15       A.  It has for several years.
16       Q.  Well, who is this --
17       A.  -- Dydia?
18       Q.  Yeah.
19       A.  When she was faculty rep, she wanted to do
20    some so she did some for various sports.  We shared
21    and she did some.  She's no longer the faculty rep,
22    and I do most of them.
23       Q.  Okay.  Have there been any complaints,
24    aside from the exit interviews that you conducted
25    of the seniors for the 2012/'13 season from the
```

 1    tennis players about Coach Sell?

 2         A.   The current team you're talking about?

 3         Q.   Were there any complaints other than you

 4    said exit interviews?

 5         A.   No, I -- I don't know of anything.

 6         Q.   How about the parents?

 7         A.   I spoke to one parent.  That was one of the

 8    same seniors that I did the exit interview with.

 9         Q.   And what did the parent say about Coach

10    Sell?

11         A.   My recollection was that his daughter did

12    not enjoy the experience.  That he did not feel

13    welcome.  That she did not talk to him at events.

14         Q.   That's the coach, right?

15         A.   The coach did not speak to him at events.

16    I think he complained about something to the effect

17    of maybe he had called a trainer, he had called

18    somebody and she wanted him to go through her for

19    the information, something like that.  That's my

20    recollection.

21         Q.   Did you do anything about that complaint?

22         A.   I talked about it with Eddie, to let him

23    know so that in the evaluation process he could

24    talk with Julia about it.

25         Q.   Did you talk to Mr. Alleva about that?

```
 1      A.   Yes.
 2      Q.   And did you talk to him about the exit
 3 interviews that you did from the players and what
 4 they were reporting to you?
 5      A.   Yes.
 6      Q.   Have you kept track of the morale on the
 7 tennis team?
 8      A.   I don't keep track of morale on any team.
 9      Q.   It's part of the evaluation process of a
10 coach, right?  Or not?
11           MR. BARTON:
12                Object to the form.
13           THE WITNESS:
14                I would say no in terms of, again, I
15           answered this earlier, if a student comes
16           forward with an issue or concern, or a
17           parent, then obviously we look into the
18           issue and decide what we need to do with
19           the information.
20                And most of the time, it gets addressed
21           in the performance evaluation.
22 BY MS. CRAFT:
23      Q.   So did you look into the information the
24 parent provided about Coach Sell specifically?
25      A.   Yes.
```

REDACTED

MIRIAM SEGAR                                4/9/2014

```
 1        Q.  You went and talked to her, or what?
 2        A.  I just told Eddie.  I brought it to Eddie's
 3   attention.  He followed up with her, followed up
 4   with the trainer, as well.  And that was it to my
 5   knowledge.
 6        Q.  Do you know if it was reflected in her
 7   performance appraisal?
 8        A.  I did not see her performance appraisal, so
 9   I do not know.
10        Q.  Exhibit #33, these are your notes?
11        A.  Yes, ma'am.
12        Q.  Bates 1377 is your interview with      RB
13   RB
14        A.  Yes.
15        Q.  And were you just asking her about what
16   happened at the incident, or were you asking her
17   about other things?
18        A.  We asked about the night before with her,
19   what she did.
20        Q.  And who is the "we"?
21        A.  Eddie and I.
22        Q.  Okay.
23        A.  Asked about the event, what she recalled.
24        Q.  Were you asking these players about their
25   experiences with Tony Minnis, also?
```

REDACTED                    **MIRIAM SEGAR**                    **4/9/2014**

```
1        A.  Depended on how the interview went.  It's
2   sort of like this.  Depending on what I say, you
3   ask me other questions.
4             And that's how this was, as well.
5   Depending on things they said, we may ask another
6   question.
7        Q.  Did you guys record these?
8        A.  We did not.
9        Q.  Did Eddie make notes?
10       A.  I really don't know if he made notes, or
11  not.
12       Q.  Okay.  So in this interview you had with
13   RB              , she says that she had -- and was it
14  three and a half drinks in one hour?
15       A.  That's what she said.
16       Q.  Do you think that was true?
17       A.  I wouldn't know -- I have no way of
18  knowing.  I don't know how big the drinks were.  I
19  have no idea.  I don't necessarily think that what
20   RB  told us about the night before was accurate.
21       Q.  Well, let me ask it this way.  As I
22  understand your notes, she said they went to Fred's
23  and for an hour, from 8:30 to 9:30, they got free
24  drinks, which were vodka and Red Bull, and she
25  drank three and a half in one hour.
```

REDACTED

**MIRIAM SEGAR**                                    **4/9/2014**

```
 1        A.   Uh-huh.

 2        Q.   Correct?

 3        A.   Correct.

 4        Q.   And then she passes out the next day at 10

 5   o'clock in the morning, right?  So that's almost

 6   12 hours later.  And she's still testing positive

 7   in the hospital for alcohol?

 8        A.   Which is why I said I don't necessarily

 9   believe the story about the night before.

10        Q.   Okay.  Now, she said the night before she

11   was with  KB   DH            YV    HE   ; is

12   that right?

13        A.   What I recall was that she said they, all

14   these girls, went out and that she saw all these

15   girls at Fred's, but that she did not return with

16   them; that they separated.  That's what I recall

17   from her conversation.

18        Q.   Now, was there anything in your interview

19   with Rebecca that you thought Tony had done wrong?

20        A.   Yes.

21        Q.   What?

22        A.   Well, if you -- Tony was telling her to run

23   faster or pack her bags and go back to Florida.

24   She fell down and nobody checked on her.

25        Q.   Wait a minute.  Let me read your notes.
```

MIRIAM SEGAR                                           4/9/2014

```
 1        A.   Uh-huh.
 2        Q.   Tony told, quote, "run faster or pack your
 3   bags back to Florida."
 4             Then you write, "Fell down twice, got back
 5   up.  Manager came over once to check"?
 6             I see the quote attributed to Tony, but I
 7   don't see what the issue is with Tony with her
 8   falling down because she's drunk.  I mean, how is
 9   that a Tony issue?
10        A.   You asked my opinion, and I'm trying to
11   tell you.  Tony told her to continue to run when
12   she was having a problem.
13             If you look at the rest of the notes, the
14   girls all saw her stumble and fall -- most of them
15   did.  The girls heard Tony yelling to run.
16             The girls told us that Tony had, before she
17   arrived, been questioning all of them about their
18   activities the night before.  And the girl,
19   Rebecca, felt like if she didn't continue to run,
20   she wouldn't have a scholarship and so she
21   continued to try to run.
22        Q.   How is that any different, pardon me, than
23   the LSU football coach yelling at one of his
24   players to run wind sprints because he was late for
25   practice?  I mean, I don't get it.  How is that any
```

```
 1    different?  This is NCAA Division 1 athletics.
 2              MR. BARTON:
 3                   Object to the form.
 4    BY MS. CRAFT:
 5        Q.  Like, are you really telling me that if I
 6    go watch practice and Coach Miles has somebody run
 7    wind sprints because he's late for practice and
 8    he's screaming and yelling at them about you need
 9    to run faster or you leave, that you are going to
10    cite him, too?
11        A.  Well, it's a little bit of an unfair
12    question.  The tennis team, when she showed up,
13    according to what we were told by the student
14    athletes, Coach Minnis had been asking and
15    questioning back and forth, back and forth.
16              Where is she?  Where is she?  I know you
17    were all out.  What's going on?
18              Well, some of the girls told her.  And I
19    think yesterday in the deposition he even said he
20    knew that she had been out, assuming she was at a
21    bar, and all this and she shows up and is told to
22    run.  The girl is stumbling and falling, talking to
23    her about her scholarship.  He doesn't see it.  The
24    manager goes over.
25              So, yeah, if you ask me, I think that there
```

```
 1    was some responsibility he had.  A girl almost died
 2    running.
 3        Q.  And that's Tony Minnis' fault?  I mean, I
 4    just want to understand because --
 5        A.  -- it's not his fault that she almost died.
 6    It's not his fault that she drank.
 7            But as a head coach, I think he has a
 8    responsibility to know what's happening.  He
 9    directed the running.  He should have known that
10    she was falling, because everybody else out there
11    did.
12        Q.  Have you ever been out to the CCL tennis
13    courts?
14        A.  I have not.
15        Q.  I have.  And let me ask you something.  At
16    the CCL tennis courts, since you have never been
17    out there, has anyone ever explained to you they
18    are surrounded by boxwood hedges?
19            MR. BARTON:
20                Object to form.
21    BY MS. CRAFT:
22        Q.  Has anybody explained that to you?
23            MR. BARTON:
24                Same objection.
25            THE WITNESS:
```

```
 1                  I don't know about boxwood.  I do know
 2             if you look through the notes that many
 3             student athletes saw her fall.  Many
 4             student athletes knew she wasn't a good
 5             runner.  The student athletes heard Tony
 6             yelling about her scholarship.
 7                  And so you asked me, Do I think that he
 8             did anything?  And I'm saying, Yes.
 9  BY MS. CRAFT:
10      Q.  In all fairness, the only comment I'm
11  seeing that she's reporting to you is run faster or
12  pack your bags back to Florida.
13             I don't see anything else in the other
14  notes about, a threatening scholarship, other than
15  you have one note which I don't know is attributed
16  to anybody, on Bates 1382, under the middle of the
17  page, "Threatened her scholarship, may, asking her
18  to transfer."
19             That seems like it's something else, not
20  the running business?
21      A.  Well, on 1378 which is a continuant of
22     RB          , she told us her breathing was
23  erratic, that teammates saw her fall and could tell
24  she was having problems.
25      Q.  Here's why I'm asking, You're conducting an
```

 1    investigation and you are going to fault one of
 2    your head coaches who's been here for 20 something
 3    years.  You have not gone out to CCL, and you are
 4    going to take the word of some girls who play on
 5    the tennis team; am I right, over your coach?
 6         A.   They were witnesses to what transpired that
 7    day.
 8         Q.   There certainly was also a doctor there.
 9    Did you talk to him?
10         A.   I didn't.  Because the doctor had nothing
11    to do with the night before or the event that
12    happened that morning.
13         Q.   At CCL, are you aware, for example, if you
14    were to run around the courts, the way the courts
15    actually are set up, you have about four courts
16    across the front and then you have a walkway that
17    comes in.  And then you have additional courts and
18    courts behind you on the left?
19              And then you have got this big, old what
20    used to be just a pro shop and now it's a pro shop,
21    restaurant, bar and bathroom facilities.
22              So if you were running around those courts
23    and facing straight ahead towards the parking lot,
24    you are not going to see a whole lot.
25              MR. BARTON:

1              Object to form.

2    BY MS. CRAFT:

3        Q.  Did you take that into consideration?

4        A.  I told you I've not ever been out there, so

5    that would be something that I would -- but I did

6    have the girls describe for me the courts.  I did

7    ask Tony about the courts, and where they were in

8    relation to the courts.

9              What he told us originally was that he was,

10   like, in the middle and there were courts around,

11   that he was moving around.

12       Q.  Okay.

13       A.  Almost every girl on the team saw her

14   collapse, get back up and start running.  The only

15   one who seems not to have seen that is Coach

16   Minnis.

17       Q.  Let me ask you this, Did you take into

18   consideration that if Coach Minnis is sitting here

19   mingling around the first four courts at the front

20   of the CCL complex, which actually face the parking

21   lot, and this girl is running around in the back

22   and the other girls are sitting here hitting

23   towards the back, right, because they are playing

24   doubles or mixed doubles, but they would have much

25   more of an advantage point than he ever would have

```
 1      because his back was to her the whole time?
 2              MR. BARTON:
 3                  Object to the form.
 4              THE WITNESS:
 5                  So with the manager that we interviewed
 6                  that Coach Minnis instructed, tell her to
 7                  start running, at one point he told us that
 8                  Tony told him to go tell RB to pick up
 9                  the pace.
10                  So my assumption was he was watching
11                  her because he was instructing her to pick
12                  up the pace.  He is yelling at her saying,
13                  so, yeah, I'm thinking he is watching her.
14                  Because why else would he be saying, Pick
15                  up the pace?
16      BY MS. CRAFT:
17          Q.  Where are your notes from the interview
18      with Tony Minnis about this incident?
19          A.  I didn't make notes of my interview with
20      Tony Minnis.  Lisa Jackson, Tony, Eddie and I, we
21      all sat down I didn't keep notes.
22          Q.  Where are your notes for your interview
23      with Lisa Jackson?
24          A.  Lisa was in the same meeting with Tony.
25          Q.  Why didn't you make notes for those two
```

```
 1    people for what you told me?
 2          Help me here.  You're investigating an
 3    incident.  You said, Oh, my gosh, a girl almost
 4    died out there.  You are doing this investigation.
 5          You don't talk to the doctor who was there,
 6    and you don't have any notes of what you talked
 7    about with either Tony Minnis or the Assistant
 8    Coach Lisa.  Why not?
 9          MR. BARTON:
10              Object to the form.
11          THE WITNESS:
12              We went down to Tony's office, Eddie
13              and I did, we mostly -- it really wasn't an
14              investigation at that point.  It was a
15              conversation that we had about what the
16              girls had said about our concerns.
17              I don't recall having an official
18              investigation interview with Tony Minnis.
19    BY MS. CRAFT:
20      Q.  Well, see, here's what doesn't make sense
21    for what you're telling me.
22          You're saying it wasn't an investigation at
23    that point, but we went to Tony's office and we
24    talked to him about what the girls said.
25          That, I'm assuming, is Exhibit #33 which
```

```
 1    you told me was an investigation?
 2        A.  This was an investigation from what the
 3    girls saw and what happened.
 4        Q.  Right.
 5        A.  Tony had already shared with us his
 6    information.
 7        Q.  Okay.  So after you talked to Tony, is that
 8    when you decided to launch an investigation and go
 9    re-interview these people, or what?
10        A.  They were interviewed before we talked to
11    Tony.
12        Q.  That's why I'm confused.
13        A.  Because Tony had talked to us on Saturday.
14    I believe he talked to Eddie the day the incident
15    occurred.  Again on Sunday and again on Monday.
16            The trainer made his report as to what had
17    occurred and what his conversations with Coach
18    Minnis had been.  There were some verbal
19    conversations that I'm aware of that happened.  And
20    then we interviewed these girls.
21        Q.  Okay.  And then you said you went back to
22    Tony?
23        A.  We did.  To let him know what we -- what
24    our concerns were about what the girls had said,
25    about what we had learned.
```

```
 1        Q.  And did you ask him about what the girls

 2   said?  And what his response was?

 3        A.  We shared with him the information.  He

 4   refuted some of it.

 5        Q.  Okay, so where are your notes of that?

 6        A.  I didn't make notes of that.  It was a

 7   conversation, like we are having right now.  I'm

 8   not making notes right now because I'm actively

 9   involved in this conversation with you.

10        Q.  You said Tony refuted some of it.  What did

11   he refute?

12        A.  The time that, you know, we were -- he

13   didn't think that that was the right time.  He said

14   something about he was going to have a witness that

15   was going to say that if he hadn't instructed

16   somebody to wake her up, that she could have died

17   in her sleep.

18        Q.  He gave you the name of that person.  That

19   was the doctor; am I correct?

20        A.  Yeah, I guess.  I really don't know.  He

21   told us a couple of times he was going to give us

22   documentation, that somebody was going to write

23   that in writing.

24            I don't recall ever receiving anything in

25   writing from a doctor about that, that I can
```

MIRIAM SEGAR                                    4/9/2014

1    recall.  He said that at the meeting; that he was

2    getting something in writing about it.

3              What else did he say?  I don't remember off

4    the top of my head.

5         Q.  Okay.  Notes would have helped you; am I

6    correct?

7         A.  Again, it was a conversation.  I didn't

8    feel like notes were important in that meeting.

9         Q.  Did you prepare the write-up that was given

10   to Tony about it?

11        A.  Which write-up are you referring to?

12        Q.  Was he written up or reprimanded about this

13   situation?

14        A.  Are you talking about Joe Alleva's letter?

15        Q.  Uh-huh.

16        A.  Eddie and I and Joe, yes, we were involved

17   with the reprimand letter.

18        Q.  Well, who actually typed it out?

19        A.  Honestly, I don't know if it was Joe's

20   secretary or me.  One of us did.

21        Q.  It's Exhibit #24, and it's a letter to Tony

22   from Joe Alleva.

23        A.  Uh-huh.

24        Q.  Yes?

25        A.  Yes.

1      Q.  And do you know, you said that you and

2  Eddie and Joe put this letter together

3  collectively; is that right?

4      A.  Yes.

5      Q.  Did you tell Joe Alleva that Tony had

6  rebutted the allegations of the girls?

7      A.  I would assume that I had shared the

8  position that Tony had, that we were aware of.

9      Q.  I don't want you to assume.  I need you to

10  tell me what you remember telling him.

11      A.  I remember talking to him regularly

12  throughout this and updating him on a daily basis

13  of the things that we talked about with the girls,

14  as well as with Coach Minnis.  So yes, I assume I

15  told him that.

16      Q.  And why was the decision made to give my

17  client a reprimand?

18      A.  Because a girl almost died.

19      Q.  You haven't had football players almost

20  die?

21      A.  Not to my knowledge.

22      Q.  In the letter, it says, "Your decision to

23  instruct the student athlete in a punishment run

24  without a Certified Athletics Trainer present

25  endangered the health and safety of your student

```
 1    athlete."
 2            Let me ask you something.  Was there some
 3    sort of policy or requirement?  Because you know I
 4    asked Mr. Bahnsen about that, and he says, no.
 5            Was there a policy or a requirement that
 6    there has to be Certified Athletics Trainer
 7    present?
 8      A.   I sent the information to Coach Minnis
 9    that's in the handbook.  And what we train our
10    trainers to do is to be at these events and be at
11    every event.
12            I know that that morning, that Coach Minnis
13    instructed the trainer not to attend.
14      Q.   How do you know that?
15      A.   Because the trainer told us.
16      Q.   You said it's in the handbook.  Is it in
17    the Athletic Training Handbook?  Or what is it in?
18      A.   Student Athlete Handbook.
19      Q.   Okay.  Now, with respect to Mr. Minnis, you
20    understood from the trainer that all he told him to
21    do was, You don't need to be there for the initial
22    fundraising part, right?
23      A.   Right.
24      Q.   And this all happened during the initial
25    fundraising part, right?  They were out there
```

MIRIAM SEGAR                    4/9/2014

1    playing mixed doubles, right?

2        A.   Right.

3             My point is that Coach Minnis told the

4    trainer not to attend.  The trainer was scheduled

5    to be out there, and he told him not to go.

6        Q.   No, actually, as I understand your notes,

7    what Mr. Minnis told the trainer was, You don't

8    need to come early; that's the fundraising part.

9    You can come later.

10       A.   Right.

11       Q.   And this trainer -- and correct me if I'm

12   wrong -- had been to this same event for years,

13   right?

14       A.   That's not true.

15       Q.   He had never been before?

16       A.   I don't know.

17       Q.   Is there some sort of policy that all head

18   coaches and their assistants are expected to be

19   familiar with the department's medical policies?

20            "Coaches should be equipped to handle

21   emergency situations.  In the absence of a member

22   of the athletic training staff, such knowledge is

23   not only vital to the welfare of the student

24   athlete, but it is important in preventing charges

25   of neglect or misconduct from being filed against

REDACTED

**MIRIAM SEGAR**                                      **4/9/2014**

```
 1    the coach in charge."

 2            That's the policy you are referring to?

 3       A.  Yes, ma'am.

 4       Q.  Okay.  So why don't you tell me what

 5    training the University gave to Coach Minnis such

 6    that he would be equipped to handle emergency

 7    situations in the absence of a member of the

 8    athletic training staff?

 9       A.  You probably should ask Jack Marucci and

10    what they do with the coaches.  I'm not sure if

11    they did anything official with the coaches at that

12    time.

13       Q.  Well, they do now because Mr. Minnis

14    brought it to y'all's attention, right?

15            MR. BARTON:

16                Object to the form.

17            THE WITNESS:

18                And they do now because a girl almost

19            died.

20    BY MS. CRAFT:

21       Q.  Because of  RB

22       A.  We do now because of the incident that

23    occurred when the girl almost died, yes.

24       Q.  And you aware, are you not, that Coach

25    Minnis in his response to this reprimand letter
```

```
 1   pointed out the fact that the policy, such as it is
 2   that you provided him, required LSU to be giving
 3   him training which he had not received, right?
 4          MR. BARTON:
 5               Object to form.
 6          THE WITNESS:
 7               Well, it never says LSU is going to
 8               provide it.  It says we expect that our
 9               coaches to be.
10   BY MS. CRAFT:
11      Q.  No, ma'am, what it says -- and I can show
12   it to you.
13      A.  No, that's fine.
14      Q.  It says, "All head coaches and their
15   assistants are expected to be familiar with the
16   department's medical policies."
17      A.  Uh-huh.
18      Q.  That's not being equipped to handle the
19   situation, right?  They're two, different things,
20   correct?
21          MR. BARTON:
22               Object to form.
23          THE WITNESS:
24               Can you keep reading?
25   BY MS. CRAFT:
```

1     Q.  Sure.  "Coaches should be equipped to

2  handle emergency situations in the absence of a

3  member of the athletic training staff."

4     A.  So that morning if the doctor wouldn't have

5  been at CCL, what would have happened?

6     Q.  Well, let me ask it this way, ma'am.

7          Why didn't LSU ever provide any such

8  training, such that Mr. Minnis would be equipped to

9  handle emergency situations like that?

10     A.  And what I would tell you is I'm not sure

11  that it wasn't available on campus.  I'm not sure

12  it wasn't available through a request of an

13  athletic trainer.

14          We did not formally require that coaches go

15  through that.  But we certainly didn't deny the

16  opportunity if requested for it.

17     Q.  But certainly after this incident you did

18  require all the coaches, right?

19     A.  I said that we do because the student

20  athlete almost died.  And had the doctor not been

21  present, she may have.

22     Q.  Okay.  And so where in this policy does it

23  say that he was required, "he" was required, to

24  have a Certified Athletics Trainer present?

25  Where's that?

```
 1      A.  Well, since he, as you just mentioned,
 2   doesn't feel prepared to take care of the health of
 3   the student athlete, then he should have had a
 4   trainer present.
 5      Q.  I understand that, ma'am.  But where in the
 6   policy does it say that?  Because it doesn't,
 7   right?
 8           MR. BARTON:
 9              Object to the form.
10           THE WITNESS:
11              Our coaches, we have meetings annually
12           where the trainer talks to them about
13           having trainers present, talks to them
14           about medical-training policies, talks to
15           them about how to handle issues that come
16           up, how to refer kids to doctors, how --
17           all of our policies.
18              So I don't know that it's in that, that
19           you're reading.  But I do believe there was
20           a definite understanding, which is why he
21           said, Don't worry about coming to this.
22           It's not an official workout.
23              I think the coach knew that he should
24           have a trainer present because he directed
25           one not to show up.
```

```
 1    BY MS. CRAFT:
 2        Q.   That sounds an awful lot like an assumption
 3    to me.  I need you to tell me what facts you have
 4    to base that assumption on, ma'am.
 5              MR. BARTON:
 6                   Object to the form.
 7              THE WITNESS:
 8                   Fact of --
 9    BY MS. CRAFT:
10        Q.   As it relates to Tony.
11        A.   The fact that he asked the trainer not to
12    show up that morning; said it wasn't important.
13        Q.   With all due respect, he didn't say, Don't
14    show up.  He said, Don't show up for the
15    fundraising part, right?
16        A.   Which is where this occurred.
17        Q.   Okay.  And?
18        A.   And your question?  I mean, I'm answering
19    your question.
20        Q.   But as it relates to this policy, you do
21    agree with me that there's nothing written in the
22    policy that required a Certified Athletic Trainer
23    be present, right?
24        A.   There's nothing in that policy that you
25    just read that states that.
```

MIRIAM SEGAR                                           4/9/2014

```
 1        Q.  Is there any other policy?  And I can show

 2   you, because I think we introduced it yesterday in

 3   response to --

 4           MR. BARTON:

 5               What number is it?

 6           MS. CRAFT:

 7               I think it is -- I've got a piece of

 8           it.  It's in the discovery or in these.

 9           Minnis 923.

10           MR. BARTON:

11               What exhibit is that?

12   BY MS. CRAFT:

13        Q.  And for the record, it's Exhibit #25, and

14   it is 923 to 927.

15           And I'm going to give you a second because

16   I need to use the restroom, too.  But if you

17   wouldn't mind, show me in here where it says that.

18        A.  Where it says what?

19        Q.  A certified trainer is required to be

20   present.

21           MR. BARTON:

22               Object to form, asked and answered.

23           THE WITNESS:

24               And I have already answered that

25           question.
```

```
 1   BY MS. CRAFT:
 2        Q.  I want you to show me in this policy
 3   provided to my client --
 4        A.  -- is that the one you just read; is that
 5   what you are talking about?  The physical welfare
 6   section of the handbook?
 7             And I also said, in addition, in August of
 8   each year, our medical staff speaks to all coaches
 9   and staff --
10        Q.  -- and where are you reading from, please?
11        A.  Exhibit #25 that you referenced.
12        Q.  No, I'm asking in the policy that you sent
13   to my client --
14        A.  -- but I'm trying to answer you.
15        Q.  Okay.
16        A.  I attached the policy within this response.
17   And it also, within the response, indicated that in
18   August of each year, our medical staff speaks to
19   all coaches and staff and reviews the trainer and
20   guidelines.
21        Q.  Okay.  I'm looking for the policy that my
22   client got reprimanded for violating, which says
23   that certified training people have to be present
24   at this thing.
25             You referred me to Page 35 -- or 33,
```

1    okay -- which, for the record, on Exhibit #25 is

2    Bates number 925.

3         A.  The exact words that you are asking about

4    are not written in the policy.

5         Q.  Now, the second thing or the other thing

6    that he was reprimanded for in this letter -- and

7    let me get back to it.  It's Exhibit #24 -- was

8    this, "In addition, you had knowledge that the

9    student athlete in question had been drinking the

10   night before, and you did not speak to her upon

11   arrival to assess her physical condition, and you

12   required her to run for a 45-minute period with no

13   breaks or hydration offered."

14        Okay, in Exhibit #33, which is your notes,

15   tell me where you find that my client had knowledge

16   she had been drinking the night before.

17        A.  I think it was      HE        that said

18   that --

19        Q.  -- what page number or Bates number?

20        A.  1383.

21        Q.  And where does    HE         say

22   something?

23        A.  Where she says, "Tony singled her out and

24   told her she lied about the number of drinks."

25        Q.  That has to do with that night before?

REDACTED                    **MIRIAM SEGAR**                    **4/9/2014**

```
1        A.   What I recall, is that a couple of the
2    girls who had been in trouble for drinking, that he
3    was asking them, Who went out?  She was out that
4    night?  Where is she?  What's going on?
5             And my understanding is, well, from talking
6    to Paul Porter, is that when Coach Minnis was
7    calling Paul Porter to try to find  RB , that he
8    mentioned to Paul, as well, Yeah, I think she went
9    out last night.  She may be sleeping it off.
10       Q.   I'm looking for it in your notes.
11       A.   Again, I think  HE    was one of the girls
12   that he talked to before.
13       Q.   So that's the note you are referring to --
14       A.   -- yes.
15       Q.   Let me finish.
16            -- on Page 1383, quote, "Tony singled out
17   and told lying about number of drinks?"
18       A.   Uh-huh.
19       Q.   Where else?
20       A.   I think it's also in the trainer's
21   statement that he made after the incident if I
22   recall, where he said that -- I think it's
23   potentially in that.
24       Q.   Where's that?
25       A.   The Paul Porter statement.
```

```
 1        Q.  I don't know what you are talking about.
 2            MS. CROCHET:
 3                It's been produced.  You have it.
 4            MS. CRAFT:
 5                Have we seen it?
 6   BY MS. CRAFT:
 7        Q.  If it's not in the Paul Porter statement,
 8   where else would it be?
 9        A.  There were two girls that weren't
10   participating in the event, and I can't recall who
11   the other one was.  KB              KB              ,
12   she was asked to call her roommate to try to get
13   RD   to wake up.
14            And she told us that once she realized --
15   Tony realized they were late, he started asking,
16   Who went out?  Asking the different girls, Who went
17   out?
18        Q.  That's   KB          who was not at
19   the event?
20        A.  I believe she was at the event.
21        Q.  Okay.  So your note on 1388, "Called her
22   roommate,   KB     ."  And that's   KB
23            That's  KB  telling you that's what she
24   did?
25        A.  That she was instructed to do that by Tony.
```

1      Q.  And you wrote "good witness" on it.  Why?

2      A.  Because Tony kept going back to her over

3   and over, because I think maybe she was one of the

4   ones that wasn't playing.  And she had a history of

5   the whole thing because she was on the phone trying

6   to get all this to happen.

7      Q.  Good witness to what?

8      A.  To the event.

9      Q.  And then you wrote, "Front door opened."

10  What's that?  Is that what her roommate is telling

11  her?

12          "Clothes on floor.  *RB*  woke up banging

13  on door."  Who is relating that information?

14      A.  *KF*  is relating that information.

15      Q.  From whom?

16      A.  I assume  *KH*          She called her

17  roommate at the request of Tony, because everybody

18  is trying to find the girl.  She's late.

19      Q.  There's concern.  Where is she?

20      A.  There's concern.

21      Q.  Right.

22      A.  And my note right there, Once he realized

23  that we were late, Tony started asking, Who went

24  out?  That's the first assumption.  Where is she

25  and who all went out?

REDACTED

**MIRIAM SEGAR**                                              **4/9/2014**

```
 1        Q.  Is that before or after Tony is trying to
 2   figure out where she is, and is calling people or
 3   having people call to find out where she is?
 4        A.  I think it's during.  Because once he
 5   realized we were late -- that she wasn't there, he
 6   started looking.  And the first question is, Did
 7   she go out?  Who was with her?  And who knows about
 8   this event?
 9        Q.  Okay.  So which of the girls in your notes
10   is reflected as fessed up and said, Hey, yeah, I
11   was with her last night and she went out last
12   night?
13             That told Tony that; not that ultimately
14   confessed to you what they did after she almost
15   died from drinking.  But where in your notes is it
16   reflected that they told Tony, Hey, RB   went out
17   last night and she was drinking all night long and
18   got hammered?
19        A.  Nobody said that she was drinking that long
20   because they all said they left before  RB .  But
21        KB    on 1381 said that HE      KH
22    YV  and  RB , they thought about going out but
23   didn't.   KB   drove.
24        Q.  I understand that's what happened --
25        A.  -- well, you are asking who went out and --
```

REDACTED                    **MIRIAM SEGAR**                    **4/9/2014**

```
 1        Q.   No.  My question was, Where in your notes
 2   is it reflected that any of these girls told Tony
 3   that this girl went out the night before and drank?
 4   I don't see that.
 5        A.   Well, you weren't the one taking notes.
 6             And I'm telling you that this statement
 7   about          KF          , Tony started discussing
 8   who went out, asking questions and was on the girls
 9   about it.
10        Q.   All right.  But you see why that's
11   important, right?  Because I'm thinking, correct me
12   if I'm wrong, if my coach asked me and it's a team
13   rule that I can't drink, Who went out last night,
14   and were they drinking?  I'm going to be lying --
15   no offense -- but I'm a teenager.  And I sure am
16   not going to tell my coach, It was me, Coach, with
17   her.
18             MR. BARTON:
19                  Object to the form.
20             THE WITNESS:
21                  They told me that they told him they
22             went out with her.
23   BY MS. CRAFT:
24        Q.   Okay, and what about drinking?
25        A.   They went home early, and that they were
```

REDACTED

MIRIAM SEGAR                                    4/9/2014

```
 1    modest in their drinking.  They did not know what

 2    happened to   RB   because they left    RB

 3           And at one point, my understanding was that

 4    Coach Minnis got upset because, Why would they

 5    leave  RB  ?

 6       Q.  Where is that in your notes?

 7       A.  I don't know that it's in this set of

 8    notes, or not.  I don't see it, where I'm looking

 9    right now.

10       Q.  Is there another set of notes?

11       A.  Not to my knowledge.

12       Q.  Could you see my dilemma?  It seems to me

13    what he's being reprimanded for apparently is your

14    conclusion that he knew that   RB   had been

15    drinking the night before, and that he didn't

16    assess her.

17           I don't see that anywhere in here.  The

18    only notes you have pointed to is that once he

19    realized -- once realized late, Tony discussing who

20    went out.

21           That's a far cry from, We went out to the

22    movies, as opposed to, We all went out, as you

23    reflect, at 19 with a fake ID to Fred's.

24       MR. BARTON:

25           Object to form.
```

**REDACTED**

**MIRIAM SEGAR**                                    **4/9/2014**

```
 1    BY MS. CRAFT:
 2         Q.   That's what I'm trying to get at, when --
 3              MR. BARTON:
 4                   -- every time you get into this, she
 5              starts reading through these notes you have
 6              asked her to read through, and you ask a
 7              new question or start over.
 8                   So I would like her to finish looking
 9              through the notes.
10              MS. CRAFT:
11                   Sure.  I can use the restroom.  Take
12              your time.
13              (Brief recess was taken.)
14                   Back on the record.
15    BY MS. CRAFT:
16         Q.   So the question was, Where in your notes,
17    Exhibit #33, does it reflect that Tony Minnis knew
18    that that girl had been drinking the night before?
19         A.   1381.
20         Q.   Hold on.  Let me find out exactly where.
21    Go ahead.
22         A.        KB          Before  RB  arrived, was
23    asked -- asked          about if they went out.
24    Tony speaks to both   KB   and   YV   about
25    letting the team down.
```

REDACTED

**MIRIAM SEGAR**                                    **4/9/2014**

1          They admitted that they told Tony at that

2     time, when he asked them, before          arrived, if

3     they had drank, and they said yes.  And he said

4     they had let the team down.

5          Q.  Here's my question.  It says, "went out"

6     and you would have written "drinking "if they said

7     drinking, right?

8          A.  No, they went out drinking.  I would not

9     have said "drinking."  Just like when Tony said

10    yesterday he went out, he assumed it was a bar.  We

11    were talking about a drinking episode at that

12    point, so no.

13         Q.  So this note on 1381 that refers to Tony

14    asking   *KB*   and   *YV*   if they went out, that's

15    one of your supports; am I correct?

16         A.  It is.

17         Q.  All right.  What else?

18         A.  On 1382.  Still   *KB*      interview, that

19    she said -- I remember her saying that he blames

20    them for going out and had blamed her for allowing

21    *BB* to drink excessively.

22         Q.  That was after the fact; am I correct?

23         A.  It was during this interview.

24         Q.  Right.  But this blame about   *KB*    for

25    allowing   *RP*  to drink excessively came after

1    y'all figured out that this girl was drunk in the

2    morning?

3         A.   My understanding was that they told Tony

4    that they had gone out; that they had driven; that

5    RB was with them.

6              And he blamed them for letting the team

7    down for going out the night before a contest.  And

8    that was before  RB  arrived.  And I wrote that in

9    my notes.

10        Q.   Okay, but I'm looking for the part about

11   where these girls tell you that they told Tony,

12   RB    was drinking the night before.

13             And you have pointed out the one on 1381.

14   And then this note that's in a square, "Blamed

15   KB    for allowing her to drink excessively."

16             And you're saying that's evidence that

17   these girls told Tony before this girl arrived,

18   RB    arrived, that she had gone out and drank

19   excessively?

20        A.   The excessive comment, I guess, I don't

21   know if that was before.  I do know it was before

22   when he asked them, before  RB  arrived, which is

23   in my notes.

24             And they told him, Yes, they went out.

25   RB    was with them.  And that he chastised them

```
 1    for letting the team down, to go out the night
 2    before a fundraiser.
 3         Q.  And we took a break so you could review
 4    these notes?
 5         A.  Yes.
 6         Q.  So you referred me to 1381 where, before
 7    RB   arrived, asked    KB      YV   if went out?
 8         A.  Uh-huh.
 9         Q.  And you're saying that also includes, on
10    your recollection, that they also told him, Oh,
11    hey,  RB   went out drinking with us last night,
12    too?
13         A.  RB    was out with us.
14         Q.  See, because here's why I'm asking on 1381.
15    Your note before  RB   arrived asked,    KB
16     YV   if went out?  You actually crossed out
17    RB     name and wrote   KB    above it.  So it
18    tells me --
19         A.  -- yeah.
20         Q.  -- that your note was -- he asked and
21    KB    and    YV   said we went out.
22         A.  That's not what it says.
23         Q.  Then why did you cross out  RB  ?
24         A.  I will tell you, before  RB   arrived, he
25    asked not  RB    he asked  KD    and    YV   about
```

REDACTED

MIRIAM SEGAR                                        4/9/2014

```
 1    going out.  And they said they did.  And so he knew
 2    that information before  RB  arrived.  He knew
 3    they had gone out before  RB  arrived.
 4        Q.   He knew  RB  had gone out, or  KB  and
 5    VV
 6        A.   He knew they had all gone out together
 7    because he asked.  The reason he was asking,
 8    Where's  RB  ?  Where's  RB    Does anybody know
 9    where  RB  is?  Who went out?  Did y'all go out?
10             He asked some kids.  He asked  KB  about
11    it before  RB  arrived.  He asked her if they went
12    out.
13        Q.   Where else in your notes?
14        A.   1390, which I believe is    PB
15    interview.  Tony knew that  RB  had gone out.  She
16    looked hung over when she got out of the car.
17        Q.   Okay.  So does that tell us that  PB  said
18    Tony knew that  RB   had gone out because she
19    looked hung over?  Or that somebody said  RB  went
20    out last night?  That's what I'm confused about.
21        A.   And they said, Tony knew that  RB  had
22    gone out because all the girls -- he was walking
23    around to the different courts asking where  RB
24    is.  Does anybody know where  AB  is?  Who went
25    out last night?
```

REDACTED

MIRIAM SEGAR                                    4/9/2014

```
 1              And it was -- what  PB   said is that Tony
 2    knew that  RB   had gone out and that --
 3         Q.  -- does that go with the note that she
 4    looked hung over?
 5         A.  That was   PB    impression of how she
 6    looked when she got out of the car.
 7         Q.  And so I'm clear, you said that  PB
 8    reported to you that  RB   looked hung over when
 9    she got out of her car?
10         A.  That was her opinion.
11         Q.  And that she observed her looking hung
12    over?
13         A.  That's what I wrote down, so that was her
14    opinion.
15         Q.  Ma'am, what  PB   told you is she observed
16    RB   get out of her car and she looked hung over;
17    is that right?
18         A.  What  PB   said was that, in her opinion,
19    RB   looked hung over.
20         Q.  When she got out of her car, right?  Yes?
21         A.  It doesn't say "car."  It says, "She looked
22    hung over when she got out."
23              I think what she meant is when she got out
24    at CCL to start the event.
25         Q.  Here's why I'm asking.  You have never been
```

1    to the CCL tennis courts, correct?

2         A.  I have not been.  I answered that.

3         Q.  Got it.  So you would not know, for

4    example, that the tennis courts have two lines of

5    parking, one directly in front of the courts which

6    have boxwoods, and the second one is divided by a

7    median which also has a ton of bushes designed to

8    hide the trees.

9              MR. BARTON:

10                  Object to the form.

11             THE WITNESS:

12                  And I didn't say that I recall "car."

13                  It says, "She looked hung over when she got

14                  out."  I mean to the courts.  I didn't say

15                  "car" in the note, and I don't recall

16                  saying it in the deposition.

17   BY MS. CRAFT:

18        Q.  Any other places, ma'am?

19        A.  1391, Joey Baccalla.

20        Q.  Who was this?

21        A.  He's the manager.

22        Q.  Okay.

23        A.  He was instructed to tell her to start

24   running.  He said that she looked hung over and her

25   face was flushed.

1              And he's the only person that actually

2      talked to her, which was part of our contention as

3      to why we believe that if Mr. Minnis had made the

4      effort to talk to her, he would have probably

5      realized that her face was flushed and she looked

6      hung over.  Because we had two people tell us that,

7      in their opinion, she looked hung over.

8          Q.  Let me ask you something, ma'am -- any

9      other places, by the way?

10         A.  Not in these notes.  There is a reference

11     in a document that I don't know if you want to

12     discuss it, but it was provided, where Paul Porter,

13     the trainer, who was at the event and arrived late

14     and received a phone call from Coach Minnis, says

15     that at 9:15, he got a phone call saying that  RB

16     RB    was not at the fundraiser; they couldn't get

17     ahold of her.  They were concerned because she was

18     not answering her phone.  They wanted to find her.

19         Q.  Why don't we attach this as Exhibit #33.

20             MR. BARTON:

21                 Exhibit #34.

22     BY MS. CRAFT:

23         Q.  Okay, Exhibit #34.

24             (Whereupon, the document was duly marked

25                 for identification as "Exhibit #34" and

```
 1              attached hereto.)
 2      A.   Tony then informed me that she had gone out
 3   partying the previous night.
 4              I told them that I would try to get her
 5   roommate's phone number to see if she has any
 6   information.
 7              I could go on.  But Tony, according to what
 8   Paul told us and what he wrote in his own
 9   statement, that when Tony called him before they
10   even found  PP  , that she had gone out partying
11   the previous night.
12              So we had every reason, based on student
13   athlete interviews, as well as the trainer who had
14   spoken to Tony directly prior to her collapse and
15   prior to her arrival, that Tony said she had gone
16   out partying.
17              So we believed that he had knowledge that
18   she had been out the night before drinking.
19      Q.   Okay.  So is it the policy, then, of LSU
20   that every coach that knows that one of their
21   athletes has been out drinking the night before,
22   that coach is required to perform an independent
23   assessment of every single student athlete before
24   they take the field, the court, the track or
25   anything else; is that what you're telling me?
```

```
 1          MR. BARTON:

 2              Object to the form.

 3          THE WITNESS:

 4              I'm telling you it's the coach's

 5          responsibility to run a safe practice in a

 6          safe environment.  And that if a coach has

 7          knowledge prior to a student athlete

 8          beginning an event, beginning a practice,

 9          that a student athlete has been out the

10          night before, there should be some

11          assessment of the student to make sure they

12          are in a condition to which they can

13          participate.

14     BY MS. CRAFT:

15       Q.  Yes, ma'am.  And, then, with that being

16     said, am I to understand, then, I can take the

17     depositions of every single head coach at LSU, and

18     I can go film their athletes drinking the night

19     before, and I can tell them, "Hey, your athletes

20     went out last night and drank," and they are

21     supposed to assess them before practice?

22              Because that's pretty easy.  I can

23     certainly do that --

24          MR. BARTON:

25              -- object to the form.  Object to the
```

```
 1          form.

 2          THE WITNESS:

 3              No, my answer would be in the

 4          circumstance where a student athlete shows

 5          up late and that we can't find her and

 6          information has been shared that she's been

 7          out and she is not there when she's

 8          supposed to be, that I would hope there

 9          would be an assessment of the student.

10              The student that he sent over there to

11          see her, the manager, reported that she

12          looked flush and saw her falling and saw

13          things that had he done that, I think that

14          he would not have had her run.

15              I think he would not have done some of

16          the things he did, had he taken the time to

17          talk to her, look at her, watch her.  He

18          didn't do any of those things.  He put a

19          manager in charge of that.  A manager went

20          and helped her up when she fell down.

21     BY MS. CRAFT:

22          Q.  With all due respect, ma'am, LSU never

23     trained any of its head coaches to make those

24     medical assessments; isn't that correct?

25              MR. BARTON:
```

```
 1                    Object to the form.
 2   BY MS. CRAFT:
 3        Q.   Never did.
 4        A.   Not true.
 5        Q.   Really?  When did you, when did LSU train
 6   Tony Minnis to make an assessment of the physical
 7   condition of an athlete and alcohol consumption?
 8   When?  When?
 9        A.   Sort of a leading question.
10        Q.   It is, and I'm entitled to under 615 of the
11   Code of Evidence.
12             So when, ma'am?
13             MR. BARTON:
14                  Object to the form.
15             THE WITNESS:
16                  I can't give you a date, again, but I
17                  can --
18   BY MS. CRAFT
19        Q.   -- so there was some training?
20        A.   I don't know that.
21             MR. BARTON:
22                  She's trying to answer your question.
23             THE WITNESS:
24                  I'm trying very hard to cooperate with
25                  what you're asking me.  I can't give you a
```

```
 1              date where there was training that happened
 2              with -- if you see it looks like this, then
 3              maybe you should ask them if they've been
 4              drinking.
 5                   But I can tell you that when a coach
 6              has knowledge, which I have shown you to
 7              our understanding he did, even to the
 8              admission that he made on the phone to his
 9              trainer, that he knew she had been out
10              partying, that it is his responsibility to
11              see how that child is before they start
12              conditioning in any form or fashion.
13         MS. CRAFT:
14              I'm going to object as non-responsive.
15   BY MS. CRAFT:
16      Q.  Ma'am, are you telling me there actually is
17   such training that was given --
18      A.  -- there's no training about alcohol.
19         MR. BARTON:
20              Let her finish the question.
21   BY MS. CRAFT:
22      Q.  I'm sorry.  There is no training?
23      A.  There is no training about alcohol.
24      Q.  Got it.
25              And there is no training that you were
```

```
 1    talking about, about how -- training a coach to

 2    assess the impact of alcohol or drinking the night

 3    before on a student athlete, right?  There's no

 4    such training, right?

 5         A.   There's no formal training.  There is

 6    common sense that should be applied.

 7         Q.   Besides common sense and besides your

 8    qualifier of, "formal training," I want to be

 9    clear.  There's no such training at LSU, right?

10              MR. BARTON:

11                   Object to the form.

12              THE WITNESS:

13                   About alcohol consumption?  No.

14    BY MS. CRAFT:

15         Q.   Now, with respect to Minnis' write-up --

16    and, by the way, can you explain to me why it is

17    when we looked at his file, we don't really see any

18    write-ups on Tony Minnis until after Mr. Alleva

19    arrives?

20                   There's, like, one or two hanging out there

21    but then, all of a sudden, it seems like there's a

22    whole bunch.

23              MR. BARTON:

24                   Object to the form.

25    BY MS. CRAFT:
```

MIRIAM SEGAR                                        4/9/2014

```
 1        Q.  Can you explain that to me?
 2            MR. BARTON:
 3                Same objection.
 4            THE WITNESS:
 5                I have no idea.
 6   BY MS. CRAFT:
 7        Q.  Did you and Mr. Alleva ever talk about his
 8   opinion of Tony Minnis?
 9        A.  No.
10        Q.  Did you ever share your opinion of Tony
11   Minnis to Mr. Alleva?
12        A.  Only about incidents like this, where I
13   would -- if I interviewed somebody, I would say,
14   This is something you need to know.  It wasn't a
15   personal opinion about Mr. Minnis, no.
16        Q.  Did you ever share your opinion of
17   Mr. Minnis with Mr. Alleva?
18            MR. BARTON:
19                Objection, asked and answered.
20            THE WITNESS:
21                I feel like I did answer that.
22   BY MS. CRAFT:
23        Q.  You just said about this incident and
24   others, or something like that.
25        A.  I said about anything that came to my
```

```
 1    attention that warranted his knowledge.
 2            So if we had an issue, a complaint, an
 3    interview, anything like that, yes, I made him
 4    aware.  But I did not discuss my personal opinion.
 5    Because this wasn't personal; this was business.
 6        Q.  Well, did you do that with every coach?
 7        A.  Yes.
 8        Q.  So were there other coaches at LSU, to your
 9    knowledge, who had some idea or reasonable
10    suspicion, if you will, that one of their student
11    athletes was using, oh, I don't know, let's say
12    marijuana the night before and then showing up at
13    practice the next morning, and then the student is
14    doing practice without an assessment, have you
15    shared any of that with Mr. Alleva?
16            MR. BARTON:
17                Object to the form.
18            THE WITNESS:
19                I don't understand that question.
20    BY MS. CRAFT:
21        Q.  See, here is what I'm asking.  Because as I
22    understand it, at LSU, some of your football
23    players have had problems with marijuana, right?
24            MR. BARTON:
25                Object to the form.
```

```
 1              THE WITNESS:
 2                   We have had student athletes at LSU
 3              that have had marijuana positives.
 4    BY MS. CRAFT:
 5         Q.   Sure.  And you've even had some arrested,
 6    right?
 7         A.   We have had student athletes arrested.
 8         Q.   Sure.  Well, when you had them arrested,
 9    for example, did you go to the football coach and
10    say, Oh, Coach Miles, shame on you.  You should
11    have known that your student athlete is using
12    marijuana and you have been letting him practice?
13              MR. BARTON:
14                   Object to the form.
15    BY MS. CRAFT:
16         Q.   Did you do that?
17         A.   I don't think that's even close to this
18    situation.
19         Q.   Well, I'm asking the question.  Did you do
20    that?
21         A.   Yes, I informed him of any issue that I'm
22    aware of.  Every coach that I'm aware of, if
23    there's an issue with a substance that could be
24    problematic for the student athlete, and even our
25    drug policy that's online, I could provide you a
```

```
 1    copy.  It talks about coaches' responsibilities in
 2    referring athletes that they feel like have any
 3    issues with substance of any kind.
 4         Q.  So what if they don't do that, what
 5    happens?
 6         A.  It's the responsibility of the coach, not
 7    -- all coaches, administrators, weight-room staff,
 8    trainer room, academic's inner staff, any staff
 9    member that has knowledge is supposed to refer them
10    immediately for a test and/or assessment.
11         Q.  Well, you didn't refer RB   for an
12    assessment, did you?
13             MR. BARTON:
14                 Object to form.
15             THE WITNESS:
16                 Well,  RB   was in the hospital.  And
17                 when  RB   got out of the hospital, we did
18                 a drug test.  We had stuff at the hospital
19                 that was done.
20                 I don't think there were any drugs in
21                 her system at the hospital.  There was just
22                 alcohol.  I think they ran a tox screen.
23                 Again, I haven't seen it, but that was my
24                 understanding.
25    BY MS. CRAFT:
```

REDACTED          **MIRIAM SEGAR**                    **4/9/2014**

```
 1        Q.  So the answer to my question is, You did
 2   not refer  RB   at any time for any assessment; is
 3   that correct?
 4             MR. BARTON:
 5                  Object to the form.
 6             THE WITNESS:
 7                  No,  RB   didn't have a drug positive.
 8   BY MS. CRAFT:
 9        Q.  What about for alcohol, ma'am?  Did LSU or
10   you refer her for some sort of assessment of
11   alcohol abuse?
12        A.  She met with our sports psychologist for
13   alcohol education.
14        Q.  When?
15        A.  That's part of our policy.
16        Q.  When?
17        A.  I don't know the date.  But she was issued
18   a probationary violation under our policy because
19   she had an alcohol-related incident.
20                  Obviously, the trainers were aware.  There
21   was a lot of discussion that went on.  And I
22   believe she talked to a sports psychologist to get
23   some education.
24                  I know she met with the dietitian several
25   times, talking about food intake and responsibility
```

```
 1    with food and substance.
 2        Q.   Was that something that you referred her to
 3    when she was having these one-on-ones with you?
 4        A.   No, ma'am.   That was something that in the
 5    fall I know she had met with the dietitian a couple
 6    of times because she was having episodes of
 7    syncope, feeling dizzy, light headed.
 8             She had some issues at some workouts where
 9    she was -- she couldn't finish her workout a couple
10    of times, all before the incident that occurred.
11    She had, like, three or four things.  She went to
12    the doctor and had blood work done; things that
13    would have been reported through Paul Porter
14    directly to Coach Minnis.
15        Q.   Well, you knew about them, right?
16        A.   I don't get a daily report so I didn't know
17    about them --
18        Q.   -- until when?
19        A.   -- in detail.
20             I knew, in general, that she had had some
21    issues with syncope.  After the incident that
22    occurred, I called the training room and asked them
23    for her history of withholding, for syncope, like
24    issues with -- I guess she was feeling dizzy and
25    light headed.
```

```
 1              Because in the release from the hospital, I
 2    think one of the things they cited was syncope, a
 3    syncope episode, like a passing-out episode.
 4              And I wanted to know how many times she had
 5    it because after this, she was withheld for quite
 6    awhile.  And I think it was, like, three or four
 7    occasions.  So I know she talked to the dietitian
 8    about that coming about.
 9         Q.  "Withheld," what do you mean?
10         A.  I think she wasn't cleared for practice or
11    competition for a period of time after this
12    incident, trying to figure out if there were any
13    other issues going on.
14              Because of her previous -- she had some
15    blood glucose tests before this incident because
16    she had syncope episodes.
17         Q.  Syncope is just passing out, right, light
18    headedness?
19         A.  That's my understanding.
20         Q.  Okay.  So not any kind of medical
21    condition; it's just --
22         A.  -- no, we were making sure there wasn't a
23    medical condition.
24         Q.  Absolutely.  In fact, if you look at
25    Mr. Porter's statement, Exhibit #34, at the back of
```

```
 1    it, he talks about, in the first big paragraph at
 2    the bottom, at 4:15 p.m. that evening she was
 3    admitted into Room 3309, and I leave to go home.
 4           At this point, she, AB    still denied
 5    having more than three drinks.  But Dr. Melton had
 6    told Tony and me that at noon she had a blood
 7    alcohol content of 4.0.
 8           Dr. Melton also reported that it is rare
 9    that his sphincter gets this tight, implying that
10    he thought that the situation was extremely severe.
11           Tony and I assumed that 40 (.4) which meant
12    unconsciousness, labored breathing and eminent
13    death.  I asked Dr. Melton what he thought it was,
14    and he said severe dehydration and indicated he
15    wasn't surprised considering how much alcohol was
16    in her system at noon.
17           I found out on Sunday morning from Dr. Shaw
18    when we went to check on  AB   together at
19    9:00 a.m. that the ER uses a different system for
20    classifying blood alcohol content and that the
21    blood alcohol was actually in the range of .08 and
22    .04 and not .4 which Tony and I had assumed.
23           Dr. Shaw joked that she must have had three
24    drinks at breakfast for her blood alcohol to be .04
25    to .08 at noon and indicated she must have been
```

1    lying about having only three drinks Friday night,

2    and must have been well over that considering that

3    the body metabolizes a drink an hour.

4           Do you see that part?

5    A.  I do.

6    Q.  Let me ask you something, ma'am.  When you

7    found out this, did you ever go back to RB    and

8    say, Hey, why are you lying to me?

9    A.  I told  RB   I didn't believe her in the

10   interview.  We told her that we didn't believe her.

11          When we deal with drug, alcohol issues,

12   generally kids don't tell you the truth.  If it's a

13   substance-abuse issue, they very rarely tell the

14   truth.  So it's not surprising that they mislead,

15   so it's sort of irrelevant that she didn't tell the

16   truth at that point.

17          Because the incident happened, and we had

18   documentation that she had a significant blood

19   alcohol level.

20   Q.  Here's what occurs to me.  In LSU

21   administration, and correct me if I'm wrong, the

22   only person who had information that this girl may

23   have a drug and alcohol problem, from early on, and

24   I'm talking about in the fall of 2011, was you.

25   You were the one constant in LSU administration,

REDACTED                    MIRIAM SEGAR                    4/9/2014

```
 1    correct?
 2            MR. BARTON:
 3                    Object to the form.
 4    BY MS. CRAFT:
 5        Q.  You have talked with this girl, you met
 6    with this girl.  You talked to her roommate, you
 7    moved her out of her room.
 8        A.  I told you I didn't meet with her very much
 9    in the fall.  I met with her mostly in the spring
10    after this incident, and then the next fall before
11    she transferred.
12            I also told you I did several drug tests on
13    her.  They were all negative.  We had no
14    significant drinking issues that I'm aware of at
15    all with  RB   before this incident, so I'm not
16    quite sure what your question is.
17            But if you're asking did I have knowledge
18    of a roommate that at one point said I think maybe
19    I saw a drug, but, when asked, "I'm not really
20    sure."  And, "It may have been a vitamin," or, "I
21    guess it could have been a prescription.  I'm not
22    sure.  Maybe it was something.  But I'm not happy
23    living there."
24            And I did a drug test and it was negative,
25    you know.  I had no reason to think somebody is on
```

REDACTED

MIRIAM SEGAR                                    4/9/2014

```
 1   drugs.  And I can't accuse a kid of being on drugs
 2   when I have no proof.
 3        Q.  Okay, ma'am, but with all due respect, both
 4        PB        : and her father told you that it
 5   wasn't just suspected drugs, but it was alcohol
 6   use.  Remember, you said, coming in at all hours of
 7   the night, drinking?
 8        A.  Well, they were -- what I recall what I
 9   said was, I think there was some drinking.  But the
10   majority of the issue that she had was slovenly
11   behavior, thermostat issues, as well as visitors,
12   like, people coming in at all hours of the night.
13        Q.  This girl  RB   how old was she in the
14   fall of 2011?
15        A.  I don't know.  I would say 18 or 19.
16        Q.  So you have got  PB   telling you she's --
17   at least --
18        A.  -- right.
19        Q.  -- that she's bringing alcohol into the
20   dorms, right?
21        A.  No.
22            MR. BARTON:
23                Object to the form.
24            THE WITNESS:
25                No, I don't think I said that.
```

REDACTED

```
 1    BY MS. CRAFT:
 2        Q.  Bringing alcohol in late at night is what I
 3    thought you told me.
 4        A.  I think I said having guests in at
 5    different hours of the night.
 6        Q.  Okay.  Well, PB · is telling you the girl
 7    is drinking at 18 or 19, right?
 8        A.  I think PB   may have said she drinks, but
 9    that was not  PB   main concern.  I don't recall
10    talking about    P B      very much or about
11    alcohol at all.
12        Q.  Okay.  Well, let's say it was one drink.
13    You realize that's against the law, right?
14        A.  I do.  And obviously we counsel students
15    not to drink, as would Tony.
16        Q.  Okay.  Well, then, when you talked to RB
17    in the fall of 2011, did you confront her about
18    drinking underage?
19        A.  I don't have a specific recollection about
20    talking to her in the fall of 2011 prior to this
21    incident about alcohol.
22        Q.  Did you tell her coach, Look, it's possible
23    that RB   is drinking, so maybe he could be on the
24    lookout for some issue?
25        A.  I don't recall having a conversation with
```

**REDACTED**                **MIRIAM SEGAR**                **4/9/2014**

1    Tony about alcohol.  But I recall having multiple

2    conversations with Tony about  _RB_  and I know

3    that he was aware and he was concerned about some

4    issues with  _RB_  as well.

5         Q.  What issues?

6         A.  Well, we had the syncope episodes.

7         Q.  Which is where she's getting light headed?

8         A.  Where she's getting light headed.

9             And I think he talked to me about her

10   commitment to the team, whether or not she really

11   wanted to be at LSU.  I know that he had some

12   curfew guidelines and because -- and not just

13    _RB_   but I think he said yesterday in his

14   deposition other kids on the team had been

15   drinking, and so he had talked to the team about

16   drinking.  I think he knew  _RB_   drank from time to

17   time.

18        Q.  That's a guess on your part; is that

19   correct?

20        A.  No, I believe he knew that.

21        Q.  Based on what?

22        A.  Based on conversations that I have had with

23   him over the time that he was here, about, I think

24    _AM_   with alcohol, and   _KB_    had gone out before

25   this, and  _RB_   had gone out with them, and

```
 1    different things.
 2         Q.   Gone out with whom?
 3         A.   Different people on the team.
 4         Q.   With the girls?
 5         A.   Uh-huh.
 6         Q.   Okay.  So at the point -- and then later
 7    on, I will tell you that there's some documents
 8    that reflect I think your opinion or some note
 9    about Mr. Minnis was too controlling.  He had a
10    curfew with the team, and that there was an issue
11    with that.
12              Am I right about that; that was a concern
13    for you?
14         A.   It was a concern for the girls, that they
15    had an 8 o'clock curfew and they couldn't go to the
16    library and they couldn't study.
17         Q.   Couldn't go out, right?
18         A.   It wasn't about going out.  You don't have
19    to have an 8 o'clock curfew to -- girls aren't
20    going out at 8 o'clock, anyway.
21         Q.   Well, when did the curfew come into effect?
22    After this incident with the drinking, or in the
23    fall when he, according to you, he knew they were
24    out drinking, the underage ones, what?
25         A.   I don't know.
```

REDACTED

MIRIAM SEGAR                                    4/9/2014

```
 1        Q.   Did you ever ask him?

 2        A.   I think we talked about the curfew and

 3   asked him why it was so early.

 4        Q.   And what did he tell you?

 5        A.   I don't think he had a good reason for it.

 6        Q.   What did he tell you?

 7        A.   I don't recall.

 8        Q.   Did you write it down anywhere?

 9        A.   I did not write it down.

10        Q.   And so why were you talking with him about

11   the curfew he imposed on his student athletes?

12        A.   I just told you, they called me with

13   concerns.

14        Q.   What were any other issues that you can

15   think of with Tony Minnis that you were involved

16   in?

17        A.   Could you be more specific?

18        Q.   Well, let me back up because I didn't

19   finish with Exhibit #31.  That's the E-mail from

20   Dr. Jones to you on March 24th.

21        A.   Yes, ma'am.

22        Q.   Okay, we talked about the thing, "RP    is

23   a huge concern.  I know that I have spoken to you

24   about this, but during some of my individuals, I

25   have learned that there has been some drug abuse
```

```
 1   since she's been at LSU."
 2         You told me that the first time, according
 3   to you, Dr. Jones said anything about RB   and
 4   drug abuse is this E-mail, Exhibit #31, to you; is
 5   that correct?
 6      A.  That's the first time I remember, yes.
 7      Q.  So if she testifies differently, do you
 8   have anything to refute what she's saying?
 9      A.  No.  And I don't think she would have
10   anything to refute what I'm saying.  It's the first
11   time I remember talking to her about drugs.
12      Q.  And then she writes, "I believe this is a
13   huge concern, especially with the, quote, unquote,
14   'medical things' that she had going on."
15         What medical things was she talking about?
16      A.  I seem to be thinking that it was about
17   syncope, withholding that she had been having.  She
18   had complaints of different -- different things
19   throughout the spring after this episode.  But we
20   had some before and they continued after to my
21   knowledge.
22      Q.  "She's also extremely negative with the
23   team."  Did you talk to Dr. Jones about that?
24      A.  Not specifically, other than what's stated
25   here.
```

1        Q.   "Even after the team meeting, while I was

2   talking to some of the girls, she said, quote,

3   'Don't believe Tony.  He's not going to change.  He

4   hates us and always will be a negative,'" end

5   quote.

6            Did you talk to Dr. Jones about that?

7        A.   No.

8        Q.   And she writes, "Her issues are now

9   stirring the pot with the rest of the team."

10           Did you talk to Dr. Jones about that?

11       A.   No, this followed Dr. Jones' solution

12   meeting that she had with the team, and this was

13   part of her report.

14           I remember talking with her at some point

15   about the report after I read through it.  And I

16   don't recall specifically talking about, like,

17   these things you are quoting, "stirring the pot" or

18   any of that, the other things.

19       Q.   The reason that I am asking you that,

20   ma'am, is because I asked you if there were any

21   follow-up E-mails to Exhibit #31 when we first

22   talked about it.

23       A.   Right.

24       Q.   You said no, you sent it to legal counsel

25   but you picked up the phone and called Dr. Jones.

REDACTED

MIRIAM SEGAR                                    4/9/2014

```
 1           So that's why I'm asking you about each one
 2    of these things --
 3        A.  Right.
 4        Q.  -- what you talked to her about.
 5        A.  Okay.  I remember more talking to her about
 6    the general report.  Because I had read through it
 7    and just wanted to clarify a few things from the
 8    report.  Her report was pretty thorough.
 9           I mean, she had responses of the team,
10    responses of the coach.  She told me she thought
11    the meeting was -- you know, went pretty well.  I
12    think she asked me, "Did you see my note about
13    AD
14           And I said I did.
15           And I think we talked briefly about any
16    suggestions that she had, and she just said, you
17    know, You need to keep trying to work with her and
18    try to make the situation better.
19           I don't recall talking specifically about
20    any of these things that she cited.
21        Q.  And she writes, "Though most of the team is
22    able to ignore her, a couple of the girls have
23    definitely been sucked in.  Not sure what can be
24    done since she's on scholarship, but I truly
25    believe she's playing us all and she's a
```

```
 1    pathological liar."
 2            That's pretty strong words.  Did you ask
 3    Dr. Jones about those?
 4      A.   We talked a little bit about her belief of
 5    being a liar.  And I think that Tony also felt she
 6    was lying about some of her symptoms and questioned
 7    whether or not she really wanted to participate.
 8            Because we did a bunch of tests and we
 9    couldn't find anything.  But there were times where
10    she wouldn't go out to the court and times where it
11    was -- I think, my recollection is that was
12    referring to the fact that she is saying she's
13    having all these issues, but there's really nothing
14    to back up it.
15            Does she really want to be here?  Is what
16    she's saying really adding to up to how she's
17    behaving?
18      Q.   You'd agree with me, would you not, coming
19    from a psychological professional, accusing a child
20    of being a pathological liar is a pretty big deal,
21    right?
22            That's not just some sort of, She may be
23    making up her symptoms.  That sounds pretty
24    psychologically diagnosing to me.
25            MR. BARTON:
```

REDACTED

MIRIAM SEGAR                                    4/9/2014

1              Object to the form.

2    BY MS. CRAFT:

3        Q.  How about you?

4        A.  I don't think "pathological liar" is a

5    diagnosis.  I think it was an opinion about how she

6    represented herself.

7             And, you know, my recollection of that

8    timeframe is that Tony also kind of felt the same

9    thing; that she wasn't being truthful with her

10   symptoms and her interactions with the team.

11       Q.  And how about this note that Dr. Jones

12   writes about not sure what -- I felt as though -- I

13   think it's thought -- all of this needed to be

14   brought to your attention.

15            But how about this whole business about

16   some of the girls on the team being sucked in to

17   the pathological liar known as   RB

18            Did you consider that as perhaps a cause of

19   a morale issue or a lack of quality experience for

20   the tennis team?

21       A.  No.  Because the pathological liar, I told

22   you, I think refers to her symptoms and medical

23   condition.

24            And we said after she talked about the fact

25   that she didn't like Tony, and that she -- and I

1    read that to be some of the girls are getting

2    sucked in to what she's saying.  She's a negative

3    influence.  That's how I read that.

4        I didn't -- I didn't connect the

5    pathological liar to that.  And in our conversation

6    with Tiffany, I'm not sure that that was her

7    intent, either.

8        Q.  Well, did you consider what Dr. Jones wrote

9    to you in the confines of sharing with Mr. Alleva,

10   Hey, I know that we have some sort of thought that

11   there's a lack of a quality experience on the

12   tennis team, but we have got this girl who has a

13   drinking and probably a drug-abuse problem that is

14   basically slicing the team in half and sucking in

15   some of these girls to her negative opinions?

16       MR. BARTON:

17            Object to the form.

18       THE WITNESS:

19            Well, I don't think that -- and I would

20            have to look back at the record -- but I

21            don't think that she was even participating

22            in contests or events during this

23            timeframe.  I think she was being withheld

24            a lot.

25   BY MS. CRAFT:

```
 1      Q.  But correct me if I'm wrong --
 2      A.  -- well, each -- each person has their own
 3  experience, aside from what somebody else may say.
 4         My opinion is not going to differ of Joe
 5  Alleva after today because I heard him say
 6  something than it did before I got here today.
 7         So I don't think that somebody else's
 8  experience is based on what one of the girls are
 9  saying at all.  No, I don't think that has anything
10  to do with it.
11      Q.  Well, the psychologist thought it did.  In
12  fact, she wrote that these other girls were being
13  sucked in to it, right?
14         MR. BARTON:
15             Object to the form.
16         THE WITNESS:
17             She doesn't say anything about morale
18             in here.  And I don't think it affected the
19             morale.
20  BY MS. CRAFT:
21      Q.  Well, was there or was there not a morale
22  issue on the tennis team?
23      A.  I believe there was.  I believe Tiffany
24  documented it in her report.
25      Q.  And what was the cause of that morale
```

1    issue?

2        A.  I think Tiffany documented that, too, and I

3    think that -- and if I could look at it, I could

4    quote some things to you.

5            But I believe a lot of it was caused by

6    Coach Minnis and the way he ran things and the way

7    he communicated with them.

8        Q.  Do you find it odd, ma'am, that in all the

9    years he had coached at LSU, there had never been a

10   morale problem before and now, all of a sudden,

11   there is with this  RB  girl with the drug issue

12   and alcohol issue and your own psychologist saying

13   she's sucking in some of these other kids to

14   negative stuff about Coach Minnis?

15           MR. BARTON:

16               Object to the form.

17   BY MS. CRAFT:

18       Q.  Did find that odd?

19       A.  Well, I wouldn't say there had never been

20   any morale issues.  I think there had been student

21   athletes over the years that had issues with things

22   that Coach Minnis did.  So I can't say that there's

23   never been any morale issues before that year.

24       Q.  Correct me if I'm wrong, you're dealing

25   with a bunch of teenagers, right?

1      A.   I am.

2      Q.   So there have been teenagers, student

3  athletes, who have had issues with every coach on

4  campus?

5      A.   Right.

6      Q.   Right?

7      A.   That's definitely true.

8           You know, and we forget to talk about the

9  fact that the student was recruited by Coach

10 Minnis.  He has the best opportunity, more than

11 anybody else.  I just get them once they are here.

12          I don't have a chance to meet them, talk to

13 them, look at their history, look at their record.

14 Like, we get stuck with what we get.  So the person

15 that recruited her to LSU was Coach Minnis.

16     Q.   And what does that have to do with the fact

17 that every single coach at LSU dealing with

18 teenagers from time to time is going to have an

19 issue with one of those teenagers?

20     A.   Nothing.  Other than the fact that you are

21 describing her as an alcohol, drug-abusing person

22 which I have told you, to my knowledge, she's not a

23 drug-abusing person.

24          But I'm saying that Coach Minnis is the one

25 who recruited her.

```
 1      Q.  Ma'am, all I'm doing is quoting from the
 2  expert you hired to talk to these kids, and that's
 3  Dr. Jones, and that's what she's saying about her,
 4  right?
 5      A.  LSU hired her not to work with tennis but,
 6  again, at his request she worked with tennis.
 7      Q.  Let me show you a document we are going to
 8  attach as Exhibit #35.  Just housekeeping.  These
 9  are some E-mails, I think, between you and
10  Mr. Minnis.
11          (Whereupon, the document was duly marked
12           for identification as "Exhibit #35" and
13           attached hereto.)
14      A.  Yes.
15      Q.  And they're dated, the first one starts in
16  September 27, 2011.
17      A.  Right.
18      Q.  Am I correct this has to do with -- it's an
19  E-mail from you to Madelene Sagstrom.  Who is that?
20      A.  Women's golf student athletes.
21      Q.    PB          and    RB          Those
22  are the three roommates in WCA 901; is that
23  correct?
24      A.  Correct.
25      Q.  And what you're doing is basically telling
```

REDACTED

MIRIAM SEGAR

```
 1    them, reiterating that they have already received
 2    notification that there were candles in their
 3    apartment?
 4         A.   Uh-huh.  Yes, ma'am.
 5         Q.   And you said candles are a fire hazard.
 6    And then you talk about the thermostat.  Be
 7    respectful of your roommates.  Your room is
 8    disorganized and dirty.  Keep it orderly.
 9              Where were you getting this information
10    from?  Was this as a result of your discussion with
11    𝓁𝓑
12         A.   Well, the candles was -- the University has
13    a policy against that, and the room was written up
14    for having candles present by the Housing
15    Authority.
16         Q.   Okay.
17         A.   The rest of it was a conversation that I
18    had with ρβ
19         Q.   Then right above, my client writes to you,
20    "I have had numerous incidents over the years
21    involving roommates and issues," which is probably
22    true given teenage girls, "and we have always taken
23    care of it within our team and resolved whatever
24    issue has arised.
25              "I don't understand why you are getting
```

1    involved in this when issues arise every year.  I

2    will confront both of them tomorrow and deal with

3    this like we have always done."

4         Is that true; that you had never gotten

5    involved in these roommate issues before?

6         A.  Not true.  I wouldn't get involved in a

7    roommate issue if a student athlete went directly

8    to a coach about an issue and said so-and-so is not

9    pulling her weight or so-and-so is messing up the

10   room.  I would never know.

11        But in instances where Housing and/or a

12   student athlete comes and asks for assistance with

13   the room and says, Hey, this is a problem, then I

14   always get involved and help.  I do that daily with

15   different sports.

16        Q.  But why not get the coach involved?

17        A.  I did.  I copied him on the E-mail.  That's

18   exactly -- this is a very routine thing that I do.

19   And I copied the head golf coach Karen Bahnsen, and

20   I copied Tony Minnis.

21        Q.  Let me ask you something.  When Tony wrote

22   back to you and is saying, this is something

23   unusual, I'm paraphrasing, deal for you to get

24   involved, and you said call me?

25        A.  Right.

```
 1      Q.   Okay.  And then he writes to you again, and
 2   he says, "I will call you after I speak to both
 3   girls.  I am just little annoyed because these
 4   issues seem petty to me.  You could really help in
 5   both tennis programs if you used your same
 6   persistence in pushing to get our courts done so we
 7   can practice in our own facility."
 8           And then you wrote back.  "I find your
 9   comments offensive.  I'm doing my job.  Whenever
10   you want to meet, let me know.  Of course, I will
11   help tennis in whatever way possible.  I will not
12   apologize for my involvement with housing issues.
13   That is part of what I do with all teams.  I copied
14   you so you could follow up as well about this
15   procedure."
16      A.   Uh-huh.
17      Q.   You were offended by his comments?
18      A.   I was offended by the fact that he was in
19   the way, and I was offended by the first E-mail
20   that said -- with the exclamation point -- I don't
21   understand why you are getting involved in this
22   when issues arise every year.
23           It wasn't personal.  It was sent to the
24   three kids in the room.  It was copied to both
25   coaches.  It was a standard, Hey, be a good
```

REDACTED

MIRIAM SEGAR                                    4/9/2014

```
 1    roommate type of E-mail that I send regularly.

 2              And after I explained that to him, he said

 3    he's annoyed because it seemed petty.  And I was

 4    addressing an issue that was brought forth to me by

 5    an individual on the team who honestly did not want

 6    the other roommates to know who did what.  So I

 7    just sent it to the whole room, and I copied both

 8    coaches.

 9      Q.  Well, let me ask you something.  Am I to

10    understand, since you're telling me that it is

11    common, that if we look at all of Mr. Minnis'

12    E-mails, we are going to see E-mails like this from

13    you copied to him about roommate issues with his

14    tennis players?

15      A.  Again, if it came to my attention, yes, you

16    would.  But I don't know how many went directly to

17    him.  If PB   had chose to go to Tony instead of

18    coming to sit with me about this messy room and

19    thermostat --

20      Q.  -- and the drinking?

21          MR. BARTON:

22              Object to form.

23          THE WITNESS:

24              I'm not even sure if it was the same

25              conversation, to be honest.  I don't
```

REDACTED

```
 1              remember if it was that exact, same
 2              conversation or not.
 3                  Because this is early September.  PB
 4              didn't move out until November, so I really
 5              don't know that it was the same
 6              conversation.  I think it started out with
 7              this, and escalated along the way.  That's
 8              my recollection of it.  I don't remember
 9              having that conversation.
10  BY MS. CRAFT:
11      Q.  But my original question was, If we look at
12  Mr. Minnis' E-mails, right, we are going to see
13  somewhere along the way where you have copied him
14  on a roommate issue that you are involved in?
15              MR. BARTON:
16                  Objection, asked and answered.
17              THE WITNESS:
18                  I answered that.  If I knew about it
19              and if it came to my attention, then, yes,
20              you would.
21  BY MS. CRAFT:
22      Q.  Would it surprise you, ma'am, that there's
23  no such E-mail other than this one incident in
24  September of 2011?
25      A.  It wouldn't surprise me because I don't
```

**REDACTED**

```
 1    recall having a lot of issues with the women's
 2    tennis team.  Not all of them live on campus, and
 3    you are dealing with eight girls, so it's a much
 4    smaller number.  And, historically, a lot of his
 5    kids have lived off campus, which I would not get
 6    involved with.
 7        Q.  Because it's dated September of 2011, it
 8    might not have been the time where  PB   came to
 9    you and talked to you about   RB  drinking, right?
10        A.  I said that, yes.
11        Q.  So would that have been a time where you
12    would have sent an E-mail, again, to these girls
13    not wanting to single out, reminding them that they
14    are not allowed to be drinking underage, and then
15    you would copy my client with it so he might have a
16    clue?
17        A.  Potentially.  But when I met with  PB
18    the time I remember talking to  PB   and not long
19    after that seeing the pictures of the messy room,
20    was -- I think it was later in the semester.
21            And, like I told you, I did a drug test.
22    It was negative.  And I don't recall sending an
23    E-mail because it would have been specific to a
24    student, and I don't recall sending that.
25        Q.  Then at the top he writes, "Miriam, this
```

```
 1    was not meant to be offensive in any way.  I'm
 2    simply making you aware of much bigger issues that
 3    exist that need your attention far more than two
 4    girls not getting along.
 5            "I was going to inform you concerning both
 6    situations with the country club and City Park,
 7    anyway, and would think you would be our strongest
 8    advocate about student athletes driving across town
 9    to practice and missing out on practices.
10            "I need help in getting the country club
11    back.  We use it normally 40 to 55 days each year
12    and now have nowhere to go.  If this offends you,
13    I'm sorry, but this is a major problem."
14            At some point in time, the access to the
15    Country Club of Louisiana's indoor facilities had
16    been terminated by CCL because of an incident
17    between administration and the Athletic Department;
18    isn't that right?
19        A.  I have no knowledge of it.
20        Q.  Well, let's look down at the other E-mail.
21    Bottom of the page, Mr. Minnis writes to you,
22    September 28th.  "Also, if you could set us up to
23    have access to the Country Club of Louisiana indoor
24    again.  We used it for 17 years, and at the end of
25    the last year lost the ability to practice because
```

1    of an incident between the athletic administration

2    and the club; therefore, when it rains there is no

3    practice.

4            "Could you please see if you could arrange

5    for us to do what we did before, whatever incident

6    occurred.  I would and my team would appreciate you

7    checking into both matters."

8            What's that about?

9        A.  I don't know what incident he was referring

10   to between athletic administration and the club.

11   To this very day, I don't know anything about an

12   incident like that.

13       Q.  Did you ever bother to ask?

14       A.  I talked to Eddie who was also copied on

15   his E-mail.  And Eddie told me that he and Tony

16   were going to meet with the people at CCL about

17   getting the access granted again.  And that was my

18   conversation about that.

19       Q.  Well, did you ever find out what the LSU

20   athletic administration had done to sour the

21   relationship with CCL and the use of the indoor

22   facilities?

23       A.  I asked Eddie about it, and I don't

24   remember him -- I honestly don't remember what he

25   told me.

1          But he did tell me he was on it, and they

2     were going to have a meeting with the people out at

3     CCL, and that he was going to work on doing that.

4     So I checked on that with Eddie.

5          Q.  And I am correct, am I not, currently the

6     women's tennis team is not allowed to use the

7     indoor facilities at CCL for whatever reason?

8          A.  I honestly don't have any knowledge of

9     that.  I know they practice at the BREC Park,

10    Independence Park, but I don't know.  I don't know

11    about that.

12         Q.  Coach Sell has not spoken to you about

13    that?

14         A.  She has not.

15         Q.  And you have not talked to Eddie about it?

16         A.  I have not.

17         Q.  Nobody has mentioned the fact that the

18    Country Club of Louisiana told the LSU women's

19    tennis team, You can't use our stuff anymore?

20              MR. BARTON:

21                   Object to the form.

22              THE WITNESS:

23                   I just told you that I have no

24              knowledge of that.  Maybe Eddie will.

25    BY MS. CRAFT:

```
 1        Q.   And you have not heard anything about that?

 2        A.   I have not heard anything about that.

 3        Q.   Well, when did you hear that the LSU

 4   women's tennis team was now going to be practicing

 5   indoor at Independence Park?

 6        A.   I knew they had been practicing there.  But

 7   I never asked specifically when, why, how they've

 8   been like that.

 9        Q.   Now, with respect to the exit interviews,

10   you know that some were included in the documents

11   provided to me --

12        A.   -- Yes.

13        Q.   -- by Dydia?

14        A.   Dydia?

15        Q.   Dydia.

16        A.   Deysler.

17        Q.   Right.  Am I right that these are all the

18   exit interviews that you had?

19        A.   These are all the written exit interviews,

20   yes.

21        Q.   And I am going to attach it as Exhibit #36.

22             (Whereupon, the document was duly marked

23             for identification as "Exhibit #36" and

24             attached hereto.)

25             Because the only one I'm seeing, ma'am,
```

MIRIAM SEGAR                                4/9/2014

```
 1    correct me if I'm wrong, is one from Hannah
 2    Robinson.  Were there any others?
 3              MS. CROCHET:
 4                   We produced more than that.
 5              (Discussion off the record.)
 6              THE WITNESS:
 7                   I don't know.
 8    BY MS. CRAFT:
 9        Q.  How many exit interviews, to your
10    knowledge, did y'all produce?
11        A.  Maybe seven.  I don't know.  I went through
12    all the years that I had and provided them.
13        Q.  And is it LSU's policy to interview all the
14    students on exit?
15        A.  It's not mandatory, but we try to get as
16    many people that will come in to come in.
17        Q.  So whatever exit interviews that y'all
18    produced are only the ones where the student
19    athlete came in and voluntarily did it?
20        A.  Yes.
21        Q.  What's your participation rate on exit
22    interviews for LSU student athletes?
23              MR. BARTON:
24                   I think what we produced was women's
25                   tennis, just to be clear.  You may be
```

**COURT REPORTERS OF LOUISIANA, LLC**
PH: 225-201-9650        www.courtreportersla.com        FAX: 225-201-9651

 1                 focused on --
 2      BY MS. CRAFT:
 3          Q.   -- and I'm just asking about the
 4      participation rate globally --
 5          A.   We have two parts to the exit interview.
 6      One is a written part, and one is an oral part.
 7               Initially we, the way we used to do it is
 8      we could give them like a written part and ask them
 9      to return it when they came in for their oral.
10               And what we started doing a few years ago
11      is doing it online, where a survey link is sent to
12      all the students so they can complete it.
13               So it's, again, not a mandatory.  We
14      encourage participation in it.  It helps give us
15      some good information about their experience in
16      many different areas -- academics, training room,
17      all kinds of different things.
18          Q.   And then I also had attached to this --
19          A.   -- I don't know about this.
20          Q.   -- the two Orthopaedic Clinic documents.  I
21      was going to ask you what's that about.
22          A.   I don't know where this came from.  I don't
23      remember giving this to anybody.
24               I know what they say.  I understand what
25      they say, but I don't recall seeing these before

```
 1    today.  I don't think they are from me.
 2         Q.  I just got them is why I'm asking.  They
 3    were right behind this thing that was produced last
 4    week or whatever.
 5              MR. BARTON:
 6                   I'm not sure of the answer to that,
 7              Jill.  It doesn't look like they are really
 8              responsive.
 9              MS. CRAFT:
10                   I suspect they have something to do
11              with perhaps an issue with a Nike contract
12              and whether or not some student athletes
13              were not utilizing the Nike contract
14              because their doctors prescribed shoes to
15              them.
16              MS. CROCHET:
17                   I don't know if you want me to talk
18              about this, but I'm the one that did this,
19              the production.
20              MS. CRAFT:
21                   Right.
22              MS. CROCHET:
23                   But I will leave it to you.  If you
24              want me to say what I know about it.
25              Ms. Craft:
```

```
 1               Well, that's fine.  I just want to
 2          know.
 3          MS. CROCHET:
 4               We had -- and I can go get what we
 5          did -- we produced the women's tennis exit
 6          interview notes.  I think that these
 7          documents were not part of those interview
 8          notes and may have been inadvertently
 9          attached to those notes.
10          MS. CRAFT:
11               Okay.
12    BY MS. CRAFT:
13      Q.  Okay.  Well, ma'am, were you the one who
14    gathered the documents for production?
15      A.  These?
16      Q.  Whatever documents have been produced to
17    me.  And I can tell you they have rolled in over
18    time.
19      A.  Yes.
20      Q.  Did you make any computer searches to try
21    to find out or get E-mails from Mr. Minnis' E-mail
22    or your E-mail?
23      A.  Not Mr. Minnis.  I don't have access to do
24    that.  My E-mail I looked through and provided
25    everything that I had to the attorneys that I'm
```

1    aware of.

2         Q.  How did you do that?

3         A.  Just looked at the E-mails.  And I think

4    that the University did a -- I think the legal

5    counsel did a -- had the University to do a search

6    on a computer, as well, and I think they did that.

7         Q.  Do you know what search terms were used?

8         A.  I don't, because I wasn't involved in that.

9         Q.  Were you aware of some of Tony Minnis'

10   E-mails being deleted?  He said a big chunk of

11   them.

12        A.  I heard that yesterday, but I had never

13   heard that before, so no, I'm not aware.

14        Q.  Since his deposition yesterday, have you

15   asked anybody at the University to look into it?

16        A.  I have not.

17        Q.  And the E-mail that was produced to me this

18   morning, which is now Exhibit #31, where did that

19   come from?

20        A.  It was in my E-mail and I gave it to legal

21   counsel back in November of '13.  So I can't speak

22   to why or when, or if it was produced, but it was

23   provided back in November.

24        Q.  Are there any other E-mails to your

25   knowledge that haven't been produced to me?

1      A.   Not to my knowledge.  The only reason that
2    I went back last night after -- because I know and
3    remembered an E-mail that -- from Tiffany.   I
4    remember specifically when you guys described it.
5          And I thought I reproduced it, because I
6    thought I remembered reading it and I looked and I
7    told Vicki, I'm like, I thought I produced --
8          MS. CRAFT:
9                -- I can't --
10          MS. CROCHET:
11                -- don't tell her what you told me.
12          THE WITNESS:
13                Okay.
14   BY MS. CRAFT:
15      Q.   You went and looked?
16      A.   I wanted to make sure that you have what I
17   have.
18      Q.   The reason that I'm asking is when you say
19   you went and looked for it last night, you went and
20   looked on your computer; is that right?
21      A.   I looked at what I had sent to the
22   attorneys from my computer, yes.
23          MS. CRAFT:
24                Let's take a short break.
25                (Brief recess was taken.

```
 1                    Back on the record.
 2    By MS. CRAFT:
 3         Q.   On that last exhibit that I had showed you,
 4    the one that's the handwritten exit interview
 5    notes.
 6         A.   I'm sorry; may I see the back page?
 7         Q.   It is Exhibit #36.
 8         A.   Okay.
 9         Q.   That is a reflection of an exit interview
10    theoretically with Miss Robinson; is that right?
11         A.   Yes.
12         Q.   And where would that document have been
13    maintained at LSU?
14         A.   In my office.
15         Q.   Would that have been in a separate file?
16         A.   I have all the exit interviews separate.
17         Q.   So was that one that you missed on the
18    first pull of documents, or are there other exit
19    interviews in your office from women's tennis that
20    have not been produced?
21         A.   I have given everything from women's tennis
22    that I had.
23         Q.   Do you know why this one we just got,
24    Exhibit #36?
25         A.   Well, in the initial production of
```

```
 1   documents, I knew -- my recollection is that --
 2   well, my recollection on the initial collection of
 3   documents was that they asked for everything like
 4   in Coach Minnis' file, any E-mail correspondence,
 5   all those types of things.
 6          And these weren't stored in the file, and I
 7   realized a couple of weeks ago that exit
 8   interviews -- that I had exit interviews that may
 9   be relevant.  So I brought it to the attention of
10   the attorney and --
11      Q.  -- I don't want to know what you talked
12   about.
13          Here's my question along those lines, and
14   that's why I'm asking, because sometimes we have
15   these semantical disputes, if you will, in
16   litigation where we ask for a personnel file, we
17   ask for an office file, we ask for what we think is
18   every file.
19      A.  Right.
20      Q.  But some employers call their files
21   different things.  Like I had one employer who
22   called it the yellow file.  Now, who would know to
23   ask for the yellow file?  Nobody would.
24      A.  Right.
25      Q.  So what I'm asking you is, Have you made a
```

```
 1    diligent effort to pull every file that relates to
 2    Tony Minnis at LSU no matter what it's called?
 3        A.  Yes.
 4        Q.  And are there any other files that you can
 5    think of that you have not looked at, supervisor
 6    files, heck, yellow files, green files, any file
 7    that has not been copied and produced?
 8        A.  Not that I'm aware of.  These exit
 9    interviews were stored by year and not by sport,
10    just as a group.  And I pulled them specific to all
11    the ones that I had, and I produced them.
12        Q.  Okay.  Did you ask each of the folks in
13    administration as to whether or not they had some
14    sort of separate file or notes on Tony Minnis?
15        A.  I did.
16        Q.  And am I correct that when you asked
17    Mr. Alleva, that he told you no?
18        A.  Correct.
19        Q.  And when you asked Mr. Nunez, he told you
20    what?
21        A.  Yes.  And they have been produced.
22        Q.  Okay.  And I think I have those notes which
23    I will ask him about on Friday.
24        A.  Okay.
25        Q.  Anybody else?
```

REDACTED

**MIRIAM SEGAR**                                    **4/9/2014**

```
 1        A.  I pulled the personnel file as requested,

 2   and that's stored in the HR office under separate

 3   lock and key.  Like, nobody can access that office

 4   except for the HR representative.

 5        Q.  Do you guys have, like, a similar file in

 6   athletics?

 7        A.  HR Athletics is what I'm discussing right

 8   now.  And that was pulled.  I'm not aware of any

 9   other person to ask for files.

10        Q.  Okay.  We talked about on the E-mail, there

11   was a cc to a Karen Bahnsen as it relates to the

12   PD          RB           roommate issue.

13        A.  Uh-huh.

14        Q.  You said she's the women's golf coach; is

15   that right?

16        A.  I did.

17        Q.  Okay.  And what is her relationship to Bo

18   Bahnsen?

19        A.  Bo Bahnsen's wife.

20        Q.  Did she ever come to you and talk to you

21   about any concerns for her niece  PB

22        A.  Not that I recall.

23        Q.  And I don't want to repeat myself, but are

24   you telling me that Bo Bahnsen didn't come talk to

25   you about any concerns regarding his niece  PB
```

REDACTED

MIRIAM SEGAR                                    4/9/2014

1    and her roommate   RB

2       A.  I don't recall speaking to Bo about the

3    roommate.  I know that Bo was aware -- I told you I

4    talked to Billy.

5           And my recollection was that Billy visited

6    with Bo first, and then came down the hall to me.

7    That's what I recall.  I remember seeing him pass

8    my office.  I know him because I have known Bo for

9    years.  And then I remember him stopping in my

10   office.  He didn't have an appointment or anything

11   like that when he came in.

12      Q.  And if I appreciate your testimony earlier,

13   your testimony was that Billy did not say anything

14   to you about a potential drug issue for  RB   or

15   drinking; is that right?

16      A.  I told you, to the best of my recollection,

17   I don't recall him talking about a drug issue at

18   all with me.  I don't recall him saying that.

19      Q.  But he did about drinking?

20      A.  I think he referenced drinking.  But,

21   again, not as the primary issue.  The primary issue

22   was guests at night, messy room.  He showed me

23   pictures.  Not being a good roommate.

24           Said that -- felt like it wasn't a good

25   idea for  PB   to live there, as well, because with

```
 1    teammates, you need space sometimes and he would

 2    prefer her to be off campus.

 3        Q.  You have sat through Bo's deposition,

 4    right?

 5        A.  I did.

 6        Q.  Where he said that his brother had

 7    expressed to him that there were concerns about

 8    RB       drinking and drug use, right?  Do you

 9    remember that?

10        A.  I heard him say that.

11        Q.  As an administrator at LSU, would you have

12    expected Bo Bahnsen to share that information with

13    you, or with somebody in administration?

14        A.  What I heard Bo say in his testimony, as

15    well, was that he instructed Billy to come talk to

16    me.  And I remember talking to him, to what I told

17    you I think was the same day.

18            And I know Bo knew that we had discussed it

19    so I assumed that he thought Billy told me.  That's

20    all I can -- I don't remember.  I don't remember

21    having a conversation specifically with Bo.

22        Q.  Aside from guessing, I mean, you would

23    expect somebody like Bo Bahnsen, who is in NCAA

24    Compliance, to at least report to somebody at LSU

25    above him or near him or whatever, Hey, I have
```

```
 1    received some information that we have a student
 2    athlete who is using drugs?
 3              MR. BARTON.
 4                 Object to the form.  Asked and
 5              answered.
 6              THE WITNESS:
 7                 I think that what I said was I don't
 8              recall specifically talking to Bo about it.
 9              I remember Bo asking me, Did you speak to
10              Billy?
11                 And I said, Yes.
12                 And he said, Okay.
13                 So that's all I remember.  I don't
14              remember specifically talking with Bo about
15              drugs or alcohol.
16    BY MS. CRAFT:
17        Q.  Here's what I'm asking, and I could be
18    wrong, but I thought that I read and/or saw
19    somewhere that there was some issue with LSU and
20    the NCAA, and some issue with the football players
21    and drug use -- and I could be wrong -- like
22    smoking pot, getting arrested for pot, having
23    problems with pot.
24                 Has there been any NCAA issue with LSU and
25    student athletes using drugs?
```

REDACTED

```
 1          MR. BARTON:
 2              Object to the form.
 3          THE WITNESS:
 4              The only issue I'm aware from an NCAA
 5          perspective is the women's track team where
 6          we had to renounce the championship because
 7          a student athlete used performance-
 8          enhancing drugs.
 9              And under NCAA policy, the only thing
10          they basically say is that institutions
11          should have a drug-testing policy for their
12          student athletes and use the policy and
13          administer it in the program, which we do.
14     BY MS. CRAFT:
15       Q.  Okay.
16       A.  For instance, if I have a drug positive at
17     LSU, I don't report it to the NCAA.  It's not a
18     responsibility that an institution has to do that.
19          But the NCAA has the opportunity to drug
20     test student athletes at their request.  So I don't
21     know what you are referring to.  I mean, I'm --
22       Q.  -- I guess here is what I'm concerned
23     about.  I understood Bo Bahnsen to say that his
24     brother told him that one of the concerns with
25       RB   was drug use.  I mean, he testified to that
```

```
 1   sitting in this room.  You heard that, too, right?
 2          MR. BARTON:
 3               Object to the form.
 4          The WITNESS:
 5               I heard you ask him a question that I
 6          recall is, Did your brother ask you
 7          anything or tell you anything?
 8               And he said, Yes, in generalities to
 9          questions that had both alcohol and drugs
10          in it, yes, I heard that.
11   BY MS. CRAFT:
12     Q.  Sure.  And he's the NCAA Compliance person,
13   right?
14          And I guess my concern from a disconnect
15   standpoint is, he testifies that he got that
16   information, heard about it or whatever it is, he
17   knew.  You're testifying you talked to his brother,
18   and you didn't know because the brother didn't tell
19   you.
20          And I guess my concern is, Where in this
21   process is the responsibility of administration to
22   report it to somebody, or to at least look into the
23   issue about a student athlete?
24          MR. BARTON:
25               Object to the form.
```

REDACTED

MIRIAM SEGAR                                4/9/2014

```
 1   BY MS. CRAFT:
 2       Q.  Do you follow?  You're saying I didn't
 3   know, and he's saying he did know, and nobody does
 4   anything.
 5       A.  That's not what I said at all.  I said that
 6   PB . his daughter, had told me and that I recall
 7   specifically talking to her and questioning her
 8   about what drugs she thought she saw.  "Was it a
 9   cigarette?"  I mean, we went through things.
10           "What did you see?"
11           "A pill."
12           "What kind of pill?"
13           "I don't know."
14           "What do you think it was?"
15           "Maybe mushrooms."
16           "Why you think that?"
17           "I don't know."
18           "Have you ever seen it?"
19           She started laughing and, "No, I've never
20   seen it."
21           "Do you think it could have been a
22   vitamin?"
23           "I'm not sure."
24           That's the conversation I recall having
25   with PB   and then having her tested.
```

REDACTED

**MIRIAM SEGAR**                                    **4/9/2014**

```
 1              Our conversation with Billy -- and I will
 2   say it again -- I recall him showing me pictures of
 3   the room.  I recall him talking about general and
 4   not getting along.  I recall him saying about
 5   having guests at night and being disruptive with
 6   sleep patterns.
 7              He may have referenced that I had talked to
 8      PB    and maybe that's what he -- but I don't
 9   recall specifically saying -- if he did, I just
10   don't recall talking about a drug issue with him
11   specifically.
12              You know, in regard to Bo, I know that
13   either that day or shortly later he asked if I had
14   talked to Billy.  And I said, "Yes."
15              And I remember him -- I don't remember
16   talking about drugs with Bo.  He -- but, then
17   again, he may have told me and I may have said, "I
18   got it.  I'm testing her."
19              Like, I don't -- I just don't recall.  I
20   don't -- I can't say that he didn't, and I can't
21   say that he did because I don't have a
22   recollection.
23              I had already, by the time I talked to
24   Billy, had drug tested her.  I know that.  And I
25   know I had talked to  PB   before I talked to
```

1    Billy.

2        Q.   Mr. Alleva described the termination of

3    Mr. Minnis' employment as a collaborative effort

4    between you, he and Mr. Nunez.

5            I need you to identify fully for me every

6    reason that you recommended and/or decided to

7    terminate Tony Minnis.

8        A.   It was a verbal conversation, so there was

9    nothing in writing.

10       Q.   I'm not asking you in writing.  I need you

11   to just tell me the reasons, your reasons.

12       A.   In my opinion?

13       Q.   Your reasons.

14       A.   My opinion?

15       Q.   Yes.

16       A.   I thought he had poor student athlete

17   management.

18       Q.   Meaning?

19       A.   Meaning he didn't have a team that was

20   healthy internally.  He had girls that were wanting

21   to quit the team.  He had parents that were

22   complaining about different things within the

23   program.

24            We had an outside consultant who had told

25   me that the program wasn't being administered very

MIRIAM SEGAR                                4/9/2014

1    well and wrote up a lot of reasons why there were

2    problems within the team, and a lot of it was

3    recommendations for the coaches.

4        Q.  Is that it?

5        A.  Those are the things that I'm responsible

6    for, so that was my portion of the comments.

7        Q.  Okay.  My question was, Why did you make a

8    recommendation?  Or why were you saying, "Fire

9    him"?

10           And are those the two reasons that you are

11   doing that?

12           MR. BARTON:

13               Objection to the form.  Objection,

14               asked and answered.

15           THE WITNESS:

16               By collaborative, all of us are

17               responsible for different aspects which I

18               have described in administration.  So in

19               talking about each of our areas, we gave a

20               report as to how we felt the program was

21               operating.

22               Those are the things that I

23               specifically talked about.  Those are the

24               things I made comment about, that I can

25               recall, from that meeting.  There were

```
 1            other considerations, but I did not speak
 2            to those specifically.
 3   BY MS. CRAFT:
 4      Q.  Okay.  And here is what I'm trying to
 5   hammer down.
 6      A.  Yeah.
 7      Q.  Why was my client fired?
 8           Now, I asked Mr. Alleva and he gave me
 9   three or four reasons, okay?  I'm asking you the
10   same question, and you have given me two.
11           Are there any other reasons, in your mind,
12   as to why Mr. Minnis was fired?
13      A.  Well, you asked how collaboration worked
14   and what part of my recommendation was, and I told
15   you my recommendation and what I put into it.
16           I mean, that's -- I feel like I have
17   answered your question.  There were other comments
18   that went on in the room, but I did not necessarily
19   make them, but I can't say I didn't agree with --
20      Q.  -- like what?
21      A.  You asked me about those comments.
22           His performance in sports over time.
23      Q.  Who was that from?
24      A.  Well, we discussed it.  Eddie primarily was
25   responsible for that information.
```

REDACTED

```
 1        Q.  Okay.  What else?

 2        A.  Again, we talked about stuff I have already

 3   told you -- the parents' concerns, the consultant's

 4   concerns, student athletes' concerns.

 5             You know, we had student athletes that year

 6   that didn't even want to finish the season.  It was

 7   a really rough season.

 8        Q.  Anything else?

 9        A.  That's all I can recall.

10        Q.  By the way, did the morale of the team

11   improve when  RB  left?

12        A.  I don't know.  I really don't because I

13   don't -- I don't know.

14        MS. CRAFT:

15             That's all I have.

16        MR. BARTON:

17             No questions.

18

19   (Whereupon, at 4:50 p.m., the taking of the

20   witness' testimony was concluded.)

21

22

23

24

25
```

1          I, MIRIAM SEGAR, the undersigned, do hereby

2   certify that I have read the foregoing deposition

3   taken on April 9, 2014, before Tamra K. Kent, CCR,

4   and it contains a true and accurate transcript of

5   the testimony given by me.

6

7          (   )   Without Corrections

8

9          (   )   With corrections as reflected on the
                   Errata Sheet(s) prepared by me
10                 attached hereto consisting of
                      pages.
11

12

13
                   WITNESS' SIGNATURE
14                 MIRIAM SEGAR

15

16
                   DATE SIGNED
17

18

19

20

21

22

23

24

25

```
 1                    C E R T I F I C A T E

 2

 3           This certification is valid only for a

 4   transcript accompanied by my original signature and

 5   original required seal on this page.

 6

 7           I, Tamra K. Kent, Certified Court Reporter

 8   in and for the State of Louisiana, as the officer

 9   before whom this testimony was taken, do hereby

10   certify that MIRIAM SEGAR, to whom the oath was

11   administered, after having been first duly sworn by

12   me upon authority of RS 37:2554, did testify as

13   hereinbefore set forth in the foregoing 151 pages;

14           That this testimony was reported by me in

15   stenographic machine shorthand, was prepared and

16   transcribed by me or under my personal supervision,

17   and is a true and correct transcript to the best of

18   my ability and understanding;

19           That the transcript has been prepared in

20   compliance with transcript format guidelines

21   required by statute or by rules of the board; that

22   I have acted in compliance with the prohibition on

23   contractual relationships, as defined by Louisiana

24   Code of Civil Procedure Article 1434 and in rules

25   and advisory opinions of the board;
```

1           That I am not related to counsel or to the

2    parties herein, nor am I otherwise interested in

3    the outcome of this matter.

4

5

6

7    Tamra K. Kent  83070
     Certified Reporter in and for
8    the State of Louisiana

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25