<u>**AFFIDAVIT PURSUANT TO FED.R.CIV.P. Rule 56**</u>

STATE OF LOUISIANA
PARISH OF EAST BATON ROUGE

BEFORE ME, the undersigned Notary Public, personally came and appeared:

Tony Minnis

a resident of the full age of majority of East Baton Rouge Parish, Louisiana, who upon being duly sworn did depose and state:

I have carefully reviewed all of the documents and evidence produced by LSU throughout this litigation and the following items were not produced, or were produced must later, which are crucial to my ability to oppose LSU's Motion for Summary Judgment. They are:

1. My 2009 evaluation which was not turned over until December, 2013, after this litigation was long under way;

2. All of the performance evaluations of Brown, Lee, Breaux, Schmitt, Karen Bahnsen, Chuck Winstead, all white and all to whom I am compared. I am unable to cogently oppose LSU's summary judgment motion without these documents. Specifically, as LSU now argues that my "performance" was a factor in the employment actions taken against me, it is important that I be able to make that actual comparison, including the ratings in each category given to him/her. For example, in 2009, I was rated as "needs improvement" in "success in sport", Brown was rated "satisfactory". Yet, my tennis season was more successful that year and we ended up nationally ranked higher than men's tennis. I was rated "needs improvement" for bogus NCAA alleged violations involving the purchase of socks, giving an extra $14 in meals to a player, and purchasing a motivational book for my team to read over the holidays. I know firsthand that Brown did the same and similar things, but was never reprimanded, disciplined, and his performance evaluation in that corresponding category was "satisfactory" as compared to my "needs improvement." I know that all of the other white LSU coaches racked up numerous violations every year and none of them were reprimanded, disciplined, and each of their performance evaluations in that corresponding category rated "satisfactory." Yet, I am the only African American Head Coach.

3. A listing of any and all student athletes in each sport at LSU who have transferred during the past 18 years. This evidence is critical in opposing LSU's Motion for Summary Judgment as it will show that I had only one student who started transfer over the last 18 years, whereas both my successor and my comparitors had students transfer out of their programs every year.

4. My letter to Nunez in August, 2009, wherein I complained of discrimination and retaliation was not turned over until December, 2013.

5. My email to Alleva in February, 2012, asking for a copy of the Trainer's policy for which I was disciplined. It has never been produced and was deleted by LSU from my computer. This document also contains my reports of unlawful conduct and cites



**EXHIBIT**

**A**

the fact that LSU had no such policy, although I was being disciplined for violating this non-existent policy.

6.      Email exchanges between myself and Alleva in October, 2008 and August, 2010 were never turned over and were deleted from my computer by LSU upon my return from the NCAA Tournament in spring, 2012 - right before I was fired. These emails are important as they contain my concerns related to unlawful discrimination and retaliation.

7.      LSU has not identified, although requested, any and all support of any LSU Coach for the purpose of improvement. This evidence would show that LSU worked with the white coaches when/if they had any performance issues, whereas, in my case, they refused and simply disciplined/wrote me up.

8.      Copies of any and all emails between LSU Sports Psychologist Tiffany Jones and Miriam Segar from February, 2012 - June, 2012, stating that "RB" had a drug and alcohol problem and that the student was the cause of any "team morale issues", that the student was "playing us" and was a "pathological liar". A singular email from Jones to Segar dated March 24, 2012, was ultimately turned over on the second day of depositions, but none other. In my conversation with Jones, she told me about this particular email and advised she had sent other, similar emails to Segar about "RB" and her behavior and impact on the team. This evidence is crucial in order to oppose LSU's Motion for Summary Judgment as it clearly shows that the allegation regarding "team morale" being attributable to me is false and, significantly, that LSU knew about "RB"'s problems for months and never relayed that information to me such that I could be on the look out for it and, perhaps, take proactive steps in that regard.

9.      Copies of the records showing TAF (Tiger Athletic Fund) contributions to my colleagues given as salary supplements and extra compensation, which I did not receive, over the last 21 years. This evidence will show that the pay disparity is even greater than shown.

10.     A March 28, 2012, email I sent to Alleva, Segar, and Nunez wherein I am claiming discrimination and retaliation had been deleted by LSU from my computer "sent" items. It was never produced by LSU until late March, 2014 right before depositions had been taken.

11.     Judy Southard's evaluations for the years 2008, 2009, and 2010 are missing. As are Nunez's evaluations for the years 2008, 2009, 2010, 2011, and 2012. As are Segar's evaluations for the years 2008, 2009, 2010, and 2012. As are Alleva's evaluations for the years 2009, 2010, 2011, 2012, 2013. These documents are necessary in order to properly oppose LSU's Motion for Summary Judgment as they will show that on each occasion, these Administrators received excellent evaluations on account of the success of sport, including the success in Women's Tennis. Yet, they would rate me "needs improvement."

12.     Alleva August 4, 2009, letter to me stating his unrealistic expectations. It was not produced until late March, 2014 after depositions had been taken.

This Affidavit is made upon my personal knowledge. Furthermore, I submit without this information being withheld by LSU, I cannot adequately oppose LSU's Motion for Summary

Judgment.

*Anthony J. M[signature]*

SWORN TO AND SUBSCRIBED before me, Notary Public, this **26**th of June, 2014.

*[signature]*
Crystal LaFleur
Bar Roll #27490

UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF LOUISIANA


ANTHONY MINNIS

·VERSUS

BOARD OF SUPERVISORS OF
LOUISIANA STATE UNIVERSITY
AND AGRICULTURAL AND
MECHANICAL COLLEGE

CIVIL ACTION

NO. 13-CV-00005

JUDGE BRIAN A. JACKSON

MAGISTRATE BOURGEOIS


Testimony of ANTHONY MINNIS, taken on
TUESDAY, APRIL 8, 2014, before Dani Smith, Certified
Court Reporter in and for the State of Louisiana.

At the offices of:

JILL L. CRAFT, ESQUIRE

509 ST. LOUIS STREET

BATON ROUGE, LOUISIANA  70801

Commencing at  10:00 A.M.

CERTIFIED COPY

**EXHIBIT**



1  come out of pocket for your travel expense to go to

2  Wichita?

3       A    No.

4       Q    I forgot to ask you, are you married or have

5  you ever been married?

6       A    Single.  Never been married.

7       Q    Do you have any children?

8       A    No.

9       Q    Let me go ahead and ask you a little more

10  about your employment or your attempts to get

11  employment since leaving LSU because we've recently

12  gotten some information from you about that.

13            My understanding is that you have applied to

14  be the tennis coach at William and Mary University; is

15  that correct?

16       A    Yes.  I was approached by the North Carolina

17  coach, who had coached at William and Mary, end of May

18  of 2012 and told me that the job had opened at William

19  and Mary and I should apply.  The athletic director

20  called me on conference call with four of his

21  assistant ADs and asked me a series of questions and

22  flew me up to Williamsburg.

23       Q    Let me -- I'm going to interrupt you, if you

24  don't mind, as I need to, to ask you some names, okay?

25       A    Okay.

1     Q     Who was the coach at North Carolina who

2   contacted you?

3     A     Brian Kalbas.

4           MS. CRAFT:  Spell that last name.

5           THE WITNESS:  K-A-L-B-A-S.  Brian.

6   BY MS. CROCHET:

7     Q     And who was -- who, at the time, anyway, was

8   the athletic director at William and Mary?

9     A     I can't recall.  He's still there, though.

10    Q     I interrupted you.  I think you started to

11  say you traveled there for an interview?

12    A     Yes.  I went on an interview and spent a

13  day, little more than a day-and-a-half interviewing

14  for the position.  I was being interviewed by one of

15  the boosters who at one point looked at me and said,

16  "What did you do at LSU?  This doesn't make any sense.

17  Who fires a coach who's made the NCAA tournament 15

18  times and been there 21 years?"

19    Q     Who was the booster, do you know?

20    A     I can find out.  I don't remember her name.

21  She -- they have the -- the tennis is the number one

22  sport at William and Mary and the Women's Tennis Hall

23  of Fame is there.  And she -- they do a lot of

24  fundraising for it.  And so I interviewed with

25  probably six people that particular day, and I was a

1  little surprised when she came out that blatantly and

2  asked me.  And my response was, "I didn't do

3  anything."

4         A few days later, I was told that a

5  gentleman from the University of Minnesota received

6  the head coaching job at William and Mary, who had

7  qualified for the NCAA tournament twice.

8     Q    Do you know if there were any other

9  candidates for the job?

10    A    Yes, there were.

11    Q    Do you know who the other candidates were?

12    A    Troy Porco, who is assistant coach at the

13  University of Virginia.

14         MS. CRAFT:  Spell that, please.

15         THE WITNESS:  P-O-R-C-O.

16  BY MS. CROCHET:

17    Q    You said he was an assistant at UVA?

18    A    Assistant at UVA.  And the assistant coach

19  at University of North Carolina.

20    Q    You don't remember the name?

21    A    I don't remember the name.

22    Q    How did you find out that you were not going

23  to be selected for the job?

24    A    They called me and told me.

25    Q    Did -- who called you?

1    A    The assistant AD, the assistant AD who

2  showed me around and he was in charge of tennis.

3  Again, I can't recall his name.

4    **Q**    **A male?**

5    A    A male.

6    **Q**    **And what did he tell you?**

7    A    He said, "We are going in a different

8  direction."

9    **Q**    **Did anyone associated with William and Mary**

10  **indicate to you in any way that they had any contact**

11  **with LSU?**

12    A    Not at William and Mary.

13    **Q**    **And are you aware of anyone at William and**

14  **Mary having any contact with anyone at LSU?**

15    A    Not at William and Mary, I wasn't.

16    **Q**    **You also listed, again in the summer of 2012**

17  **time period, that you applied for a job at University**

18  **of Maryland; is that correct?**

19    A    Yes.  The men's tennis coach at the

20  University of Maryland had been trying to get me to

21  come up there for several years, because I had several

22  friends in that area, and I really enjoy it.  So this

23  was the third different time it opened.  His name is

24  Jim Lattia, L-A-T-T-I-A.

25    **Q**    **Did you --**

1    A    Mr. Lattia called me, and told me that the

2    job was open, and so I applied for it.  Once I

3    applied, I did a phone interview.

4        Q    **With who?**

5    A    With the assistant AD, whoever that was.  It

6    was a male.

7        Q    **Don't remember a name?**

8    A    I don't remember a name.

9        Q    **Okay.**

10   A    What was very alarming is shortly after, the

11   candidates that they selected to -- the candidates

12   that they selected to go and take the visit were my

13   assistant coach, Lisa Jackson; an assistant coach from

14   the University of Minnesota; the head coach at Wichita

15   State, and I wasn't in the top three of the selection.

16   I found it very strange that my assistant coach would

17   have an opportunity to go instead of me.

18            I called Jim Lattia, who called the athletic

19   director, somebody within the Athletic Department and

20   I would have to get specific names, but he talked to

21   an assistant AD who -- and he asked why I wasn't one

22   of the top three candidates for this particular job,

23   and the athletic director responded that he had heard

24   from LSU that I had issues.

25       Q    **So let me be sure I understand --**

1     A     Sure.

2     Q     -- who each of these persons are.

3     A     Right.

4     Q     First let me go back to your phone

5   interview.

6     A     Uh-huh.

7     Q     Other than the male assistant AD, whose name

8   you don't remember --

9     A     Right.

10     Q     -- was there anyone else who participated in

11   the phone interview?

12     A     I think there were.  I think there were

13   three.  There were a total of four people, I think.

14   I'm not -- I'm not 100 percent sure, but I think there

15   were four people.

16     Q     Do you know either of their names or their

17   positions?

18     A     If I could look it up, I could probably tell

19   you, but I can't recall right now.

20     Q     To your knowledge, is the assistant AD you

21   referenced still employed?

22     A     He is, from my understanding.

23     Q     The others on the phone, male or female?

24     A     It was two other males and a female, if I'm

25   not mistaken.  One I think was -- I'm not -- I can't

1    be 100 percent sure.  So I'm not sure.

2        Q    In the phone interview, were you asked about

3    why you were no longer at LSU?

4        A    No.

5        Q    Going back to the interview with William and

6    Mary, other than the comment from the booster, was

7    there any discussions about why you were no longer at

8    LSU?  Either were you asked or did you volunteer any

9    information?

10       A    I was asked by a couple of the other

11   administrators what happened at LSU.

12       Q    And what did you tell them?

13       A    I just -- I didn't tell them anything.  I

14   just said that, you know, I just -- that I was

15   terminated, and I was just looking for another job.  I

16   didn't tell them anything specific about what actually

17   happened.  I did at Maryland, though.

18       Q    Going -- again, at the phone interview, you

19   gave some information about --

20       A    No.  No.

21       Q    -- why you left?

22       A    Not at the phone interview.  After Jim

23   Lattia called the athletic director, the athletic

24   director called me and --

25       Q    Let me interrupt you a minute, if I can.

1     A    Sure.

2     Q    So am I correct about the chronology, when

3 you weren't asked to come on campus for an interview,

4 you contacted Mr. Lattia --

5     A    Mr. Lattia.

6          MS. CRAFT:  Let her finish.

7 BY MS. CROCHET:

8     Q    Did he contact the athletic director or

9 assistant athletic director?

10    A    Assistant athletic director.

11    Q    Do you know who that was?

12    A    Again, it's -- if I -- I could look it up,

13 but I can't recall his name.

14    Q    To your knowledge, he's still there?

15    A    He's still there.

16    Q    And if I understood you correctly, according

17 to Mr. Lattia, this assistant athletic director said

18 that someone at LSU had said that you had --

19    A    Had issues, correct.

20    Q    -- issues?  Did Mr --

21         MS. CRAFT:  Let her finish.

22 BY MS. CROCHET:

23    Q    I need to remind you, too.

24    A    I'm sorry.

25    Q    I'm not reminding you and I should.

1          Did this -- did Mr. Lattia say who it was

2    that supposedly had made statements about you who was

3    working for LSU?

4       A    He didn't specify who.

5       Q    All right.  So I think you started to tell

6    me that you then had some interactions with this same

7    assistant athletic director?

8       A    After Mr. Lattia called the assistant AD, he

9    called me back and said, "He's going to call you."

10   And so the assistant AD called me up and asked me what

11   happened at LSU and I went -- I was very specific in

12   what I told him.

13      Q    And I'm going to ask you about that, but let

14   me ask you this question.  The assistant AD who called

15   you --

16      A    Uh-huh.

17      Q    -- was he the same assistant AD --

18      A    Same one.

19      Q    -- who was coordinating the phone interview?

20      A    I will sit back.  Okay.

21      Q    Let me finish.  The person who called you

22   after Mr. Lattia's inquiry was the same person who was

23   on the phone interview; is that correct?

24      A    Correct.

25      Q    Okay.  All right.  So now let's move to the

1    phone call.

2         A    Uh-huh.

3         Q    **He asked you what happened.  What did you**

4    **tell him?**

5         A    I said I didn't do anything; that we had

6    qualified for the NCAA tournament for the 15th time in

7    18 years, and he was very surprised that I would be

8    terminated after that.  I told him that I had been

9    facing discrimination at LSU, and I had had some

10   issues in dealing with the administration and I had

11   spoken out and spoken up against different things that

12   were going on.  And I told him that I would love to

13   coach at the University of Maryland and I would love

14   it if he would give me an opportunity and he then

15   decided to fly me up and take a visit.

16        Q    **In this phone conversation, did you provide**

17   **any specifics about what you had complained about?**

18        A    I did.

19        Q    **What did you -- as best you can remember,**

20   **please tell me what you said.**

21        A    Sure.  I told him that I caught LSU making

22   up policies that they -- that didn't exist in order to

23   reprimand me.  I told him that I had gotten

24   reprimanded on numerous occasions for things that were

25   not true and when I would write them back, they would

1    never respond.  I told him that I really pushed

2    because we had the worst facilities in the conference,

3    and I was trying to push to -- to make the program

4    better, not just for myself, but for the program and

5    the team.  And I told him I felt as though they were

6    resentful of that.

7         Q    When you discussed the -- your claim about

8    LSU making up policies and reprimanding you for things

9    that weren't true, did you go into the particulars or

10   did you use just a general phrase of the type you just

11   described?

12        A    I went into, with that situation, I went

13   into the particulars because it was very recent in my

14   mind and I went specifically as to exactly what

15   happened.

16        Q    Is that the incident involving the student

17   at CCL --

18        A    Yes, sir.

19        Q    -- that you're referencing?  Is it fair to

20   say that what you described to the assistant athletic

21   director at the University of Maryland is essentially

22   what you said in your response --

23        A    Yes.

24        Q    -- to Mr. Alleva?

25        A    Sorry.  Yes.

1     Q   Did you say anything else that would not be

2    included in the response to Mr. Alleva to this

3    assistant AD in Maryland?

4         MS. CRAFT:  That's kind of an unfair

5         question because he doesn't have it sitting in

6         front of him.  But to the best of your

7         recollection, if you can recall.

8         THE WITNESS:  No, I was very specific about

9         what I saw and what I experienced.

10   BY MS. CROCHET:

11     Q   So after this conversation, did I understand

12   you to say you went to Maryland for an interview?

13     A   I did.

14     Q   And with whom did you interview?

15     A   I interviewed with the head athletic

16   director, the academic people, the business guy.  I

17   met a number of people at the University of Maryland.

18     Q   Were you there for a full day?

19     A   I flew in on a -- like it was a Wednesday

20   evening, I believe, I stayed probably until

21   4:00 o'clock and then I just stayed up there with

22   friends of mine.

23     Q   Going back to the phone conversation with

24   the assistant AD, did he tell you that he had spoken

25   with someone at LSU?

1    A    He didn't.  He did not.

2    Q    **Did you ask him about that?**

3    A    I didn't.

4    Q    **Did you ever find out who supposedly had**

5  **spoken to the University of Maryland, who at LSU had**

6  **spoken to the University of Maryland?**

7    A    Did not.

8    Q    **So am I correct that all you know about what**

9  **was supposedly said to the University of Maryland by**

10  **someone at LSU was that you had had issues?**

11    A    I had had a lot of issues.

12    Q    **Are you aware of any other statements from**

13  **anyone employed at LSU that were supposedly made to**

14  **the University of Maryland during the time you were**

15  **interviewing?**

16    A    No.  I was not.

17    Q    **Did Lisa Jackson go to Maryland for an**

18  **interview?**

19    A    What ended up happening was Lisa got the job

20  at University of Alabama Birmingham.  And when she got

21  that job, the Wichita State coach called the

22  University of Maryland and pulled out and told them

23  that they should hire me.  And I had some other

24  coaches around the country who had contacted Maryland

25  and told them that they should hire me, because it was

1   very late, it was late July, early August, and so it

2   was a tough time for them.

3       Q   **How do you know that the Wichita coach**

4   **recommended you?**

5       A   He called me and told me that he was pulling

6   his name out and he took -- he told them that they

7   should hire me.

8       Q   **What is his name?**

9       A   Colin Foster.

10      Q   **Which other coaches contacted Maryland about**

11  **you?**

12      A   I was told Lin Loring at Indiana.

13          MS. CRAFT:  Spell that last name, please.

14          THE WITNESS:  L-O-R-I-N-G.

15  BY MS. CROCHET:

16      Q   **Who told you Mr. Loring had contacted**

17  **Maryland?**

18      A   I can't -- I just -- I had heard that he

19  had -- he had made the comment that they would be

20  foolish not to hire me at that particular time, and

21  had contacted Maryland when they were asking.

22      Q   **Which other coach or coaches contacted**

23  **Maryland, to your knowledge?**

24      A   I can't remember.

25      Q   **Were there others that you can't remember?**

1      A    I'm pretty sure there were a couple others.

2      **Q    Let me ask you about Lin Loring while I'm**

3  **thinking about it.  Are you aware he's been listed as**

4  **a possible witness in this case?**

5      A    Yes.

6      **Q    Do you know why he's listed as a witness**

7  **other than perhaps contacting Maryland?**

8      A    No, he -- he was very upset at how I was

9  treated and thought that I had done a very good job

10  here, and especially with the situation I was in.  And

11  when I talked to him about would he be willing to be a

12  witness on my behalf to vouch for the job I did, he

13  said he would be more than happy to.

14      **Q    What did you tell Mr. Loring about why you**

15  **had filed a lawsuit and what you -- why you filed the**

16  **lawsuit?**

17      A    Well, he -- he actually called me, and

18  couldn't believe that I was terminated after

19  qualifying for the NCAA tournament because I'm the

20  first coach in the history of the SEC in ᵐᵉⁿ

21  tennis to ever be terminated after ı

22  tournament and most of the coaches k

23  told him exactly the incidents that

24  told him -- we had talked on numerous

25  I was even terminated from around 200

1   '10 when we would be on the road recruiting and I told

2   him just to get some advice because he's the

3   winningest coach in college tennis history and he's

4   long tenured and I would get advice from him on some

5   of the things that I was dealing with.  And so he was

6   very aware of all the incidents that had been going

7   on.  So once the termination happened, he basically

8   said, "If there's anything that you need me to do, I

9   would be more than happy to."

10      Q    **Had you ever coached against Mr. Loring?**

11      A    In tournaments and actually one dual match

12  in 1993.

13      Q    **And in 2012, when you were not renewed by**

14  **LSU, when had been the last time you had coached**

15  **against Mr. Loring?**

16          MS. CRAFT:  I'm going to object to the form

17      of the question insofar as I'm quite confident

18      throughout you'll be using the term non-renewed

19      as opposed to terminated.  I'm just going to

20      lodge a continuing objection to characterizing it

21      as a non-renewal.

22          THE WITNESS:  The one thing is a little

23      different in tennis.  There are tournaments and

24      dual matches.  I want to say there was a

25      tournament in 2011 when I coached against

1      Mr. Loring.

2  BY MS. CROCHET:

3      Q    Other than that tournament in 2011, how many

4  other times had you coached against him?

5      A    Probably 15 times.

6      Q    To your knowledge, had Mr. Loring ever

7  personally witnessed anything that you considered to

8  be discriminatory or retaliatory that happened to you?

9      A    Personally witnessed?

10     Q    Yes.

11     A    No.

12     Q    Let's go back to --

13     A    Can I -- actually he did, on a couple of

14  occasions, comment about my salary.  Because it was at

15  National Clay Courts in 2006, an article came out as

16  far as to the raises and the salaries of all the

17  coaches were there, and made several comments.

18     Q    What was Mr. Loring's comment about your

19  salary?

20     A    Very surprised that I was the lowest

21  salaried coach at LSU.

22     Q    At LSU?

23     A    At LSU.  It was an article that -- it was

24  some article that came out and he made comments about

25  it.

1    Q    Let's go back to the Maryland job.

2    A    Uh-huh.

3    Q    So you went to Maryland for an interview.

4  Then what was the next thing that happened as it

5  related to that job?

6    A    I met, when I met with the ADs there, since

7  William and Mary I didn't really tell them what

8  happened, I felt like I should go ahead and tell

9  Maryland exactly what happened.  And so I spoke to a

10  lady who I believe was academic -- the academic person

11  at the University of Maryland, and explained the whole

12  situation to her.  She and the guy who was

13  coordinating the whole thing showed me around.  The

14  overall head athletic director told me that he knew

15  Verge, and asked me what happened.  And I told just

16  briefly, I did not get into specifics with the head

17  AD, and but I didn't meet with him for very long

18  because I could tell that the assistant AD was in

19  charge.

20    Q    When you say Verge, you're referencing Verge

21  Ausberry?

22    A    Verge Ausberry, yeah.

23    Q    Did you tell the folks at University of

24  Maryland, as it relates to your experiences at LSU,

25  essentially the same thing that you told the assistant

1   AD at William and Mary?

2      A   I did. I did.

3      Q   Did you go to Maryland that one time to

4   interview?

5      A   Yes.

6      Q   And did you have any other interviews or

7   interaction with Maryland before finding out that you

8   weren't going to be hired for the job?

9      A   I did not. They -- I went, I believe, on a

10  Thursday, and on a Friday, the assistant coach at

11  University of Minnesota went. On a Monday, my buddy,

12  who had just taken -- who actually, I'm sorry, had

13  just taken over the Minnesota job, called me to inform

14  me that the assistant coach at University of Minnesota

15  got the Maryland job and the assistant coach had had

16  one NCAA tournament appearance as an assistant and I

17  had had 15.

18     Q   Did anyone from Maryland contact you about

19  the fact that you were not going to be hired?

20     A   Later that day, I was contacted and told

21  that they again were going in a different direction.

22     Q   Who called to tell you?

23     A   The -- whoever was coordinating the

24  whole ...

25     Q   Did anyone at Maryland indicate that they

1   had had any contact with anyone at LSU?

2       A    No.

3       Q    Are you aware of anyone at Maryland having

4   any contact with anyone at LSU about you?

5       A    Jim -- Jim Lattia told me that the

6   University of Maryland had contacted LSU and was told

7   that I had had some issues, that's what I was told.

8       Q    Okay.  And we have already discussed that.

9       A    Yes.

10      Q    You also listed, again, going to the summer

11  of 2012, in your answers to interrogatories, you

12  listed University of California, Santa Barbara?

13      A    Yes.

14      Q    And you applied for that position?

15      A    (Witness nods head.)

16          MS. CRAFT:  Answer out loud.

17          THE WITNESS:  I applied.

18  BY MS. CROCHET:

19      Q    You were not interviewed?

20      A    No, not even called or interviewed, just

21  sent a letter saying that they were completing -- the

22  coach that received that position was the head coach

23  at Fresno State, and he received the position at Cal

24  Santa Barbara.

25      Q    Did you ever speak to anyone at Cal Santa

1   Barbara?

2        A    Never spoke to anybody.

3        Q    **Are you aware of anyone at Cal Santa Barbara**

4   **having any contact with anyone at LSU?**

5        A    I'm not aware of anything at Santa Barbara.

6        Q    **You also applied to the University of**

7   **Minnesota --**

8        A    Yes.

9        Q    **-- in the summer --**

10       A    Yes.

11       Q    **-- again of 2012?**

12       A    I did.

13       Q    **But you were not interviewed?**

14       A    Were not.  I did call the -- when the

15  William and Mary -- when the Minnesota coach got the

16  William and Mary job, he called Minnesota on my

17  behalf, because he was good friends with, again, the

18  assistant AD, and told me to call him.  I called him

19  and just told him of my interest for the job and I was

20  very serious about it, and never heard back.

21       Q    **What is the name of the University of**

22  **Minnesota coach who got the William and Mary job?**

23       A    Tyler Thompson, T-H-O-M-P-S-O-N.

24       Q    **And Mr. Thompson contacted the AD at**

25  **Minnesota?**

1    A    The assistant AD and he said he was going to

2  contact the AD, but I'm not sure if he did.

3    **Q    Do you know who the assistant AD at**

4  **Minnesota was that Mr. Thompson contacted?**

5    A    I don't.

6    **Q    And then am I correct that you spoke with**

7  **the same assistant AD?**

8    A    I spoke with the same assistant AD.

9    **Q    Is that a male or female?**

10    A    A male.  A male.

11    **Q    Is he still there?**

12    A    I would imagine.

13    **Q    Tell me about your conversation with this**

14  **assistant AD at Minnesota.**

15    A    I called him and I said, "That -- that the

16  program that you guys have, I can get to another

17  level.  I've been in the SEC for 21 years, and your

18  facility is much nicer and I can get some good players

19  and we can make a nice run."  And he said, "Thanks.

20  And I will get back to you," and I never heard from

21  him again.

22    **Q    Do you know if anyone at University of**

23  **Minnesota had any contact with anyone at LSU about**

24  **you?**

25    A    I don't.

1     Q    **Has anyone ever told you that was the case?**

2     A    I don't.

3     Q    **Who got that job?**

4     A    Very good friend of mine named Chuck

5 Merzbacher, who --

6         MS. CRAFT:  Spell that, please.

7         THE WITNESS:  M-E-R-Z-B-A-C-H-E-R.  From

8     Ohio State.

9 BY MS. CROCHET:

10    Q    **You have also listed University of Kansas in**

11 **May of 2013 but were not -- but say in your answers**

12 **you were not interviewed for that job.**

13    A    I was not.

14    Q    **Did you have any contact with or any**

15 **interaction with anyone at Kansas?**

16    A    Never spoke to anyone at Kansas.

17    Q    **Are you aware of anyone at Kansas having any**

18 **contact or discussion about you with anyone at LSU?**

19    A    Never.  I never had any contact with Kansas.

20 They simply sent me a letter saying that I was not --

21 I would -- they had come up with their three people

22 that they are going to bring in on visits and I was

23 not one of the three.

24    Q    **In your answers to interrogatories you say**

25 **they hired the assistant coach at Texas Tech?**

1      A      Texas Tech.

2      Q      **Who is that?**

3      A      I can't recall his name, but he -- again, I

4   can't recall his name.

5      Q      **You also list, again in the summer of 2013,**

6   **the University of Wisconsin position that you, I'm**

7   **assuming, applied for?**

8      A      I applied.

9      Q      **But did not get an interview?**

10     A      Correct.

11     Q      **Is that correct?  Did you have any contact**

12  **with anyone at University of Wisconsin?**

13     A      The University of Kentucky coach who is in

14  the Hall of Fame, ex-player, is the men's coach, and I

15  contacted Greg Van Emburgh --

16            MS. CRAFT:  Spell that.

17            THE WITNESS:  Greg V-A-N and then

18     E-M-B-U-R-G-H.

19  BY MS. CROCHET:

20     Q      **Let me interrupt you because I'm confused.**

21  **You started out saying the coach at Kentucky.**

22     A      The men's coach, the ex-men's coach, Dennis

23  Emory coached the men's tennis coach at Wisconsin.

24     Q      **So he had been at Kentucky?**

25     A      Right.

1    Q    **Then he went to Wisconsin?**

2    A    Right.

3    Q    **I'm sorry, I wasn't following you.**

4    A    He had played for Coach Emory at Kentucky

5    and went to Wisconsin.

6    Q    **Okay.  And who was -- and that was --**

7    A    Greg Van Emburgh.

8    Q    **And you talked with him?**

9    A    I spoke to him and I told him I would be

10   very interested in the job.

11   Q    **What response, if any, did you get?**

12   A    He said that he would try to put in a good

13   word for me.

14   Q    **Did you ever hear anything from him again?**

15   A    No.

16   Q    **And in your answers to interrogatories you**

17   **say that the head coach at West Virgina got the job.**

18   A    Tina Samara, T-I-N-A, S-A-M-A-R-A.

19   Q    **Are you aware of anyone at Wisconsin having**

20   **any contact with anyone employed by LSU about you?**

21   A    No.

22   Q    **In your lawsuit, you make an allegation that**

23   **Joe Alleva, Miriam Segar, and Eddie Nunez responded to**

24   **reference inquiries by saying you had issues.**

25   A    Correct.

1    Q    **What's the basis for that allegation?**

2    A    The Maryland situation.

3    Q    **Is that the only basis for it, that**

4  **allegation?**

5    A    Well, the other part is the release issue

6  when -- after my contract was non-renewed, after my

7  termination, where Mr. Alleva made no comment about

8  anything.  I look back and he thanked Van Chancellor,

9  thanked Adam Smith, but never said anything about me,

10  which leads to suspicion as to what I actually did.

11    Q    **You said release, you mean like press**

12  **release?**

13    A    Press release, correct.

14    Q    **The fact that there was no press release?**

15    A    There was a press release, and the press

16  release stated nothing.  There was no -- what I was

17  hearing from other people is that it was very

18  suspicious that after 21 years of coaching that

19  Mr. Alleva would not come forward and say, "We would

20  like to thank Tony for his years of service.  We would

21  like to thank him for what he's done."

22        I look back, he did that with V.

23  Chancellor, who was here for four years.

24  with Adam Smith, who was here for six yea.

25  me, said nothing.  And so this led to a c.

1 suspicion as to why a coach of 21 years would be

2 terminated and there was nothing said from the

3 athletic director.  That was made very clear to me at

4 William and Mary when I was on the visit there that

5 this was very, very suspicious.

6    Q    **What did the press release say, as best you**

7 **can remember?**

8    A    It said basically that LSU was not going to

9 renew the contract of Tony Minnis; that he had been

10 here for 21 years.  It never acknowledged that I made

11 the NCAA tournament in 2012 and there was no specific

12 comment by Mr. Alleva.  It was just a very blanket.

13 Whereas when Van Chancellor was released, it was very

14 specific in letting him play golf for a year and

15 paying him five, $600,000.  It was very specific in

16 thanking him for his times of service after four

17 years.  When Adam Smith resigned, it was very specific

18 in thanking Adam for his time and service.

19         So I even read on a blog, and I was --

20 somebody informed me as to Tiger Rant that why would

21 Mr. Alleva, after 21 years of service, the guy was

22 here, not say anything thanking him or doing anything

23 to honor him.

24    Q    **Have you, other than the positions that we**

25 **have just gone through, have you applied for any other**

1  **positions?**

2      A    Coaching?

3      **Q    Any positions.**

4      A    I have applied for other positions outside

5  of coaching.  Just, I mean, just -- I was talking to a

6  friend of mine at the University of Texas about doing

7  something outside of tennis, where I would do possibly

8  fundraising at the University of Texas.  A friend of

9  mine, Greg Vincent, who is a vice-provost there

10  approached me years ago and told me that he thought

11  with my background with the Master's in business, and

12  my background as a player and a coach, that I should

13  go into some type of business administration.

14          And so I reached out to him in August of

15  2012, and went to Austin in mid -- mid February, and

16  actually April, around 7th or 8th, and visited and

17  basically talked to him about the particular position.

18  And then I spoke to another buddy of mine who is in

19  Take Shape for Life about the possible -- possibility

20  of helping, being kind of, I guess, an agent or a

21  salesman for Take Shape for Life and his name is Rob

22  Lecky, and he's in Lafayette.

23      **Q    Let me ask you about the University of**

24  **Texas.  Was there an actual position there --**

25      A    Yes.

1     Q     -- or were you talking --

2     A     Sorry.

3     Q     **What was the actual position?**

4     A     The position was, at the time was

5     fundraising for diversity, for the diversity position.

6     And then --

7     Q     **Let me interrupt you a minute because I'm**

8     **not sure what the position was.  Fundraising for**

9     **diversity?**

10    A     Yeah, University of Texas is very big

11    into -- in doing things for diversity and they will go

12    out with outreach programs and things in the community

13    and so they had initially talked to me about going

14    around and helping raise money to -- to supplement

15    those type things.

16    Q     **Who did you talk to at the University of**

17    **Texas besides Greg Vincent?**

18    A     Robiaun Charles.

19          MS. CRAFT:  Do you know how to spell it?

20          THE WITNESS:  R-O-B-I-A-U-N.

21    BY MS. CROCHET:

22    Q     **Is that a male or female?**

23    A     Female.

24    Q     **What was her position?**

25    A     She was in charge of the diversity program.

1    Q    Anyone else that you spoke with?

2    A    Erica Saenz, E-R-I-C-A, and then S-A-E-N-Z.

3    Q    Was it your understanding that this was the

4    group that was hiring, interviewing candidates for the

5    position?

6    A    Yes.

7    Q    Anyone else that you interviewed with or

8    spoke with about the position?

9    A    No.

10   Q    I assume you did not get hired for the

11   position?

12   A    Correct.

13   Q    And how did you find out you weren't being

14   hired?

15   A    Well, I -- they -- they changed the position

16   from a -- from a fundraising to grant writing and when

17   they changed the position, I actually pulled out

18   because it was -- they changed -- when I interviewed

19   in February and in April, in mid June, they changed it

20   to grant writing and I pulled out of it.

21   Q    To your knowledge, did anyone at LSU have

22   any contact with anyone at the University of Texas

23   about you?

24   A    No.

25   Q    The Take Shape for Life opportunity, what

1  became of that?

2      A    Just a position where Rob Lecky, who is a

3  doctor in Lafayette, spoke to me about possibly doing

4  some motivational stuff and helping with Take Shape

5  for Life.  And I spoke to him on three or four

6  occasions, and he told me that, you know, he would

7  like to consider me for a position.  He thinks that I

8  could do a pretty nice job.  I went to a, like a --

9  had a meeting with people in the Lafayette area, and I

10 went to it, I want to say around mid April of last

11 year -- actually I take that back, mid March of last

12 year, and listened and I didn't follow up with him

13 after.

14     Q    Any other attempts to become employed that

15 you haven't already described?

16     A    I -- I applied for just basic jobs, numerous

17 basic jobs around the country in sports, like

18 different sales jobs and things of that nature, but I

19 haven't received anything back.

20     Q    Do you have a record of the other positions

21 for which you have applied?

22     A    I have.  Yes, I do.

23     Q    Do you have documents related to that

24 search?

25     A    I -- I went on NCAA.org and I applied

1    through that.  I wanted to stay in sports.  So I

2    applied for different positions in different, like,

3    conferences, in sales, and things of that nature.  And

4    so I have a record of many of the jobs I applied for.

5         **Q    In connection with those jobs, do you have**

6    **any information that would indicate that anyone to**

7    **whom you applied had any contact with anyone at LSU**

8    **about you?**

9         A    No.  I haven't spoken to -- I didn't really

10   speak to many of those people.

11        **Q    When you say you have a record of the other**

12   **positions for which you applied --**

13        A    Uh-huh.

14        **Q    -- you have a list?**

15        A    I have a list, correct.

16             MS. CROCHET:  I would like to ask for

17        production of that list.

18             MS. CRAFT:  Is that something you e-mailed

19        to Angela or no?

20             THE WITNESS:  I might have it here.  Can I

21        see --

22             MS. CROCHET:  That's up to your lawyer.

23             MS. CRAFT:  Go ahead.

24             THE WITNESS:  I think.  I'm not sure.

25   BY MS. CROCHET:

1      Q      Can I ask you a question while you're

2   looking?

3      A      Sure.

4      Q      These other opportunities for which you

5   applied, did you ever have any contact with anyone for

6   an interview or to discuss the job?

7      A      No.  Because it was all done through e-mail.

8   Let me -- I have to look later.

9      Q      Let's just remember that we would like to

10  get that information from you.  If you have it before

11  the end of today we can maybe ask you about it.

12     A      Okay.

13     Q      Off the top of your head, can you remember

14  any other jobs for which you applied?

15     A      No.

16     Q      The records that you have, would all of

17  those jobs have been jobs you applied for through

18  NCAA.org?

19     A      The majority.

20     Q      Can you remember any other sources that you

21  went to to apply for jobs?

22     A      No.

23     Q      To the extent that you can remember, sitting

24  here right now, have you described to me all of your

25  attempts to gain employment?

1  A  I have.

2   Q  **Subject to whatever is on the list.**

3  A  Right.  I have.

4   Q  **And is your only -- am I correct that you**

5 **retired and receive a retirement income?**

6  A  I retired?

7   Q  **That you receive retirement through your**

8 **employment at LSU?**

9  A  Wait.  Wait.  You mean as far as a check

10 each --

11   Q  **Let me ask you a clearer question.  I**

12 **understand that you did not leave LSU voluntarily by**

13 **retiring.**

14  A  Correct.

15   Q  **But after you left LSU or in around that**

16 **time period, did you start collecting retirement**

17 **benefits?**

18  A  The only benefits I've collected are health

19 insurance.  I haven't received any benefits.  I have

20 money invested in 403(b) that I can't touch until I'm

21 59-and-a-half.  That's -- that's the only income.

22   Q  **How old are you, Mr. Minnis?**

23  A  48.

24   Q  **To your knowledge, will you at some point be**

25 **eligible for retirement benefits through a plan you**

1    Q    And have you reviewed those documents --

2    A    I have.

3    Q    -- at some time before today?

4    A    Yes.

5    Q    In those Initial Disclosures you list Morris

6    Carney and Jeff Deaver of LSU and say that they can

7    testify about your e-mails that were deleted.

8    A    Correct.

9    Q    Do you remember that?

10   A    Yes.

11   Q    Can you tell me what you mean by that?

12   A    Yes.  In 2012, around a week before the NCAA

13   tournament, I forwarded all of my e-mails to another

14   account, I just, for whatever reason.  And when I got

15   back from the NCAA tournament, all of my sent e-mails

16   from, I want to say October of 2011 through around

17   March 2012, were deleted, including the letter to Joe

18   Alleva, Miriam Segar, and Eddie Nunez claiming

19   retaliation and refuting the incident which happened

20   at the country club.

21   Q    So I want you to take me step by step

22   through this.

23   A    Sure.

24   Q    You said, I think I understood you to say

25   that you sent your e-mail to another account.

1     A     Correct.

2     Q     And to which account did you send it?

3     A     My Yahoo account.

4     Q     But you, am I correct, did not make any

5   attempt to remove that same e-mail from your LSU

6   account?

7     A     Correct.

8     Q     So as far as you were concerned, your e-mail

9   would be both on your Yahoo account and on your LSU --

10    A     Correct.

11    Q     -- account; am I right about that?

12    A     Correct.  And they were not -- my sent -- it

13   wasn't my in box, it was my sent e-mails.

14    Q     That you sent -- I'm sorry for interrupting

15   you.

16    A     Go ahead.

17    Q     It was your sent e-mail that you sent to

18   your Yahoo account?

19    A     Correct.

20    Q     All right.  And what prompted you to do

21   that?

22    A     I was very suspicious of the admini

23   I was very -- they -- there had been a consis

24   pattern of harassment, of retaliation, and

25   discrimination, and I had -- you know, Jill I

1    obviously been wonderful, but there were friends of

2    mine such as Leo Hamilton, Robert Abendroth, Jon

3    Boustany, Craig Freeman, who are attorneys that had

4    consistently -- we go to lunch and were very surprised

5    by the way I was being treated and giving me heads up

6    to, you know, make sure that you're, you know, not

7    putting your e-mails just to the LSU account and doing

8    some other things.

9          So around that time, when I sent the e-mail

10   to Ms. Segar, Mr. Nunez, and Mr. Alleva on

11   March 28th, and heard no response, I was quite

12   surprised.  And so I just on a hunch, and just from

13   talking to other people, decided to forward it to my

14   Yahoo account in case something happened.

15   Q    So I'm going to ask you, you know, you said

16   that you were -- had been suspicious and had felt you

17   had been subjected to --

18   A    Sure.

19   Q    -- discrimination.  I'm going to ask you

20   about everything that you think or contend happened to

21   you, but right now, I want to focus on whether or not

22   there was a particular incident that prompted you to

23   send your e-mail to the -- to the Yahoo account.  And

24   was that, you said, a March 28th e-mail?

25   A    Well, that was part of the list.  What I did

1   was March 28th was one of several e-mails that I had

2   sent to the administration and so I forwarded all of

3   those e-mails to another account.

4       Q    Okay.  The March 28th e-mail, what was the

5   subject of it?

6       A    It was -- it had to do with the incident at

7   the country club.

8       Q    Is that the e-mail in which you asked for a

9   policy about a trainer being present?

10      A    That was one of maybe three in which I asked

11  for a policy of being present.  That particular

12  e-mail, I basically refuted the allegations in the

13  letter of reprimand that I received and I went through

14  and pretty much step by step acknowledged each of the

15  particular allegations.

16      Q    So when you returned and checked your sent

17  box --

18      A    Uh-huh.

19      Q    -- was there anything in the sent box or

20  just e-mail from a particular time period?

21      A    There were -- there were e-mails in the sent

22  box but it was a gap, decided gap where there were no

23  e-mails from --

24      Q    Did -- go ahead.

25      A    I'm not 100 percent sure, but I almost want

1    to say it was either -- I think it was October 2010

2    through '12, or 2011, I'm not 100 percent sure, but it

3    was one of the two.

4         Q    Would you say those dates for me again.

5         A    It was either October 2010 through, like,

6    April 1st, 2012, or October 2011 through -- it was

7    one of the two.

8         Q    October 2011 through April '12?

9         A    Yes, ma'am.  Yes.

10        Q    2012.  And so were there e-mail in the sent

11   box before October 10th -- or October of 2010?

12        A    Yes.

13        Q    Were there e-mail in the sent box after

14   April '12?

15        A    Yes.

16        Q    Did you talk to anyone at LSU about that?

17        A    No.

18        Q    Did you show anyone that there was a gap?

19        A    No, because I was terminated right after.

20        Q    You did not talk to Mr. Carney?

21        A    I did not.

22        Q    You did not talk to Mr. Deaver?

23        A    I did not.

24        Q    Am I correct that you contend that there was

25   a gap because when you returned, you looked in your

1  sent box?

2      A    I did.

3      Q    The information that you forwarded to the

4  Yahoo account, was it for a particular time period?

5      A    No.  It was -- it was through the years,

6  different things that I had documented and sent to the

7  administration.  So it was -- it was, I guess, the

8  time period from, I guess, maybe 2007 on.

9      Q    So is this the correct way to characterize

10  what you sent to your Yahoo account.  You did not send

11  everything during that time period, but you picked

12  things to send?

13      A    Correct.

14      Q    And was your criteria for picking what to

15  send that the e-mail related to the issues that you

16  felt you had had at LSU?

17      A    Not necessarily.  There were some -- there

18  were some other things that I forwarded -- actually I

19  take that back.  After my termination, I went through

20  my LSU e-mail account and forwarded all things to my

21  Yahoo.  Before my termination, I was only forwarding

22  things that I thought were particular to the incidents

23  that I was dealing with.

24      Q    Has anyone at LSU ever told you what might

25  have happened to the e-mail that you contend was no

1    longer in your sent box?

2        A    No.

3        Q    Do you have any information about what

4    happened to it?

5        A    I don't.

6        Q    Do you contend that that e-mail was

7    purposely removed?

8        A    I do.

9        Q    What's the basis for that contention?

10       A    One of the basis is I found it very

11   mysterious that when I got back, that they were

12   deleted and in this whole -- with the initial

13   disclosures and everything, it's ironic that some of

14   the e-mails have just come to surface.  And we have

15   been exchanging stuff for close to a year now and I've

16   recently, in the last month, have gotten e-mails that

17   I sent back then.  So it just seems very strange to me

18   that in this particular case, that after I got back

19   from the NCAA tournament, that all of these were

20   deleted.

21       Q    Is there any other reason why y(

22   the -- your contention that this e-mail w

23   was purposeful?

24       A    I'm sure it was purposeful beca

25   e-mail does not want to surface because

1    addressed the retaliation claim.  They never addressed

2    the policy.  They never addressed the assessment.

3    They never did any of those things.  I was very sure

4    that that was the reason why.

5        **Q    And you have described all of the basis for**

6    **that contention, that the e-mail was -- was purposely**

7    **deleted?**

8        A    Could you ask the question --

9        **Q    Have you described all of the reasons why**

10   **you think that e-mail was purposely deleted?**

11       A    Yes.

12       **Q    Have you produced -- you talked about**

13   **sending e-mail to the Yahoo account.  Have you, in**

14   **this litigation, produced all of the e-mail that you**

15   **forwarded to your Yahoo account?**

16       A    All of the e-mails pertaining to the case, I

17   have.

18       **Q    Was there e-mail that you sent to your Yahoo**

19   **account that you have not produced?**

20       A    I'm not 100 percent sure, but I went through

21   it very thoroughly, and I'm pretty sure I produced

22   everything.

23       **Q    Everything that you sent to the Yahoo**

24   **account or everything that you contend relates to your**

25   **employment?**

1    A    Everything -- everything that I contend

2  relates to my employment.  I haven't withheld

3  anything.  I have turned over everything that I have.

4  In fact, I had turned over everything I have in the

5  initial disclosure.

6    Q    Let me ask you another question, if I can,

7  about your supplemental initial disclosures.  F. King

8  Alexander, LSU President, has been listed as a

9  witness.  Are you aware of that?

10   A    I am.

11   Q    Do you know why he has been listed as a

12 witness?

13   A    Yes.  I think that he should possibly

14 understand what's going on in this case and I was

15 curious to know what he knew about it.

16   Q    To your knowledge, was he even employed at

17 the time that your contract was not renewed?

18   A    He was not, but I was informed by a

19 parishioner that he had informed F. King Alexander of

20 the incident that happened with me, and so I was

21 curious to know if he knew exactly what was going on.

22   Q    When you say parishioner, somebody who goes

23 to your church?

24   A    Correct.

25   Q    To your knowledge, other than what this

1    parishioner might have told Dr. Alexander, did he have

2    any other knowledge about your situation?

3         A    Not to my knowledge.

4              MS. CROCHET:  Let's take a brief lady's room

5         break.

6              (A brief recess was taken.)

7    BY MS. CROCHET:

8         Q    Mr. Minnis, you mentioned -- I asked you

9    some questions about your e-mail account.  Can you

10   give us your Yahoo address, the address to which you

11   sent the e-mail?

12        A    Tonyminnis55@Yahoo.com.

13        Q    Do you contend, between what you have seen

14   produced in this case, and what you, yourself, have,

15   do you contend that any e-mail is missing?

16        A    Yes.

17        Q    Would you -- are you able to describe what

18   you believe to be missing?

19        A    Yes.

20        Q    Would you describe that to me.

21        A    I was told -- Tiffany Jones was our sports

22   psychologist, and I have spoken to her within the last

23   three weeks.  She actually had tried to get me to come

24   do a show on her university and she informed me that

25   she sent an e-mail to Ms. Segar claiming that the

1    student-athlete ████████████ who had passed out,

2    that she knows the players on the team informed her

3    that this young lady had a drug and alcohol problem.

4         Q    Let me be sure I understand --

5         A    Sure.

6         Q    -- what -- who sent what.

7         A    Correct.

8         Q    Ms. Jones --

9         A    Correct.

10        Q    -- sent Ms. Segar an e-mail discussing

11   ███████████ supposed drug and alcohol issues?

12        A    Discussing -- according to Tiffany, she said

13   that, "I sent Miriam Segar an e-mail saying that I

14   know you know ██████ had a drug and alcohol problem.   I

15   know that the administration knew.   I know that you

16   did not inform Tony or the head trainer.   How could

17   you try to hold them accountable when you knew what

18   was going on."   And -- go ahead.

19        Q    No, I want you to finish your answer.

20   Sometimes I interrupt before I realize you're

21   finished.

22        A    Basically, I'm sure, the way that whole

23   thing portrayed was Tiffany, we are about to play

24   Tennessee and I want to say it was around March 20 --

25   24, somewhere around there in 2012, and we were

1 meeting in a locker room, and Tiffany, we had flown

2 Tiffany in on three different occasions, and she came

3 in the locker room and asked to see me, Lisa, and our

4 trainer, Paul Porter. And she pulled me aside, and

5 said, Heads up, guys, ███████ apparently was doing

6 drugs and was rooming with ██████████ and ██████

7 happens to be the niece of Bo Bahnsen, who is the

8 compliance director. That apparently Paige got

9 suspicious of ██████████, and called her father,

10 Billy, who came to the dormitory or apartment where

11 they were living and saw it was drugs, and said, "We

12 are out of here," informed Bo, who informed Miriam and

13 we were never told. And -- go ahead.

14    Q    So I'm confused about how this relates to

15 the e-mail that you're referencing. The e-mail that

16 Ms. Jones sent to Ms. Segar --

17    A    Uh-huh.

18    Q    -- was that, in your understanding, was that

19 e-mail sent after the incident at CCL?

20    A    Yes.

21    Q    And you -- you contend that this e-mail

22 exists because Ms. Jones told you she sent this

23 e-mail?

24    A    Correct.

25    Q    This conversation in the locker room --

1    A    Outside the locker room.

2    Q    **Excuse me, outside the locker room, did that**

3   **take place before or after the incident at CCL?**

4    A    After.

5    Q    **And did that conversation take place before**

6   **or after the e-mail was sent, if you know?**

7    A    I'm almost positive it was before because

8   she actually came to me, we were -- she came to me and

9   told me that she had sent the e-mail.  She didn't give

10  the specifics of what she sent, she just said that she

11  sent an e-mail kind of backing up what she found out.

12    Q    **Did Ms. Jones indicate to you that Ms. Segar**

13  **or anyone else at LSU knew that there was a concern**

14  **about drug use before the CCL incident?**

15    A    Yes.

16    Q    **What did she say about that?**

17    A    She said that ███ was rooming with ███

18  in the --

19    Q    **That whole scenario --**

20    A    -- in the fall, right.  And because I

21  didn't -- I didn't even know when ███ moved out of

22  the dormitory, I didn't even know.  And we found out

23  later, typically when kids move in and out, like --

24  that doesn't ever really happen, but apparently,

25  according to Ms. Jones, there was concern on the part

1   of Billy Bahnsen of ▓▓▓▓ being in the dormitory with

2   ▓▓▓▓▓▓▓ and apparently said, "We are out of here,"

3   his exact words.

4      Q    **That incident, that you've already**

5   **described, happened before the incident at CCL, as you**

6   **understand it?**

7      A    Correct.

8      Q    **Do you know how Ms. Jones found out about**

9   **that incident involving** ▓▓▓▓▓▓▓▓

10     A    Ms. Jones, in the summer of 2011, I had a

11  conversation with Brian Lee and D-D Breaux, and they

12  had informed me how good Ms. Jones was, and so when

13  she came to visit Brian Lee on a Saturday in August, I

14  approached Tiffany, and asked her would she be willing

15  to help with our team and the administration approved

16  it.

17          Afterwards, she came in, she came in maybe,

18  at least once, maybe twice in the fall, and we had her

19  come in the spring.  When she came in the spring --

20  when she came each time, she would interview the girls

21  individually and she met with them one-on-one and she

22  told me, this was her words, that she said that --

23  that the girls told her that they had made the --

24  Miriam was aware of -- of the drug use, and this is --

25  this is how -- she heard it from the girls.

1      Q    Had Ms. Jones ever told you about her

2  concerns about ▇▇▇▇▇▇ possibly having a drug or

3  alcohol problem before the CCL incident?

4      A    No.

5      Q    Okay.  So let's go back to the missing

6  e-mail, what you contend to be missing.  Is there any

7  other e-mail that you think is missing or not -- has

8  not been produced in this case?

9      A    Yes.  There was an e-mail that I have that I

10 sent to Mr. Alleva on February, I believe, 15,

11 basically asking for a copy of the policy that says a

12 certified trainer must be present during any physical

13 activity and he never responded, but Ms. Segar shortly

14 responded, right after.

15     Q    Let me ask a clearer question.  Between the

16 e-mail that you have and have produced in this case

17 and the e-mail that LSU has produced, do you contend

18 that there is e-mail that you think existed but has

19 not been produced?

20          MS. CRAFT:  I'm confused.

21          MS. CROCHET:  Let me start again.

22 BY MS. CROCHET:

23     Q    You have produced e-mail in this case.

24     A    Right.  Correct.

25     Q    LSU has produced e-mail in this case.

JANET PARKER/JOHNS PENDLETON, L.L.C.
225-344-4559

1    A    Correct.

2    Q    **Have you reviewed the e-mail that LSU has**

3  **produced?**

4    A    I have reviewed all of LSU's e-mails.

5    Q    **Between those two sets of e-mail production,**

6  **yours and LSU --**

7    A    Uh-huh.

8    Q    **-- do you contend that there is e-mail that**

9  **exists that's not in either your set or LSU's set?**

10    A    I do.  The Tiffany Jones e-mail and there

11  was one e-mail to Joe Alleva that I -- for whatever

12  reason, when my e-mails were deleted, I did not get a

13  chance to forward it to my Yahoo account.  However, I

14  had already printed it out in my binder and I

15  discovered it, I want to say maybe five, six weeks

16  ago, and turned it over to Ms. Craft.  And that e-mail

17  was, I want to say February 15, to Joe Alleva asking

18  for a copy of the policy.

19    Q    Okay.  **Any other e-mail that you contend**

20  **existed at one time but has not been produced by**

21  **either you or LSU in this case?**

22    A    Not at this particular time.

23    Q    **Let me go back to your employment search.**

24  **Do you know why William and Mary was looking for a**

25  **coach?**

1    A    Yes.  They had missed the NCAA tournament,

2    they had missed it, I think, for the second straight

3    year, I think.

4        Q    Had their coach been terminated?

5        A    Yes.

6        Q    Do you have any idea what that person's

7    conference record was?

8        A    No idea.

9        Q    You have any idea what their national

10   ranking was or overall record?

11       A    Yeah, I think -- well, I think they were

12   like 70 something.  They weren't very good.

13       Q    Do you know why the University of Maryland

14   position was open?

15       A    What happened there?  I think, I think they

16   just retired.  I'm not 100 percent sure.

17       Q    What about the Cal Santa Barbara position,

18   do you know why it was open?

19       A    Not sure.

20       Q    Or Minnesota?

21       A    He left to take the --

22       Q    That's right.  You told me that.

23       A    Yeah.

24       Q    What about the University of Kansas

25   position, do you know why it was open?

1    A    She had -- they had not made the tournament

2  in six or seven years.

3    **Q    Do you know what their conference record had**

4  **been?**

5    A    No.

6    **Q    Do you know what their national ranking had**

7  **been?**

8    A    They weren't nationally ranked.

9        MS. CRAFT:  I'm sorry, they were not

10    nationally ranked?

11        THE WITNESS:  They were not.

12  BY MS. CROCHET:

13    **Q    Do you know anything about their overall**

14  **record in the years preceding the opening?**

15    A    Before -- yeah, one thing that is very

16  different with tennis, I sat on the NCAA committee

17  from 1997 to '99, and I sat on -- I was chair of the

18  NCAA committee in 2004.  Our sport is a little bit

19  different.  It's the strength of schedules, not your

20  record.  So there are many teams that have winning

21  records, that doesn't matter.  What matters in tennis

22  is the teams you play and the quality of the teams.

23        So when I sat on the NCAA committee in 2004

24  and actually did the draw to the tournament, the

25  record isn't necessarily important, it's who you play

1    and how competitive you're playing against.

2        Q    **What about the University of Kansas vacancy,**

3    **do you know why that position was open?**

4        A    That's what I just -- she did not make the

5    tournament, yeah.

6        Q    **I'm sorry.  What about Wisconsin, do you**

7    **know why that one was open?**

8        A    Missed the NCAA tournament like seven years

9    or six years.

10       Q    **Do you know anything about their conference**

11   **record or national ranking leading up to that position**

12   **being open?**

13       A    I don't think they were ranked nationally at

14   all.

15           MS. CROCHET:  I will show you a document

16       that I will mark as Minnis 1.

17           (Exhibit #1 marked for identification.)

18   BY MS. CROCHET:

19       Q    **This appears to be a resume that was**

20   **recently produced --**

21       A    Right.

22       Q    **-- in discovery responses in this case.  Do**

23   **you recognize that as your resume?**

24       A    Yes.

25       Q    **In Career Profile, you describe your --**

1  your -- what you describe as your demonstrated

2  expertise.  You see what I'm referencing?

3       A    Yes.

4       Q    Do you agree that those items that you list

5  there in the resume:  Recruiting, managing budgetary

6  affairs, and the continuing list, those are -- are

7  characteristics that are part of -- having those

8  characteristics are part of being a head coach?

9       A    Correct.

10      Q    And those are skills that you would expect a

11 head coach to have?

12      A    Correct.

13      Q    Would a head coach also need to be generally

14 familiar with conference and NCAA guidelines --

15      A    Definitely.

16      Q    Excuse me.  -- as it relates to interacting

17 with student-athletes?

18      A    Sure.

19      Q    And the rules of his or her particular

20 school?

21      A    Uh-huh.

22           MS. CRAFT:  You need to answer out loud.

23           THE WITNESS:  Yes.  I'm sorry.

24 BY MS. CROCHET:

25      Q    Isn't it also, in fact, one of the main

1    roles of a head coach to put a competitive product on

2    the court?

3         A    Correct.

4         Q    Have a winning team?

5         A    Correct.

6         MS. CROCHET:  We will attach the resume as

7    Minnis 1.

8         MS. CRAFT:  What I'd like to do with the

9    exhibits, if at all possible, I'd kind of like to

10   keep the numbers consecutive.  We are doing

11   another two days of depositions.

12            I know you're not taking them, but I do

13   want to kind of allow them to travel so we can

14   have a booklet of exhibits at the end of the

15   depositions.  Is that okay with you?

16        MS. CROCHET:  Fine with us.  Try to remember

17   at the end of the day what number we left off on.

18        (Discussion off the record.)

19   BY MS. CROCHET:

20        Q    Mr. Minnis, you worked for LSU for 20 plus

21   years?

22        A    Correct.

23        Q    Were you aware that LSU had policies

24   prohibiting discrimination?

25        A    I was.

1   course of this whole thing, had several attorney

2   friends, just friends of mine that had given me

3   different pieces of advice. And the consistency was

4   whenever you have any type of complaint, to document

5   it, and inform the party and which I did to Mr. Nunez,

6   I informed Mrs. Southard, I informed Mr. Alleva, all

7   in writing and I also did so verbally.

8      Q   So let me go back to my question about human

9   resources in Thomas Boyd. That's what I want to know

10  about right now.

11      A   Okay.

12      Q   Other than the contact that you described

13  about your insurance after you were not renewed by

14  LSU --

15      A   Correct.

16      Q   -- had you had any contact with anyone in

17  human resources, campus human resources located in the

18  Thomas Boyd building?

19      A   No, I had not.

20      Q   While you were employed at LSU, did you ever

21  attend any training or presentation about any of LSU's

22  discrimination policies?

23      A   I can't recall. I really can't. I -- you

24  know, the only thing I attended were things that were

25  mandated by the Athletic Department and I don't -- I

1  can recall maybe once or twice possibly discussions to

2  that, but overall I can't recall.

3       Q    Let me ask you a minute about your -- the

4  competitive record of your team.

5       A    Okay.

6       Q    Am I correct that in 1992, the -- well, let

7  me start again.  Strike that question.

8            All of LSU's teams compete in the

9  Southeastern Conference or the SEC --

10      A    Correct.

11      Q    -- is that correct?  In -- is it true that

12 in 1992 the SEC for women's tennis expanded from 10 to

13 12 teams?

14      A    Correct.

15      Q    Probably for all other sports as well --

16      A    Yeah.

17      Q    -- correct?  And during the time that you

18 were a coach, you never won seven SEC matches in any

19 season, did you?

20      A    Correct.

21      Q    In fact, you only had three winning records

22 in the SEC, 1997, 2004, and 2008.

23      A    Correct.

24      Q    And your overall SEC record was a losing

25 record, 86 and 146; is that correct?

1       A       Correct.  Correct.

2           Q       And then your last four years your record

3   was 16 and 27?

4       A       Correct.

5           Q       And am I correct that in 2010, your team,

6   your ITC ranking was 70?

7       A       Correct.

8           Q       For our record, can you say what the ITC is.

9       A       ITA.

10          Q       ITA.  I'm saying the wrong thing.

11      A       Right.

12          Q       Would you say what that is.

13      A       Intercollegiate Tennis Association.

14          Q       In 2011, your ranking was 68th?

15      A       Correct.

16          Q       In 2012, 44?

17      A       Correct.

18          Q       You've spoken a lot about the NCAA

19  tournament and am I correct that 64 teams are selected

20  for that tournament every year?

21      A       Yeah, but it's not -- it's not -- it's a

22  little misleading.  There are, I want to say, 22 teams

23  that get automatic bids because they are in a

24  conference.  So basically to qualify to the NCAA

25  tournament, you have to be in the top 42, 43 to make

1    it, and it varies from year to year.  It's not

2    necessarily they don't go off the top 64 teams.  It's

3    the top 42.

4         Q    It's a total of 64 that start out in the

5    tournament?

6         A    It's a total of 64.

7         Q    And your team didn't appear in the

8    tournament in 2006, 2010, or 2011 --

9         A    Correct.

10        Q    -- is that correct?  Am I correct that when

11   your team did appear, it only advanced past the second

12   round one time?

13        A    Incorrect.

14        Q    How many times?

15        A    Four.

16        Q    Am I correct that the highest rank --

17   national ranking of any team you coached at LSU was

18   18th and that was 1995?

19        A    Final finish was 18.

20        Q    And that was your highest ranking?

21        A    Yes.

22        Q    And your overall record in tournament play

23   is 11 and 16?

24        A    Yes.

25        Q    You were SEC Coach of the Year?

1    practice on a consistent basis.  But it's very

2    interesting because if -- if you're going to compare

3    the SEC, compare it in everything, not just what is

4    convenient.  If --

5         Q    I'm asking the questions, Mr. Minnis, and

6    I'd like you to be responsive to my question, please.

7         A    I think I have, but at the same time -- go

8    ahead.

9         Q    So going back to your complaints about the

10   facilities being equal to complaining about a Title IX

11   violation in your mind.

12        A    Right.  Correct.

13        Q    The outdoor facility that was used by your

14   women's tennis team --

15        A    Correct.

16        Q    -- was also used by the men's team?

17        A    Correct.

18        Q    That was both their practice and competitive

19   space, correct?

20        A    Correct.

21        Q    As it was the practice and competitive space

22   for the women's team?

23        A    Correct.

24        Q    The men also did not have access to an

25   indoor facility on campus or an LSU-owned indoor

1    facility; is that correct?

2         A    Correct.

3         Q    You mentioned the different practice

4    locations for the men's and women's team.

5         A    Correct.

6         Q    Am I to understand that the men practiced at

7    Independence Park?

8         A    Yes.

9         Q    And am I also correct that you contend that

10   the women couldn't practice there because of the

11   location of the baseline vis-a-vis the wall?

12        A    Right.  Correct.

13        Q    And is that because you contend the women's

14   game is played further back from the baseline?

15        A    It is.  Different game.

16        Q    Is that standard for all women's tennis or

17   is that a coaching strategy style that is --

18        A    Oh --

19        Q    Let me finish.  Is that a coaching or

20   strategy style where you play from the baseline?

21        A    The men's game is more aggressive and so

22   typically men come forward more and they are -- very

23   few men play defensive.  Most women, especially in

24   college, I mean, there are some that play aggressive,

25   but the majority of them play defensive, especially a

1   lot of kids that I would have from South America and

2   different places like that, because it's a more, like

3   for instance, the Independence Park, I almost want to

4   say it's from here to the wall is the distance. And

5   so from a safety standpoint, it was -- I thought it

6   was a hazard. And so I didn't want to put those kids

7   in that position.

8       Q   But am I correct that for some women and for

9   some coaching strategies, the location of the baseline

10  vis-a-vis the wall would not make a difference, just

11  as it didn't make a difference for the men who

12  practiced there?

13      A   It made a difference and for the players on

14  my team, they were complaining about it all the time

15  and they didn't want to -- I mean, the few times that

16  we did go to Independence, when we could go nowhere

17  else, they were complaining about it. The wall was

18  too close and you would have balls hitting. They were

19  ducking and stuff. That place is pretty bad.

20      Q   Do you know where the women's team today

21  practices?

22      A   I think they practice there.

23      Q   At Independence Park?

24      A   I think so. But they have resurfaced

25  everything. It's a little bit different.

1     Q     They haven't moved the wall, have they?

2     A     No, they haven't.

3     Q     To your knowledge -- am I correct that while

4 for most of your tenure at LSU Jeff Brown was the

5 coach of the men's tennis team?

6     A     Yes.  Yes.

7     Q     And he complained about the state of the

8 facilities as well, didn't he?

9     A     I guess.  I'm not sure.  I'm not.

10     Q     Did he ever tell you that he had concerns or

11 complaints about the facility?

12     A     Oh, for sure, yeah.

13     Q     Do you know whether he ever told anyone at

14 LSU about his complaints or concerns?

15     A     I'm sure he did.  I don't know for sure.

16     Q     And he had concerns about being rained out

17 and having no indoor facility as well?

18     A     Correct.

19     Q     And he complained to LSU as well?

20     A     Correct.

21     Q     And he also had concerns about practice

22 times having to be rescheduled and being difficult?

23     A     Correct.  Actually, but I don't think he --

24 I'm pretty sure he didn't do it in writing like I did.

25 That was the key difference.

1    Q    Do you know whether he actually complained

2    in any way to LSU about the facilities?

3    A    I know he raised concerns, but again, it

4    was -- it was totally different.  I did it in writing.

5    Q    Besides the issues surrounding the facility

6    and practice, did you complain to LSU about anything

7    else that you considered to be a violation of Title

8    IX?  That's what I'm focusing on right now.

9    A    I complained to LSU when in 2008 I received

10   a below average rating for getting to the second round

11   of the NCAA tournament and finishing ranked 27.  I

12   complained to LSU in 2009 when we were ranked between

13   15 and 25 in the nation the entire year and finished

14   ranked in 24 and lost in the second round of the NCAA

15   tournament to Stanford and I was one of eight coaches

16   up for the National Coach of the Year.

17   Q    Let me interrupt.  I don't know from your

18   answer if you understood my question.

19   A    Okay.

20   Q    I understand those were part of your -- your

21   complaints in this litigation.  I'm going to, trust

22   me, ask you about every complaint you have.

23   A    Okay.

24   Q    But right now I want to focus on what you

25   complained about that related to a violation of Title

1    IX.

2        A    Okay.  Okay.

3        Q    Was there anything else besides the

4    facilities and how your team had to practice that you

5    contend violated Title IX?

6        A    The salary disparity, the budget amongst the

7    men and women's team, the salary disparity among -- is

8    higher for the male -- the head coach and assistant

9    coach compared to ours.

10       Q    Any other aspects of your experiences with

11   LSU that you contend were violations of Title IX?

12       A    Those two were main.

13       Q    Let me ask you about just briefly right now

14   about the salary.  To your knowledge, do coaches of

15   women's tennis teams generally make less than coaches

16   of men's tennis teams?

17       A    Across the board, yes.

18       Q    Nationally?

19       A    Yes.  Yes.

20       Q    You filed an EEOC Charge of Discrimination.

21       A    Correct.

22       Q    And did I understand -- I'm not going to at

23   all ask you about what you may have discussed with

24   Jill, but am I correct that you contacted her in about

25   2008?

1     Q     Did you consider Mr. Boustany and

2   Mr. Hamilton to be giving you legal advice?

3     A     Yes.

4     Q     Any other lawyers that you have not already

5   identified as -- that you consulted for legal advice

6   about your experiences at LSU?

7     A     Robert Abendroth.

8           MS. CRAFT:  Spell the last name.

9           THE WITNESS:  A-B-E-N-D-R-O-T-H.

10  BY MS. CROCHET:

11    Q     And when would you have contacted him or

12  talked to him?

13    A     2008, 2009, around there.

14          MS. CROCHET:  All right.  I'm going -- you

15          were -- let me show you a document that I will

16          mark for identification as Exhibit 4 and ask you

17          if you recognize this as the EEOC charge filed on

18          your behalf.

19          MS. CRAFT:  I will lodge an objection to the

20          extent that it's been characterized as his actual

21          EEOC charge.  Under 42 U.S.C. 2000e-5 as a

22          precursor for an EEOC charge, it doesn't have to

23          be the typed document, but subject to that

24          objection and the characterization.

25          (Exhibit #4 marked for identification.)

1  BY MS. CROCHET:

2      Q    Do you recognize the document that we

3  described as Exhibit 4?

4      A    I do.

5      Q    And is that your signature opposite the date

6  of August 20th, 2012?

7      A    Yes, it is.

8      Q    And if you would take just a minute to read

9  it to yourself.

10     A    (Witness reviews document.)  Okay.

11     Q    Did you have an interview, whether by phone

12 or in -- in person, with anyone at EEOC?

13     A    I did.

14     Q    And that would have been sometime prior to

15 this EEOC charge?

16     A    Afterwards.  Once I filed with the EEOC --

17 wait.  I'm sorry.  Let me look at the date here.  I

18 think, I think the EEOC was in early August, I think,

19 when we did a conference call.

20     Q    And at the time of this document,

21 August 20th, 2012, had you already consulted Jill?

22     A    Yes.

23     Q    Okay.

24     A    Yes.

25     Q    Okay.  We will attach that to the

1    deposition, but if you will just keep it handy, I will

2    probably have some questions about it.

3         A    Okay.

4         Q    Let's go ahead and ask some questions about

5    it right now.

6         A    Okay.

7         Q    You, in your EEOC charge, you mention some

8    events that occurred in 2008.

9              MS. CRAFT:  Again, the objection as to the

10             predicate because --

11   BY MS. CROCHET:

12        Q    In the document we have identified as

13   Exhibit 4, you reference some incidents that occurred

14   in 2008; do you see that?

15        A    Yes.  Yeah.

16        Q    Is 2008 the first time you contend you were

17   subjected to discrimination or retaliation or had

18   things occurred prior to that time?

19        A    I would say 2008 it really escalated.

20        Q    Had anything happened to you prior to 2008

21   that you contend was race discrimination?

22        A    Just with my salary.  I was very upset about

23   that.  But in 2008, when I started to complain, it

24   really escalated.  I first complained about salary

25   issues in 2006.  Almost at the same time when Lin

1  Loring, that whole incident at the clay courts is when

2  I first mentioned it.

3      Q    All right.  So I want to be very clear about

4  the basis for all your claims, Mr. Minnis.

5      A    Sure.

6      Q    And so it may seem tedious, but I want to

7  ask you in sort of a systematic, organized way.

8          So is 2006 the first time you contend you

9  were subjected to race discrimination and that race

10  discrimination was connected to your salary?

11      MS. CRAFT:  To the extent you're asking him

12      for a legal conclusion, I am going to lodge a

13      continuing objection.  But go ahead, if you can

14      answer.

15      THE WITNESS:  I had complained before to --

16      actually I had complained once before in 1999, if

17      I'm not mistaken.  And actually, I remember

18      specifically a Debbie Corum, the senior women's

19      administrator in the year 2000, we had just made

20      the Sweet 16 and I remember her asking, she told

21      me she was going to ask for a $10,000 raise and I

22      ended up getting a $5,000 raise at that

23      particular time.  That's when -- but it kind of

24      stayed on the radar a little bit and then in

25      2006, I brought it to Mrs. Southard's attention,

1    Judy Southard.

2  BY MS. CROCHET:

3       Q    So to be clear, in 1999, do you contend that

4  the salary you were paid or the increase you got was

5  evidence of race discrimination against you?

6       A    I do.

7       Q    Why?

8       A    Because it didn't match up to what the

9  accomplishments and the things that we were doing,

10 just compared to some of the other coaches in the SEC

11 and just some of the other coaches at LSU.  I would --

12 I would consistently, in the African-American

13 community, have numerous people come to me on a

14 consistent basis telling me that, you know, this is

15 wrong, you need to push for this, push for that and I

16 did not do it as much.  Then in 2006, '07, I started

17 pushing more.

18      Q    In 1999, is there any other reason why you

19 contend your salary was evidence of race

20 discrimination against you?

21      A    No.

22      Q    Did you complain to anyone at LSU about what

23 you contended to be race discrimination in your

24 salary?

25      A    I did not.

1  around the country, and found out that my salary

2  wasn't up to par with some of the coaches with the

3  experience that I had and that's pretty much where it

4  started.

5      Q    You mentioned this article a little earlier

6  in your deposition.  Where was this article?

7      A    I can't even recall.  I think it was like --

8  almost want to say it was a headline with Les Miles

9  and it mentioned all the other coaches' raises.

10     Q    Do you think it was a Baton Rouge based

11 article or a publication based in Baton Rouge?

12     A    I don't think it was.  I think it was more

13 national.

14     Q    Okay.  In 2006, do you know how your salary

15 was determined?

16     A    Not sure.  No.  I know I got a 66 to 68,

17 $2,000 raise.

18     Q    Do you know in 2006 how your salary compared

19 to other coaches in the SEC?

20     A    I think it was around eight in the

21 conference, seven or eight, I think.

22     Q    And do you know what your record in the

23 conference was in 2006?

24     A    Right, we finished tenth.

25     Q    And so am I correct that you approached

1    Ms. Southard about your concerns about your salary?

2         A    Correct.

3         Q    And tell me what you told her.

4         A    I basically said I don't understand why my

5    salary is where it is.  I don't think it makes sense.

6    I didn't -- I don't think I made a huge stink about

7    it, I just -- I mentioned it to her and I trusted that

8    she would do the right thing.

9         Q    Did you tell Ms. Southard that you thought

10   that the level of your salary was evidence of race

11   discrimination against you?

12        A    I did not.

13        Q    Why not?

14        A    I don't know.  I just did not at the time.

15        Q    Did you give her any reason why you thought

16   your salary should be higher?

17        A    Yeah, because 2006, we -- we had -- we were

18   one of 15 teams that made the NCAA tournament 11

19   consecutive years and we had a couple of injuries and

20   missed it for the first time.  And there were coaches

21   that hadn't made the tournament near as much as I had

22   that were making more money.  And so I -- I was a

23   little bit -- one, in particular, was University of

24   Arkansas who had just started and never made it.  So

25   that was one of the keys that kind of pointed towards

1    happened to you during your employment at LSU that you

2    contend was race discrimination against you?

3         A    Not that I recall at this present time, in

4    2007.

5         Q    Do you -- has anyone at LSU ever told you

6    how your -- how your salary was determined, whether

7    you would get an increase or what your salary level

8    was?

9         A    No.  There's no -- it seemed to me that

10   there was no formula.  They just --

11        Q    Did anyone at LSU ever tell you that your

12   level of salary was determined by comparison to that

13   of other SEC coaches as well as the record of other

14   SEC coaches?

15        A    You know, to be quite honest with you, I was

16   told on numerous times, "Be patient, we will have a

17   facility at some point for you pretty soon.  We

18   understand the position we are putting you in."  I was

19   told that numerous times.  I was never told that it

20   was based on other SEC coaches.  I told that, hey, we

21   know we haven't given you the proper and necessary

22   resources and tools to compete at the level we need

23   you to compete at.  I was told on several occasions,

24   actually Coach Bertman told me that, I mean, I have

25   had -- Ms. Southard knew that.  It was common

1    knowledge amongst the administration, really around

2    the country.

3          No, I wasn't told that you have to attain

4    this level.  I wasn't -- I never received anything in

5    writing saying, "This is the level we aspire at LSU."

6    I never received, "This is expectations."

7          The only thing I ever received in writing

8    from LSU is saying that they are going to award

9    athletic excellence by giving a bonus to anybody that

10   qualifies for an NCAA tournament, which I did 15

11   times.

12        Q    Here's my question, Mr. Minnis.  That might

13   be the answer to some question, but it's not the

14   answer -- an answer to the question I asked you.

15        A    Okay.

16        Q    Did anyone at LSU ever tell you that your

17   salary was determined based on a comparison with other

18   SEC coaches?

19        A    Never.

20        Q    Do you know whether, in fact, that was the

21   basis for how your salary was determined?

22        A    I don't.

23        Q    Do you know how your salary compared to

24   other SEC coaches in 2008?

25        A    I don't and I will tell you why.  I'm sorry,

1    I do, but what's very interesting about that, as far

2    as the other coaches were concerned, is there were

3    other things that were included within the salary at

4    other places that weren't necessarily recorded and the

5    coaches were telling me that.

6            For example, there were other institutions

7    that would receive X amount of dollars from Nike and

8    Addidas that were kind of perks that went along with

9    overall salary.  So when I say salary discrimination,

10   I'm not talking about strictly the basic salary.

11   There are other things that were included with

12   different coaches at different institutions.

13       Q    As we sit here today, if I tell you that in,

14   for example, 2009, your salary ranked, I think,

15   seventh in the SEC and your -- your competitive record

16   was finishing ninth in the SEC, you don't know whether

17   that is, in fact, the case?

18       A    If that's the case?  I didn't think it was

19   seventh, but -- no.  I'm not sure that's the case.

20       Q    Or if in 2010 your finish was eighth and

21   your salary also ranked as eighth, you don't know

22   whether that's true or not?

23       A    I'm not sure.  I'm not 100 percent.  I will

24   tell you why, because my understanding from other

25   coaches, there were other things that were paid to

1    them besides just the base salary and I brought that

2    point up to Ms. Southard several times.

3         Q    **Did something happen in 2008 that prompted**

4    **you to go to the EEOC with a complaint?**

5         A    I didn't go to the EEOC in 2008.

6         Q    **You're right.  I misstated the question.  In**

7    **your document, that we have described as Exhibit 4,**

8    **you describe incidents that occurred in 2008?**

9         A    Correct.

10        Q    **Am I correct that you believe that things**

11   **happened in 2008 that were evidence of race**

12   **discrimination?**

13        A    Correct.

14        Q    **And what's the first thing that you contend**

15   **happened, as best you can remember?**

16        A    Sure.  In 2007, I had a young lady on my

17   team named ███████████ and she, at the end of 2007,

18   had been -- I had been approached by Mary Boudreaux

19   saying that she had committed academic fraud and she

20   had gotten caught cheating on a test.  And so I spoke

21   to her and then in 2008, she came in, and ended up, I

22   was at a tournament, Riviera, in California and my

23   assistant called to tell me that Ashley had shown up

24   without her tennis clothes and she had shown up drunk.

25   And so I pulled ██████████ aside -- and Ms. Boudreaux

1    also had told me that █████████ had missed study

2    hall on numerous occasions.

3         So I sat with ██████ and I told her that if

4    she didn't shape up, I was going to have to kick her

5    off the team.  I then met with her in around November,

6    and her behavior continued.  Afterwards, I called her

7    in the office, I had Robert Abendroth, was my

8    volunteer assistant coach sitting next to me, and

9    informed Ms. Murdock that I was not going to -- she

10   could keep her scholarship for the spring, but would

11   not be renewed for the following season and she was

12   free to transfer.

13        Shortly after, I received a letter of

14   reprimand from Ms. Southard stating that I had treated

15   ██████████████ very poorly.  Secondly, I had gone on a

16   trip to Auburn, Alabama, and as we were traveling,

17   there was a trainer who was part of the track team,

18   but our trainer's mother or grandmother had died, and

19   the trainer ended up losing $100.  So I took money out

20   of my pocket and gave it to her with the intention of

21   being reimbursed through the foundation that I raise

22   money in.

23        When I got back to LSU, I had -- we were on

24   a trip and I wasn't sure at what time the kids -- how

25   long we would be on the trip because in tournaments

1    you never know.  I came back and gave all the kids $14

2    and did not give our trainer $14, but at the same

3    time -- so I made a mistake of -- of shorting her 14

4    bucks.  I received a letter of reprimand from the

5    Ms. Southard.  She never discussed it with me.  A

6    letter of reprimand basically accusing me of stealing

7    14 times however many players were on the trip.  I

8    refused to pay it.  Later on, it was reduced back to

9    $14.  Also, in --

10        Q    Let me interrupt, if I can, about the letter

11   that you referenced.

12        A    Sure.

13        Q    Ms. Southard sent you a letter on

14   February -- dated February 13, 2008.

15        A    Correct.

16        Q    That's what you're referencing; is that

17   right?

18        A    Yes.

19        Q    And that letter, you contend, is evidence of

20   race discrimination against you?

21        A    Correct.

22        Q    Am I right about that?

23        A    Correct.  Definitely.

24        Q    Let me show you the letter because I have

25   some questions for you about it.

1    A    Okay.

2         MS. CROCHET:  We will attach it -- we will

3    mark it and attach it to your deposition as

4    Exhibit 5.

5         (Exhibit #5 marked for identification.)

6    BY MS. CROCHET:

7    Q    **First, tell me if this is the letter you're**

8    **referencing.**

9    A    This is the letter.

10   Q    **Okay.  In the first bullet point paragraph**

11   **of the letter related to** ████████  **the letter**

12   **states that you discussed disciplinary action that you**

13   **took against** ████████.  **with other team members.  Do**

14   **you deny that you did that?**

15   A    I didn't do that.  I didn't discuss

16   disciplinary.

17   Q    **Do you deny that you made degrading remarks**

18   **to the team about** ████████ **when** ████████ **wasn't**

19   **present?**

20   A    I wouldn't say it was degrading, it was --

21   it was very innocent joking.  It was -- I can tell you

22   exactly what the comment was.

23   Q    **Would you please tell me.**

24   A    Sure.  We were all sitting at a table at

25   Auburn, Alabama, and we -- the girls were -- it was a

1    team that was extremely young and they were joking

2    with me as far as what was the dumbest things that

3    they had done, and I said, "Well, you can't top what

4    Ms. Murdock did, she sent me a text meaning to go to

5    her mom basically saying 'I hate Tony,' and then when

6    I called her up, she said, 'it was meant to go to my

7    mom.'" That was basically it.

8        Q    You see in that same paragraph that the

9    letter says that you were questioned by Mr. Nunez

10   about these issues with ▇▇▇▇▇▇ and you

11   acknowledged making the remarks?

12       A    I actually told Eddie I had made that

13   particular remark. That's the only remark I made.

14       Q    Did you tell Eddie that you had discussed

15   ▇▇▇▇▇▇▇▇▇ discipline with other members of the

16   team.

17       A    No.

18       Q    The next bullet point in that letter

19   references your purchase of motivational books. See

20   that?

21       A    What's interesting is the two previous

22   years, if I'm not mistaken --

23       Q    Here's my question: Do you see the

24   paragraph --

25       A    I do.