UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF LOUISIANA


ANTHONY MINNIS                                        CIVIL ACTION

VERSUS

BOARD OF SUPERVISORS OF                              NO.: 13-00005-BAJ-RLB
LOUISIANA STATE UNIVERSITY
AND AGRICULTURAL AND
MECHANICAL COLLEGE ET AL.


RULING AND ORDER

Before the Court is Defendant's **MOTION FOR SUMMARY JUDGMENT**
**(Doc. 59)**, filed by Defendant Board of Supervisors of Louisiana State University
and Agricultural and Mechanical College ("LSU"), seeking an order from this Court
dismissing Plaintiff Anthony Minnis's ("Minnis") claims against it, pursuant to
Federal Rule of Civil Procedure 56. Minnis opposes the motion. (Doc. 66). LSU
filed a reply memorandum in response to Minnis's memorandum in opposition.
(Doc. 76). Oral argument is not necessary. The Court has jurisdiction pursuant to
28 U.S.C. § 1331.

I.      **Background**

This is an employment discrimination action brought by Minnis against his
former employer, LSU, pursuant to Title VII of the Civil Rights Act of 1964, 42
U.S.C. § 2000e, *et seq.* ("Title VII"), Title IX, 20 U.S.C. § 1681 ("Title IX"), and the
Louisiana Employment Discrimination Law ("LEDL"), La. R.S. § 23:301, *et seq*.
Generally, Minnis's Petition asserts that throughout his employment at LSU, he

was subjected to "race-based harassment and discrimination" on account of his race. (Doc. 1-2, ¶ 5).

LSU hired Minnis, a black male, as head coach of its women's tennis team in August 1991. (Doc 1-2, ¶ 2). In his twenty-one years as head coach, Minnis's teams qualified for the National College Athletic Association ("NCAA") Tournament fifteen times. (Doc 1-2, ¶ 3). Minnis received many awards and accolades during his tenure, including being chosen as Southwest Regional Women's Tennis Coach of the Year five times, and Southeastern Conference ("SEC") Coach of the Year once. (*Id.*). Minnis coached ten All-American tennis players during his tenure at LSU, including the SEC Player of the Year in 2001 and 2007. (Doc 1-2, ¶ 3).

During Minnis's tenure as head coach, the LSU women's tennis team achieved a winning record only four times overall, and in the SEC on only three occasions (1997, 2004, 2008). (Doc. 59-2 at p. 3). His overall SEC win-loss record as head coach was 86-146. (*Id.*). While head coach, Minnis's teams competed in the NCAA tournament fifteen out of twenty-one years, but in Minnis's last twelve years, the team never advanced past the second round. (Doc. 59-2 at p. 4). In the year preceding Minnis's termination, his team did not reach the NCAA tournament, and in the three years preceding the non-renewal of Minnis' contract, the women's tennis team had three consecutive losing seasons. (Doc. 59-2 at pp. 3-4).

Throughout the time relevant to this litigation, Jeff Brown, ("Brown") a white male, was the head coach of the men's tennis team. (Doc. 59-2 at p. 25). Brown was hired in 1998. (*Id.*). In calculating Brown's salary, LSU had to compete with another university on at least one occasion because of a competing offer from Texas A&M. (Doc. 59-2 at pp. 20-21). In the five years preceding Minnis's termination, his and Brown's teams had identical records. (Doc. 101 at p. 11). However, in his most successful season, Brown's team achieved a ranking of second in the nation. (*Id.*). By contrast, the highest ranking achieved by Minnis's team was eighteenth. (*Id.*). In Brown's fifteen years as LSU's head coach, the men's tennis team finished with a higher national ranking than the women's team every year except 2009. (Doc. 59-2 at pp. 25-26). Brown's overall record was 237-142, and his record in the SEC was 89-76. (Doc. 59-2 at p. 26). Over the same fifteen years, Minnis's team had an SEC record of 61-104 and an overall record of 191-174. (*Id.*).

Throughout most of his employment, Minnis received written performance evaluations. He was evaluated based on factors such as planning and organization, leadership, sports knowledge, student-athlete management, academic success of student-athletes, level of success in the sport, knowledge of and compliance with NCAA rules, recruiting, team work, judgment, work environment and safety, management and vision. (*Id.*). The outcomes of his

evaluations generally were mixed.[1]  (Doc. 59-2 at pp. 4-5; Doc. 101 at pp. 12-13).

Minnis's last evaluation prior to his termination occurred in June 2009.  (Doc. 59-2
at p. 26; Doc. 101 at pp. 9-13).

At some point during his employment, Minnis questioned whether he was
being adequately compensated.  (Doc. 59-2 at p. 7; Doc. 101 at pp. 11-12).  However,
in his deposition, Minnis conceded that he did not know how LSU calculated his
salary.    (Doc. 59-2 at pp. 19-20).    In response to Minnis's question, LSU
consistently maintained that it set Minnis's salary in accordance with his team's
ranking and on par with other SEC women's tennis coaches.  (Doc. 59-2 at p. 20).
In fact, in 2012, of the thirteen other SEC West coaches for which salary
information was provided, four made less than or roughly the same as Minnis.
(Doc. 71-1 at p. 41).  At no point during his employment did Minnis indicate to LSU
that he felt the alleged deficiencies in his compensation were in any way connected
to his race.  (Doc. 59-2 at p. 19).

In early 2008, Minnis complained about racial discrimination.  (Doc. 59-2 at
p. 7).  At that time, following the receipt of a letter from his supervisor, Judy
Southard, a white female, Minnis informed two LSU administrators that he

---

[1] For example, in the category of "level of success in sport," Minnis was evaluated as very good in
two out of seven seasons, satisfactory in one, needing improvement in three, and unsatisfactory in
one.  (Doc. 69-1 at pp. 11-51).  In the category of "student-athlete management," Minnis was given a
very good assessment in three of seven seasons, satisfactory in two seasons, and needs improvement
in the remaining two seasons.    (*Id.*).    In the category of "knowledge and compliance with NCAA
rules," Minnis was evaluated as very good in three seasons, satisfactory in one, and needing
improvement in his final two evaluations.    (*Id.*)  By contrast, LSU's evaluations of Minnis were
more consistent in other categories.  (*See, e.g.*, *id.*) (providing a very good ranking in the category of
"sport knowledge" for all seven seasons).

believed Southard was a "racist." (*Id.*). They informed Minnis that they disagreed and asked why Minnis reached that conclusion. (Doc. 59-2 at pp. 94-96; Doc. 59-9 at pp. 43-45) However, Minnis offered no facts to support his contention and there was no further follow-up by the administrators or Minnis. (*Id.*).

Minnis also complained to the administration regularly about what he perceived to be inadequate practice facilities at LSU. (Doc. 59-2 at p. 7; Doc. 59-3 at pp. 78-84). During all times pertinent to this litigation, the men's and women's teams used the same outdoor practice facility. (Doc. 59-3 at p. 80). In addition, the men's tennis coach, Brown, also lodged similar complaints about the perceived inadequacy of the facilities, particularly, the lack of an indoor practice facility. (Doc. 59-2 at p. 26).

Minnis was terminated from his position on June 30, 2012. (Doc. 1-2, ¶ 11). Minnis alleges that his replacement, Julia Sell ("Sell"), a white female with "far less experience" is being paid substantially more than he was paid. (Doc. 1-2, ¶ 13). At the time LSU elected not to renew Minnis's contract, his salary was $85,000/year. (Doc. 101 at p. 8). By contrast, Sell signed a four-year contract with a base salary of $110,000.[2] (Doc. 71-1 at p. 41). Like Minnis, at the time of her hiring, Sell had no prior head coaching experience. (Doc. 59-2 at p. 8). Also like Minnis, Sell's salary was purportedly calculated on par with the salaries of other

---

[2] Although Minnis contends that Sell was paid $120,000 in his opposition memorandum, LSU disputes this, as does evidence in the record. (Doc. 76-1 at p. 14; Doc. 71-1 at p. 41). To the extent that there is a dispute regarding what Sell was paid, it does not amount to a genuine dispute of material fact, and thus, is insufficient to defeat LSU's motion for summary judgment.

women's tennis coaches in the SEC at that time. (Doc. 101 at p. 9). Indeed, of the thirteen other SEC West coaches for which salary information for the 2012-2013 season was reported, five were paid more than Sell, and seven made the same as or less than Sell. (Doc. 71-1 at p. 41). In addition, in calculating Sell's salary, LSU contends that it included an additional premium to compensate Sell for the challenges associated with coaching a team with both a historically unsuccessful competitive record and morale issues among the its players. (Doc. 59-2 at p. 8).

Minnis then filed suit against Defendants in state court on November 20, 2012. (Doc. 1-2). Defendants removed the lawsuit to this Court on January 3, 2013. (Doc. 1). Minnis filed an Amended Complaint in this Court on May 10, 2013.[3] (Doc. 17). Minnis alleges the following causes of action: (1) impairment of his right to contract under 42 U.S.C. § 1981; (2) several claims under 42 U.S.C. § 1983; (3) claims for discrimination and retaliation based on race in violation of Title VII, 42 U.S.C. § 2000e; (4) a claim for gender-based discrimination in violation of Title IX, 20 U.S.C. § 1681; and (5) claims for discrimination and retaliation under LEDL, La. R.S. § 23:301, *et seq*. (Doc. 1-2; Doc. 17).

Following a ruling by this Court, all defendants other than LSU have been dismissed. (*See* Doc. 25). Further, *only* Minnis's claims for racial discrimination, harassment, and retaliation, in violation of Title VII, retaliation under Title IX, and discrimination and retaliation arising under state law remain. (*Id.*) As to the

---

[3] In his Amended Federal Complaint, Minnis "reiterate[s] and re-allege[s] all allegations contained in his original Petition as if quoted herein in their entirety." (Doc. 17, ¶ IV).

instant motion, LSU seeks an order from this Court dismissing Minnis's remaining claims with prejudice and at Minnis's cost. (Doc. 59 at p. 3).

## II.    Standard of Review

Pursuant to the Federal Rules of Civil Procedure, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In determining whether the movant is entitled to summary judgment, the court views the facts in the light most favorable to the non-movant and draws all reasonable inferences in the non-movant's favor. *Coleman v. Houston Independent School District*, 113 F.3d 528, 533 (5th Cir. 1997).

After a proper motion for summary judgment is made, the non-movant must set forth specific facts showing there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). At this stage, the court does not evaluate the credibility of witnesses, weigh the evidence, or resolve factual disputes. *Int'l Shortstop, Inc. v. Rally's, Inc.*, 939 F.2d 1257, 1263 (5th Cir. 1991), *cert. denied*, 502 U.S. 1059 (1992). However, if the evidence in the record is such that a reasonable jury, drawing all inferences in favor of the non-moving party, could arrive at a verdict in that party's favor, the motion for summary judgment must be denied. *Int'l Shortstop, Inc.*, 939 F.2d at 1263.

On the other hand, the non-movant's burden is not satisfied by some metaphysical doubt as to the material facts, or by conclusory allegations, unsubstantiated assertions, or a mere scintilla of evidence. *Little v. Liquid Air*

7

*Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994).  Summary judgment is appropriate if the non-movant "fails to make a showing sufficient to establish the existence of an element essential to that party's case."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).  In other words, summary judgment will lie only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits if any, show that there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law."  *Sherman v. Hallbauer*, 455 F.2d 1236, 1241 (5th Cir. 1972).

## III.  Discussion

### A.  Whether the Federal and State Law Claims are Time-Barred

In support of its motion, LSU argues that Minnis's Title VII claims are time-barred because they are based on events that occurred 300-days prior to June 6, 2012, and therefore, must be dismissed as a matter of law.  LSU further contends that any claims arising under Title IX or state law that are based on events that occurred prior to November 20, 2011, are also time-barred, and must be dismissed as a matter of law.  In opposition, Minnis disputes that his federal and state law claims are time-barred, and thus, contends that such claims must not be dismissed on this basis.

A discrimination charge is considered "filed" for purposes of 42 U.S.C. § 2000e-5 on the date the EEOC receives the charge, not the date the charged is

signed or mailed.[4]  *See Taylor v. Gen. Telephone Co. of the Southwest*, 759 F.2d 437, 441-42 (5th Cir. 1985).  Here, Minnis's EEOC file was destroyed, and thus, the exact date on which the EEOC received the charge is unknown.[5]  However, for purposes of this motion, LSU accepts Minnis's assertion that he filed an EEOC charge on June 6, 2012.[6]  Thus, for purposes of this motion, the Court will also accept this date.

In Louisiana, a plaintiff has 300 days from the date of the alleged discriminatory conduct to file a charge of discrimination with the EEOC.  *See Janmeja v. Bd. of Supervisors of La. State Univ. & Agric. & Mech. College*, 96 F. App'x 212, 214 (5th Cir. 2004).  Any claims not described in the EEOC charge are not properly before the Court.  Accordingly, any Title VII claims are based on events that occurred 300 days before June 6, 2012, or before August 11, 2011, are time-barred.

LSU further asserts that Minnis's Title IX retaliation claim and state law discrimination claims based on acts occurring more than one year prior to his filing suit are also time-barred.  (Doc. 59-2 at p. 11).  Though Title IX does not contain a

[4] By contrast, 29 C.F.R. § 1601.13 explicitly mandates that where a charge of discrimination is filed which includes an allegation under state law, the state law charges are to be forwarded to the appropriate local agency and these "[s]tate or local proceedings are deemed to have commenced on the date such document is mailed. . . ."  29 C.F.R. § 1601.13(a)(4)(i)(B).

[5] In its response to LSU's FOIA request, the EEOC asserted that due to the volume of charges received, it has a policy of destroying closed files as early as one year after the official closing date. (Doc. 59-12 at pp. 39-40).  Here, the file for charge number 461-2012-01332 was closed December 7, 2012, and subsequently destroyed on December 19, 2013, in accordance with the aforementioned policy. (*Id.*).

[6] LSU contends, and Minnis does not dispute, that this was the only charge served on LSU by the EEOC.  (Doc. 59-2 at p. 10).

statute of limitations, the appropriate statute of limitations for claims arising under Title IX is the most analogous period established under state law. *See Reed v. United Transp. Union*, 488 U.S. 319, 323 (1989) (noting that in the absence of an express statute of limitations, the Court has "generally concluded that Congress intended that the courts apply the most closely analogous statute of limitations under state law"). Discrimination claims brought under Louisiana law are subject to a one-year prescriptive period. La. R.S. 23:303(D). "This one-year prescriptive period commences to run from the day injury or damage is sustained." *King v. Phelps Dunbar, L.L.P.*, 743 So. 2d 181, 187 (La. 1999). *See also Horaist v. Doctor's Hosp. of Opelousas*, 255 F.3d 261, 268-69 (5th Cir. 2001). The prescriptive period for LEDL claims is suspended during administrative review or investigation of the claim conducted by the EEOC, but no such suspension "shall last longer than six months." La. R.S. 23:303(D).[7]

Here, with respect to Minnis's retaliation claim, the one-year prescriptive period began to run in 2012 when Minnis learned of LSU's intention to not renew his contract. Accordingly, this claim is timely.

With respect to his discrimination claims, Minnis filed his Petition on November 20, 2012. (Doc. 1-2). For such claims to be timely, the events at issue must not have occurred prior to the *maximum* eighteen-month prescriptive period

---

[7] In its entirety, La. R.S. 23:303(D) reads: "Any cause of action provided in this Chapter shall be subject to a prescriptive period of one year. However, this one-year period shall be suspended during the pendency of any administrative review or investigation of the claim conducted by the federal Equal Employment Opportunity Commission or the Louisiana Commission on Human Rights. No suspension authorized pursuant to this Subsection of this one-year prescriptive period shall last longer than six months."

(consisting of the one-year prescriptive period, plus the maximum six-month suspension period). Thus, any LEDL claims based on events that occurred eighteen months before November 20, 2012, or before May 20, 2011, are prescribed and must be dismissed. La. R.S. 23:303(D).

## B.     Minnis's Title VII Claims

Title VII prohibits discrimination by employers "against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a). Intentional discrimination under Title VII can be proven by either direct or circumstantial evidence. *Laxton v. Gap, Inc.*, 333 F. 3d 572, 578 (5th Cir. 2003); *Russell v. McKinney Hosp. Venture*, 235 F.3d 219, 222 (5th Cir. 2000). For evidence to be "direct," it must, if credible, prove the fact in question without inference or presumption. *Fabela v. Socorro Indep. Sch. Dist.*, 329 F.3d 409, 415 (5th Cir. 2003) (citations omitted). Here, Minnis has not presented any direct evidence of discrimination. Accordingly, the Court shall employ the familiar burden-shifting framework established by the United States Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973).

To overcome a motion for summary judgment on his remaining discrimination claims, Minnis must first establish, by a preponderance of the evidence, a prima facie case of discrimination. *McDonnell Douglas*, 411 U.S. at 801-803. A prima facie case is established once the plaintiff has proven that he or she: (1) is a member of a protected class; (2) was qualified for his position; (3) was

subjected to an adverse employment action; and (4) was replaced by someone outside the protected class; or in the case of disparate treatment, show that others similarly situated were treated more favorably. *Id.*; *see also Septimus v. Univ. of Houston*, 399 F.3d 601, 609 (5th Cir. 2005). The prima facie case, once established, raises a presumption of discrimination, which the defendant must rebut by articulating a legitimate, nondiscriminatory reason for its actions. *McDonnell Douglas*, 411 U.S. at 802; *Meinecke v. H&R Block*, 66 F.3d 77, 83 (5th Cir. 1995) (citing *Tex. Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 254 (1981)). If the defendant satisfies this burden by proffering a non-discriminatory reason for the adverse employment action, the plaintiff must then create a genuine issue of material fact that either: (1) the defendant's reason is not true, but instead is a pretext for discrimination (pretext alternative); or (2) regardless of the nondiscriminatory reason, the plaintiff's race was also a motivating factor (mixed-motives alternative). *Alvarado v. Tex. Rangers*, 492 F.3d 605, 611 (5th Cir. 2007) (citation omitted); *Rachid v. Jack in the Box, Inc.*, 376 F.3d 305, 312 (5th Cir. 2004). Once a Title VII case reaches the pretext stage of the analysis, the only question remaining is whether there is a conflict in substantial evidence to create a question for the fact-finder. *Shackelford v. DeLoitte & Touche, LLP*, 190 F.3d 398, 404 (5th Cir. 1999) (citing *Rhodes v. Guiberson Oil Tools*, 75 F.3d 989, 993 (5th Cir. 1996) (noting that once a Title VII case reaches the pretext stage, the sufficiency of the evidence test is applied)). Throughout, the ultimate burden of persuasion

remains with the plaintiff.  *See Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142 (2000).

Here, for various reasons, each of Minnis's Title VII claims fails.

### i.      Minnis's Title VII Disparate Treatment Claims

Disparate treatment discrimination addresses employment actions that treat an employee worse than others based on the employee's race, color, religion, sex, or national origin.  *See Pacheco v. Mineta*, 448 F.3d 783, 787 (5th Cir. 2006) (internal citations omitted).  Proof and finding of discriminatory motive is required. *Id.*

In support of its motion, LSU concedes that Minnis is a member of a protected class and was qualified for his position.[8]  Thus, the only remaining issues are whether Minnis can establish that: (1) he was subjected to an adverse employment action; and (2) others similarly situated were treated more favorably.

### 1.      Discriminatory Evaluations and Reprimands

LSU asserts, and Minnis does not refute, that Minnis received his last evaluation in June 2009.  (Doc. 59-2 at p. 26; Doc. 101 at pp. 9-13).  Minnis's claim of disparate treatment as it relates to his evaluations occurred more than 300 days prior to his EEOC charge and the filing of this lawsuit.  Thus, for the reasons discussed previously, this claim is time-barred and must be dismissed.

---

[8] Though LSU does not explicitly concede that Minnis was qualified for his position, the lack of argument concerning this element will be interpreted as a concession that it is satisfied.  Moreover, his twenty-one year tenure as the head coach of women's tennis confirms his qualification, at least until the time he was terminated.

Minnis also contends that he experienced race-based discrimination when issued written reprimands in 2008 and 2012. (Doc. 59-2 at p. 13; Doc. 101 at p. 14). Because the 2008 incident occurred more than 300 days prior to Minnis's EEOC charge, it is time-barred.[9] However, the February 2012 reprimand is timely.

The one-page "official reprimand" issued on February 6, 2012, arose out of a serious incident in which a student-athlete was ultimately hospitalized. (Doc. 59-2 at p. 13; Doc. 59-10 at p. 110). Minnis filed a rebuttal on March 28, 2012, in which he contested LSU's version of the events articulated in its reprimand, and generally denied responsibility for putting the student-athlete at risk. (Doc. 59-10 at p. 119). However, Minnis was not terminated as a result of the incident. (Doc. 59-2).[10] Indeed, there is no indication that the reprimand served any purpose other than to put Minnis on notice of LSU's concern and the possibility of liability arising from such an incident.

Importantly, Title VII does not set forth "a general civility code for the American workplace." *Oncale v. Sundowner Offshore Services, Inc.*, 523 U.S. 75, 80 (1998). Its focus is on tangible, adverse employment actions. *Burlington*

---

[9] The February 13, 2008 written reprimand addressed three issues: 1) Minnis's treatment of a student-athlete who requested release from the women's tennis program; 2) an NCAA violation pertaining to Minnis's purchase of motivational books for his players; and 3) a disputed meal voucher. (Doc. 59-10 at pp. 16-17). Though Minnis disputes the accuracy of LSU's assessment, he did concede that he violated NCAA rules. (Doc. 59-10 at pp. 19-21). Like the 2012 reprimand, there is no indication that there were any tangible employment consequences after the issuance of the reprimand.

[10] LSU maintains that the incident played only a "minor role" in its decision to terminate Minnis and that had the incident alone justified discharge, LSU would not have waited five months to terminate Minnis. (Doc. 59-2 at p. 13).

*Industries, Inc. v. Ellerth*, 542 U.S. 742, 761-62 (1998). As a result, actionable adverse employment actions are generally limited to "action[s] [that] constitute[] a significant change in employment status." *Id.* at 761. Moreover, the United States Court of Appeals for the Fifth Circuit has adopted a "strict interpretation of the adverse employment element." *Pegram v. Honeywell, Inc.*, 361 F.3d 272, 282 (5th Cir. 2004). Thus, "where pay, benefits, and level of responsibility remain the same," employment actions are typically not considered adverse. *Watts v. Kroger Co.,* 170 F.3d 505, 512 (5th Cir. 1999); s*ee also Thompson v. City of Waco*, 764 F.3d 500, 504 (5th Cir. 2014) (citations omitted) (mere "loss of some responsibilities" does not amount to an adverse employment action). *See, e.g.*, *Harrington v. Harris*, 118 F.3d 359, 366 (5th Cir. 1997) (concluding that criticism alone is insufficient to constitute an actionable employment action). Here, Minnis has failed to present any evidence that he experienced a change in employment status of any kind, let alone one that might be considered significant, as a result of the reprimand. Thus, under these authorities, Minnis's February 2012 reprimand does not amount to an adverse employment action sufficient to support a claim of discrimination under Title VII. *See King v. Louisiana*, 294 F. App'x 77, 85 (5th Cir. 2008) (holding that "allegations of unpleasant work meetings, verbal reprimands, improper work requests and unfair treatment do not constitute adverse employment actions as discrimination"); *Grice v. FMC Techs., Inc.*, 216 F. App'x 401, 407 (5th Cir. 2007) (holding that unjustified reprimands are considered "trivial" and not materially adverse in the retaliation context); *DeHart v. Baker Hughes Oilfield Operations,*

*Inc.,* 214 F. App'x 437, 442 (5th Cir. 2007) (holding that a written disciplinary warning for insubordination and being argumentative would not have "dissuaded a reasonable worker from making or supporting a charge of discrimination"); *Gallentine v. Hous. Auth.,* 919 F. Supp.2d 787, 807 (E.D. Tex. 2013) (holding that a write-up, which was classified as a verbal warning, cannot satisfy the second prong of a prima facie case of retaliation). Because Minnis has failed to establish an essential element of his prima facie case, his discriminatory reprimand claim must be dismissed.

## 2. Discriminatory Discharge

To show a prima facie case of discriminatory discharge, a plaintiff must establish that:

> (1) he is a member of a protected class, (2) he was qualified for the position at issue, (3) he was the subject of an adverse employment action, and (4) he was treated less favorably because of his membership in that protected class than were other similarly situated employees who were not members of the protected class, under nearly identical circumstances.

*Lee v. Kansas City S. Ry. Co.*, 574 F.3d 253, 259 (5th Cir. 2009).

As noted above, Minnis has satisfied the first two elements of the prima facie case. Further, it is well-established that termination qualifies as an adverse employment action. *See Burlington Industries, Inc.*, 524 U.S. at 768. Thus, the inquiry turns on whether any of the head coaches identified by Minnis were similarly situated to him. In opposition to LSU's motion, Minnis failed to point to evidence detailing the job responsibilities, duties, and expectations or competitive

success of the head coaches of other LSU sports. Rather, he merely points to the differences in salaries, (*see* Doc. 101 at pp. 9-10), and then cites deposition testimony of Athletic Director, Joseph Alleva, ("Alleva") confirming that comparisons to other sports is unavailing. (*See* Doc. 70-1 at p. 62) ("[E]ach coach gets paid for their sport. You don't compare women's tennis and women's soccer. They are different sports, a different market."). Thus, the Court has not been provided with sufficient evidence to evaluate whether the head coaches of other sports are "similarly situated" to Minnis. However, the record does contain sufficient facts to conduct the "similarly situated" analysis with respect to Jeff Brown, the men's tennis coach.

Minnis argues that his competition record and his number of NCAA violations were comparable to that of Brown (who is white), yet Brown was not terminated. (Doc. 101 at pp. 11-12). Minnis also contends that "Brown had not been awarded and recognized by his peers as had Minnis." (Doc. 101 at p. 11). However, there are several differences between Minnis and Brown, the most notable being that since Brown's hire, the men's tennis team has finished with a higher national ranking than the women's team every year save one. (Doc. 59-2 at pp. 25-26). In addition, Brown was hired in 1998, seven years after Minnis. (Doc. 59-2 at pp. 2, 25). During his tenure, Brown's team's highest national ranking was Number Two, whereas Minnis's highest national ranking was Number Eighteen. (Doc. 59-2 at p. 25). Though the men and women's teams had identical records during the last five years that the two were head coaches, (*see* Doc. 101 at p.11),

17

only the men's tennis team had a winning record in both the SEC and overall.[11] (Doc. 59-2 at p. 26). In addition, throughout both coaches' tenure, the men and women's teams shared the same on-campus practice facilities. (*Id.*). However, this is where the comparison of the coaches ends. Indeed, Minnis failed to point the Court to any information detailing the similarities or differences in Minnis's and his male counterpart's employment duties and expectations. Moreover, although Minnis contends that significant issues existed with Brown's players and that parents complained about Brown, he points to no evidence in the record to support these contentions. (*See* Doc. 101 at pp. 11, 13). Further, despite his assertion that "it is clear that the job of coaching [w]omen's [t]ennis and [m]en's [t]ennis at LSU is identical," Minnis has failed to cite to evidence in the record to establish that this is the case. It is insufficient for Minnis to request that this Court assume that the attendant responsibilities are the same. *See Anderson*, 477 U.S. at 257 (requiring the nonmoving party to present affirmative evidence to defeat a properly supported motion for summary judgment); *Liquid Air Corp.*, 37 F.3d at 1075 (holding that even at the summary judgment stage, the court will not "in the absence of any proof, assume that the nonmoving party could or would prove the necessary facts").

Moreover, though Minnis asserts that his termination is attributable to race discrimination, he has failed to point to any cases where a similarly-situated party, i.e., a coach with a losing record, succeeded in showing that his termination was

---

[11] Brown's record for the fifteen years as head coach was 89-76 in the SEC and 237-142 overall. Over those same fifteen years, Minnis's record was 61-104 in the SEC and 191-174 overall. (Doc. 59-2 at p. 26).

based on his race.[12]  Importantly, "[i]f the 'difference between the plaintiff's conduct and that of those alleged to be similarly situated *accounts for* the difference in treatment received from the employer,' the employees are not similarly situated for purposes of an employment discrimination analysis." *Lee*, 574 F.3d at 260 (quoting *Wallace v. Methodist Hosp. System*, 271 F.2d 212, 221 (5th Cir. 2001)).  In a profession created around competitive success, Minnis had a lackluster record.  In contrast, his "comparator," Brown had a superior win-loss ratio.  Accordingly, having failed to produce any evidence that "he was treated less favorably because of his membership in [a] protected class than were other *similarly situated employees* who were not members of the protected class, under *nearly identical circumstances*," *see Lee*, 573 F.3d at 259 (emphasis added), Minnis has not met his prima facie burden and his Title VII claim must be dismissed.

Even assuming, *arguendo*, that Minnis has met his prima facie burden, Minnis's Title VII claim *still* fails because he cannot rebut LSU's proffered nondiscriminatory reason for firing him.  Here, LSU offers three legitimate business reasons for firing Minnis: (1) his failure to meet the "goals established for him by his supervisors," (2) his "losing record," and (3) "morale issues" that had

---

[12] To that end, it is worth noting that, in fact, other courts have upheld the termination or non-selection of a coach based on his or her win-loss record. *See, e.g.*, *Holcomb v. Iona College*, 521 F.3d 130, 140 (2d Cir. 2008) (noting as a general matter that poor competitive performance constitutes a "good reason" to make changes in staffing a basketball program); *Lujan v. Franklin Cnty. Bd. of Educ.*, 766 F.2d 917, 931 (6th Cir. 1985) (finding that selection of nonminority candidate due to his "excellent coaching record" qualifies as a legitimate, nondiscriminatory reason for not hiring a minority candidate instead); and *Cummings v. Tex. S. Univ.*, No. H-10-1096, 2011 WL 1750697, at *4 (S.D. Tex. May 6, 2011) (finding proffered "poor win-loss" record to be a legitimate, nondiscriminatory justification for defendant's actions).

arisen on the team. (Doc. 59-2 at pp. 24-25). LSU further contends that Brown's competitive success is the reason that he was retained, not his race. (Doc. 59-2 at p. 26). In response, Minnis repeatedly highlights what he calls LSU's "shifting reasons" for terminating him, and ultimately labels those reasons "palpably false." (Doc. 101 at pp. 16-17, 19).

Although inconsistencies or discrepancies in an employer's proffered justification for firing may cast doubt on its explanation, *see Gee v. Principi*, 289 F.3d 342, 347-48 (5th Cir. 2002), the party alleging discrimination must still point to evidence from which a jury could conclude that the employer's stated reason is merely pretext. *See, e.g.*, *Armendariz v. Pinkerton Tobacco Co.*, 58 F.3d 144, 151 (5th Cir. 1995). In short, to establish pretext, Minnis cannot rely solely upon his subjective belief that LSU discriminated against him, or merely case doubt on the nondiscriminatory reasons advanced by his employer. *See Price v. Marathon Cheese Corp.*, 119 F.3d 330, 337 (5th Cir. 1997) (age discrimination); *Ray v. Tandem*, 63 F.3d 429, 434 (5th Cir. 1995) (sex discrimination). Rather, Minnis must provide substantial evidence from which a reasonable inference can be drawn that LSU's proffered reasons are false; a mere shadow of a doubt is insufficient. *EEOC v. Louisiana Office of Community Serv.*, 47 F.3d 1438, 1444 (5th Cir. 1995). Here, Minnis has failed to point to such evidence. Accordingly, Minnis's discriminatory discharge claim must be dismissed.

### 3.    Disparate Compensation

In support of the motion, LSU argues that, to the extent that Minnis's claims of disparate compensation relate to his salary prior to 2011, such claims are time-barred and must be dismissed.  (Doc. 59-2 at p. 19; Doc. 76-1 at p. 10).  For the same reasons articulated above, the Court agrees.  Thus, in considering Minnis's disparate compensation claim, the court will consider only his salary for the season leading up to his 2012 termination.

To state a prima facie claim for disparate compensation, a plaintiff must show that he was a member of a protected class and was paid less than a non-member for substantially the same job responsibilities. *Goring v. Bd. of Supervisors of La. State Univ. & Agric. & Mech. College*, 414 F. App'x 630, 633 (5th Cir. 2011) (citing *Taylor v. United Parcel Serv., Inc.*, 554 F.3d 510, 522 (5th Cir. 2008)).

LSU concedes Minnis is a member of a protected class; thus, the lone remaining issue is whether Minnis was paid less than white employees for substantially the same job responsibilities.  To meet this burden, Minnis must show that his circumstances were "nearly identical" to those of a better-paid, non-protected employee.  *Lee*, 574 F.3d at 259.

Minnis contends that he was paid "substantially less than all other white [h]ead coaches at LSU," including the men's tennis coach.  (Doc. 101 at p. 20).  In support of this contention, Minnis compares the salaries of the head coaches for men's tennis, men and women's golf, and women's soccer to his final salary of

$85,000.   In its reply memorandum, LSU challenges the accuracy of Minnis's figures, (*see* Doc. 76-1 at p. 14 n.10), while forcefully reiterating that coaches of other sports are not proper comparators to Minnis.   The Court agrees.   Beyond salary information, Minnis has pointed to no evidence in the record that would permit the Court to conduct a "similarly situated" analysis with respect to the head coaches of other sports.

Moreover, Minnis's own cursory deposition testimony, even if taken as true, does not establish that his responsibilities were substantially the same or that his circumstances were nearly identical to his comparators', including the men's tennis coach or his replacement, Julia Sell.[13]   However, as discussed above, to the extent that Minnis makes specific comparisons between his circumstances and those of Brown and Sell, their respective competitive records and employment history are too dissimilar to render either similarly-situated to Minnis.   Brown and Minnis were hired at different times.   (Doc. 59-2 at p. 20).   In setting Sell's salary, LSU asserts that it was required to compete with another university's offer of employment. (Doc. 59-2 at p. 8).   LSU also had to make adjustments for Brown due to a competing offer.   (Doc. 59-2 at p. 21).   There is no evidence that LSU faced similar circumstances with respect to Minnis.   Moreover, in comparing Minnis and Brown's salaries, it bears noting that Minnis concedes that men's tennis coaches generally make more than women's tennis coaches nationally.   (Doc. 67-1 at p. 69).

[13] Indeed, as discussed previously, merely highlighting Minnis's many accomplishments and long tenure with LSU (*see* Doc. 101 at p. 11) says nothing of how his responsibilities or even his performance compared with head coaches of other LSU sports teams.

22

Accordingly, Minnis's record evidence does not create a genuine issue of material fact regarding a required element of his claim, namely that he was paid less than his white counterparts for substantially the same job responsibilities. Fed. R. Civ. Proc. 56(c)(1)(B) (a party asserting that a fact cannot be genuinely disputed may support the assertion by citing to specific materials in the record or "showing that the materials cited do not establish the absence or presence of a genuine dispute"); *Thomas v. Barton Lodge II, Ltd.,* 174 F.3d 636, 644 (5th Cir. 1999) ("When the moving party alleges that there is an absence of evidence necessary to prove a specific element of a case, the nonmoving party bears the burden of presenting evidence that provides a genuine issue for trial.") (internal citation omitted).

Even assuming, *arguendo*, that Minnis can establish that Brown and Sell are sufficient comparators to permit a presumption of discrimination, Minnis is unable to rebut LSU's legitimate, non-discriminatory reasons for the disparity in pay. In its motion for summary judgment, LSU asserts that "Minnis did not have a competitive record that would justify merit increases." (Doc. 59-2 at p. 8). It also maintains that Minnis's salary was "not established in accordance with Mr. Brown's or any other LSU head coach's compensation," but instead, was "established in accordance with how he compared to other women's tennis coaches in the SEC." (Doc. 59-2 at p. 20; Doc. 59-6 at pp. 19-20; Doc. 59-9 at pp. 12-13).[14] Additionally, LSU avers that the respective salaries of Brown, Minnis and Sell

[14] For example, in his own deposition, Minnis acknowledges that in 2006, although his team was ranked tenth in the SEC, his salary was seventh or eighth in the conference. (Doc. 59-4 at p. 94).

were all calculated based on the market for the position at the time of hiring. (Doc. 59-2 at pp. 8, 20).

In response, Minnis disputes that his salary was determined based on salaries at the time in the SEC. (Doc. 101 at p. 8). He further avers that the disparity between his and "all of the other (white) coaches was so glaring" that others "took notice," and instructed Minnis to document it because of alleged prior racism at LSU. (Doc. 101 at p. 11). However, Minnis fails to provide deposition testimony or affidavits from those who allegedly "took notice" to corroborate these assertions. (Doc. 101 at p. 11).

In short, these self-serving conclusions are insufficient. Subjective beliefs alone will not establish pretext. *See Price*, 119 F.3d at 337 (age discrimination); *Ray v. Tandem*, 63 F.3d 429, 434 (5th Cir. 1995) (sex discrimination). To satisfy his burden, Minnis must present more than stray remarks, statements by non-decision makers or opinions. *See Nichols v. Loral Vought Sys Corp.*, 81 F.3d 38, 41–42 (5th Cir. 1996). Thus, having failed to create a genuine issue of material fact as to whether LSU's proffered nondiscriminatory reason is merely pretexual or that his race was a motivating factor, Minnis cannot defeat LSU's motion for summary judgment. Accordingly, Minnis's disparate compensation claim must be dismissed.

### ii.     Minnis's Title VII Harassment Claim

To establish a Title VII, race-based hostile work environment claim, a plaintiff must show he or she: "(1) belongs to a protected group; (2) was subjected to

unwelcome harassment; (3) the harassment complained of was based on race; (4) the harassment complained of affected a term, condition, or privilege of employment; (5) the employer knew or should have known of the harassment in question and failed to take prompt remedial action." *Hernandez v. Yellow Transp., Inc.*, 670 F.3d 644, 654 (5th Cir. 2012); *Ramsey v. Henderson*, 286 F.3d 264, 268 (5th Cir. 2002).

For harassment to affect a term, condition, or privilege of employment, it must be "sufficiently severe or pervasive to alter the conditions of [the victim's] employment and create an abusive working environment." *Harvill v. Westward Commc'ns, L.L.C.*, 433 F.3d 428, 434 (5th Cir. 2005) (quoting *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 67 (1986)). To meet this standard, the conduct complained of must be "both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so." *Aryain v. Wal-Mart Stores of Tex. LP*, 534 F.3d 473, 479 (5th Cir. 2008); *see also Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21-22 (1993).

Simply put, Minnis has failed to point to sufficient evidence from which a jury could conclude that the alleged harassment complained of was severe or pervasive enough to affect a term, condition, or privilege of his employment. As discussed previously, because Minnis's evaluations and one of his two reprimands are time-barred, they may not be considered in evaluating his hostile work environment claim. *See Goring*, 414 F. App'x at 632-33. Thus, Minnis is left with only a single reprimand, which is not enough. Hostile work environment claims

require repeated conduct. *See Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 115 (2002) (concluding that hostile work environment claims, unlike discrete acts, are based on a series of events over time). Indeed, Title VII is intended only to prohibit and prevent conduct "that is so severe and pervasive that it destroys a protected class member's opportunity to succeed in the workplace." *Shepherd v. Comptroller of Public Accounts of State of Tex.*, 168 F.3d 871, 874 (5th Cir. 1999) (internal quotation marks and citation omitted). LSU's single reprimand simply does not approach the level of "extreme conduct that would prevent [Minnis] from succeeding in the workplace." *Id.* Accordingly, the Court shall grant LSU's request to dismiss Minnis's claim that he was subjected to a hostile work environment claim on the basis of his race.

### iii. Minnis's Title VII Retaliation Claim

Minnis's Petition also asserts a claim for retaliation in violation of Title VII. (Doc. 1-2 at pp. 3-4). A plaintiff establishes a prima facie claim of retaliation by showing: "(1) he participated in an activity protected by Title VII; (2) his employer took an adverse employment action against him; and (3) a causal connection exists between the protected activity and the adverse employment action." *McCoy v. City of Shreveport*, 492 F.3d 551, 557 (5th Cir. 2007). Ultimately, "Title VII retaliation claims require proof that the desire to retaliate was the but-for cause of the challenged employment action." *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 133 S. Ct. 2517, 2521 (2013).

LSU contends that Minnis has failed to demonstrate that he engaged in protected activity, and even if he had, there is no evidence of a causal link between that activity and his termination. (Doc. 59-2 at pp. 29-30). As a result, LSU asserts that it is entitled to judgment as a matter of law. This Court agrees.

"An employee has engaged in activity protected under Title VII if she has either (1) 'opposed any practice made an unlawful employment practice' by Title VII or (2) 'made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing' under Title VII." *Grimes v. Tex. Dep't of Mental Health and Mental Retardation*, 102 F.3d 137, 140 (5th Cir. 1996). Quite simply, Minnis fails to point to any evidence in the record to show that he engaged in activity sufficient to constitute protected activity under Title VII.[15] Moreover, Minnis's scattered aggregation of facts regarding LSU's alleged acts of retaliation falls far short of the applicable standard for stating an adverse employment action occurred. *Burlington Northern & Santa Fe Railway Co. v. White,* 548 U.S. 53, 57 (2006) (holding that for employment actions to be considered adverse in the retaliation context, they "must be harmful to the point that they could well dissuade a reasonable worker from making or supporting a charge of discrimination.").

---

[15] In his opposition memorandum, Minnis states in a conclusory fashion that he "began questioning his racially disparate pay," (Doc. 101 at p. 12), and that he told Nunez "he thought his evaluation was discriminatory and retaliatory" (Doc. 101 at p. 13). However, Minnis fails to point to any evidence to support these conclusory statements, rendering his response insufficient to defeat a motion for summary judgment. *See Eason v. Thaler*, 73 F.3d 1322, 1325 (5th Cir. 1996) ("mere conclusory allegations are not competent summary judgment evidence, and such allegations are insufficient, therefore, to defeat a motion for summary judgment").

That notwithstanding, even if this Court were to accept that Minnis has satisfied the first two prongs of the retaliation analysis, Minnis's claim must still fail. As discussed previously, LSU has "produc[ed] evidence that its employment decision was based on a legitimate nondiscriminatory reason," *Turner v. Kansas City S. Ry. Co.*, 675 F.3d 887, 892 (5th Cir. 2012) (quotation marks omitted), namely, that Minnis was terminated because of his inadequate job performance, and in particular, his deficient competitive record, which had been exhaustively documented. (Doc. 59-2 at p. 8). Accordingly, the burden shifts back to Minnis to show that LSU's "proffered reasons were a pretext for discrimination." *Turner*, 675 F.3d at 892 (quotation marks and alterations omitted). Beyond his self-serving statement that all of LSU's "reasons for terminating [him] . . . are palpably false" (Doc. 101 at p. 19), Minnis offers no facts of substance to rebut LSU's proffered reason for his termination. Speculation and an employee's personal belief are insufficient to create a fact issue as to pretext. *See Douglass v. United Services Auto. Ass'n*, 79 F.3d 1415, 1430 (5th Cir. 1996) (en banc) ("It is more than well-settled that an employee's subjective belief that he suffered an adverse employment action as a result of discrimination, without more, is not enough to survive a summary judgment motion, in the face of proof showing an adequate nondiscriminatory reason."), *superseded by statute on other grounds as recognized by ACS Recovery Servs., Inc. v. Griffin*, 676 F.3d 512, 521 n.5 (5th Cir. 2012)).

Accordingly, Minnis's Title VII retaliation claim must be dismissed.

### C.     Minnis's Title IX Retaliation Claim

Title IX commands that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a).  "[W]hen a funding recipient retaliates against a person *because* he complains of sex discrimination, this constitutes intentional "discrimination" "on the basis of sex," in violation of Title IX. *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 174 (2005).  Importantly, Title IX does not require that an alleged victim of retaliation be the direct victim of the discrimination about which he complained. *Id.* at 179.  Therefore, a male coach who complains of sex discrimination against a women's athletic team may have a private right of action for Title IX discrimination. *Id.*

To establish a prima facie case of Title IX retaliation, a plaintiff must show that he or she participated in activity protected by Title IX and that the defendant took an adverse action against him or her because of that activity. *Jackson,* 544 U.S. at 184; *Sanches v. Carrollton-Farmers Branch Indep. Sch. Dist.*, 647 F.3d 156, 170 (5th Cir. 2011).  Retaliation claims under Title IX are analyzed using the same burden-shifting framework applicable to Title VII retaliation claims. *See Lowrey v. Tex. A & M Univ. System*, 11 F. Supp. 2d 895, 911 (S.D. Tex. 1998); *Pemberton v. W. Feliciana Parish Sch. Bd.*, No. 09-30, 2012 WL 443860 (M.D. La. Feb. 10,

2012).[16] Accordingly, once a plaintiff makes a prima facie showing of retaliation based on his assertion of a Title IX right, the burden shifts to the defendant to articulate a legitimate, non-retaliatory reason for its action. Thereafter, the burden shifts back to the plaintiff to present evidence that the defendant's stated non-retaliatory reason is merely pretext for an impermissible motive or unlawful behavior. *Id.* (citations omitted).

Here, as discussed previously, Minnis's termination is clearly an adverse employment action. In addition, Minnis states that he engaged in protected activity because he "vehemently objected to LSU's violations of Title 9 [sic]" (Doc. 101 at p. 7), participated in "whistle blowing activities relating to the preferential treatment of male athletes, particularly in the unequal provision of resources and facilities," and "protested discrimination" (Doc. 101 at p. 30). However, Minnis cites no evidence in the record to support such assertions. Indeed, the closest Minnis comes to demonstrating his engagement in protected activity is his assertion that he complained to administrators about the condition of LSU's on-campus tennis facilities, the inconvenience of the off-site facilities available to the women's team, and being paid a salary lower than that of the men's tennis coach.

---

[16] The Fifth Circuit has not directly addressed the legal standard that courts should apply in Title IX retaliation cases. However, other circuits have looked to Title VII as the appropriate analog for the legal standards in Title IX claims. *See, e.g., Preston v. Virginia ex rel. New River Cmty. Coll.,* 31 F.3d 203, 206–07 (4th Cir. 1994) (applying the Title VII burden-shifting scheme to a Title IX retaliation claim); *Murray v. N.Y. Univ. Coll. of Dentistry,* 57 F.3d 243, 248 (2d Cir. 1995) (same) (discrimination and retaliation claims); *Johnson v. Baptist Med. Ctr.,* 97 F.3d 1070, 1072 (8th Cir. 1996) (same) (discrimination claim); *Ray v. Henderson,* 217 F.3d 1234, 1240 (9th Cir. 2000) (same); *Lowrey v. Tex. A & M Univ. System,* 11 F. Supp.2d 895, 911 (S.D. Tex. 1998) (same) (retaliation claim).

(*See* Doc. 59-2 at pp. 32-34; Doc. 101 at p. 31 n.91). However, these complaints do not amount to Title IX complaints.[17]

Even assuming that these complaints are related to gender inequality, and viewing the evidence in the light most favorable to Minnis, LSU has articulated several legitimate, non-retaliatory reasons for terminating Minnis. In turn, Minnis has made no showing of pretext. Accordingly, Minnis's Title IX retaliation claim must also be dismissed.

### D.    Minnis's State Law Claims

Minnis remaining claims for discrimination and retaliation are brought under state law. Louisiana state courts routinely look to federal jurisprudence, including Title VII, to interpret Louisiana's anti-discrimination laws. *See, e.g.*, *Wyerick v. Bayou Steel Corp.*, 887 F.2d 1271, 1274 (5th Cir. 2004); *Smith v. Amedisys, Inc.*, 298 F.3d 434, 448 (5th Cir. 2002); *King v*, 743 So. 2d at 187 (citing *Bustamento v. Tucker,* 607 So.2d 532, 538, n. 6 (La. 1992)). Therefore, the analysis applicable to Plaintiff's Title VII claims also governs Plaintiff's state law claims. For the reasons stated above, Minnis cannot satisfy his burden of proving race discrimination and retaliation. Accordingly, Minnis's state law claims must be dismissed.

---

[17] As discussed previously, both the men's and women's coaches complained about LSU's on-campus facilities. Further, though Minnis complained about the adequacy of the women's off-site facility, he was the one who selected it. (Doc. 59-2 at p. 33). Because the style of play differs considerably between men and women's tennis, Minnis opted to use a different off-site, indoor facility than the men's team. (*Id.*). Indeed, LSU contends, and Minnis does not dispute, that "[n]othing besides Minnis' personal preference prevented the women's team from practicing on the same . . . courts used by the men's team." (*Id.*). Finally, the Court has already addressed Minnis's salary comparison.

IV.  Conclusion

For the foregoing reasons, **IT IS ORDERED** that LSU's **MOTION FOR SUMMARY JUDGMENT (Doc. 59)** is **GRANTED.**  Minnis's claims against LSU are **DISMISSED WITH PREJUDICE**.

**IT IS FURTHER ORDERED** that LSU's request that all costs be taxed against Minnis is **DENIED WITHOUT PREJUDICE.**  Should LSU choose, it shall file a schedule of reasonable costs for which it seeks reimbursement no later than 30 days from the date of entry of judgment in this matter, in accordance with this Court's Local Rules.  *See* M.D. La. L.R. 54.3.  Plaintiffs shall then have an additional 7 days to submit "[s]pecific objections" to any costs claimed by LSU.  *Id.* at L.R. 54.4.

Baton Rouge, Louisiana, this ___21st___ day of October, 2014.

_____
**BRIAN A. JACKSON, CHIEF JUDGE**
**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF LOUISIANA**